ANNEXE IV

## I- PAIEMENT DE LA REDEVANCE

Lorsque la redevance est payée en espèces, chaque SOCIETE fera, au plus tard le 20 de chaque mois, une déclaration des quantités d'HYDROCARBURES enlevées par elle durant le mois calendaire précédent.

Quatre-vingt-cinq pour cent (85%) de la redevance due pour ledit mois précédent de chaque trimestre seront versés lors de la déclaration mensuelle correspondante. Le solde de la redevance due pour chaque trimestre sera calculé et payé en même temps que la déclaration mensuelle faite au cours du deuxième mois suivant la fin du trimestre en question.

## II- PAIEMENT DE L'IMPOT SUR LES SOCIETES

Chaque SOCIETE procédera au versement d'acomptes sur l'impôt sur les sociétés de la manière suivante:

(a)  Au cours du premier trimestre, chaque SOCIETE fera une estimation de l'impôt qui sera dû par elle au titre de l'année en cours.

(b)  Un montant correspondant à 8/120e de cette estimation sera versé au plus tard le 20 de chacun des mois d'avril, mai, juin, juillet, août et septembre.

(c)  Au cours du troisième trimestre, chaque SOCIETE reverra, en fonction du résultat effectif du premier semestre, l'estimation faite par elle de l'impôt annuel.

(d)  Un montant correspondant à 8/120e de la nouvelle estimation sera versé au plus tard le 20 de chacun des mois d'octobre, novembre, décembre, et janvier, février et mars de l'année suivante, le versement du mois d'octobre étant toutefois ajusté de manière à ce que le montant total des acomptes versés le 20 octobre corresponde à 56/120e de la nouvelle estimation.

(e)  Le solde de liquidation de l'impôt sur les sociétés sera payé lors du dépôt de la déclaration, et les excédents éventuels seront traités conformément à l'article 126 bis du Code Général de Impôts.

ANNEXE V

MODELE DE LETTRE DE GARANTIE

GARANTIE

ATTENDU QUE la République Populaire du Congo (ci-après désignée le "CONGO"), et Congolese Superior Oil Company, Cities Service Congo Petroleum Corporation, Canadian Superior Oil Ltd. et la Société Nationale de Recherches et d'Exploitation Pétrolières "HYDRO-CONGO" ont passé une convention en date du 25 mai 1979 pour la recherche et l'exploitation des ressources en hydrocarbures liquides et gazeux en mer au large du Congo (ci-après désignée la "CONVENTION"), et

ATTENDU QUE /nom de la société mère / (ci-après désignée la "SOCIETE MERE") agissant en tant que titulaire, directement ou indirectement, de toutes les actions représentant le capital de /nom de la société affiliée_/ (ci-après désignée la "SOCIETE AFFILIEE") désire assurer au CONGO l'exécution des obligations de la SOCIETE AFFILIEE au titre de la CONVENTION.

EN CONSEQUENCE,

La SOCIETE MERE accepte et s'engage par la présente à fournir ou à faire tenir à la disposition de la SOCIETE AFFILIEE les fonds qui lui seront nécessaires pour satisfaire à ses obligations résultant de la CONVENTION.

Signé à _____, le _____ 1979.

Pour (nom de la SOCIETE MERE)

_____
(Titre)

GAR 00046

ANNEXE V

MODELE DE LETTRE DE GARANTIE

GARANTIE

ATTENDU QUE la République Populaire du Congo (ci-après désignée le "CONGO"), et Congolese Superior Oil Company, Cities Service Congo Petroleum Corporation, Canadian Superior Oil Ltd. et la Société Nationale de Recherches et d'Exploitation Pétrolières "HYDRO-CONGO" ont passé une convention en date du 25 mai 1979 pour la recherche et l'exploitation des ressources en hydrocarbures liquides et gazeux en mer au large du Congo (ci-après désignée la "CONVENTION"), et

ATTENDU QUE /nom de la société mère_/ (ci-après désignée la "SOCIETE MERE") agissant en tant que titulaire, directement ou indirectement, de toutes les actions représentant le capital de /nom de la société affiliée_/ (ci-après désignée la "SOCIETE AFFILIEE") désire assurer au CONGO l'exécution des obligations de la SOCIETE AFFILIEE au titre de la CONVENTION.

EN CONSEQUENCE,

La SOCIETE MERE accepte et s'engage par la présente à fournir ou à faire tenir à la disposition de la SOCIETE AFFILIEE les fonds qui lui seront nécessaires pour satisfaire à ses obligations résultant de la CONVENTION.

Signé à _____, le _____ 1979.

Pour (nom de la SOCIETE MERE)

_____
(Titre)

GAR 00047

<u>**A P E N D I C E**</u>

GAR 00048

2.

# CONGOLESE SUPERIOR OIL COMPANY
### P. O. Box 1521
### HOUSTON, TEXAS 77001

Monsieur le Ministre des
Finances                             Houston, le 17 mai 1979
Ministère des Finances

BRAZZAVILLE


Monsieur le Ministre,

Notre société et les sociétés Cities Service Congo Petroleum
Corporation et Canadian Superior Oil Ltd. signons le 25 mai
1979 avec la République Populaire du Congo, représentée par
le Ministre des Mines et de l'Energie, une Convention rela-
tive à la recherche et à l'exploitation d'hydrocarbures sur
le permis dit MARINE 1. A cette occasion, nous aimerions
recevoir de vous un éclaircissement sur les points suivants :

1.   Les travaux relatifs à la mise en valeur de ce permis
nous amèneront, en qualité d'Opérateur de l'Association,
et peuvent amener dans une moindre mesure nos partenaires
non congolais dans l'Association, à envoyer au Congo un
personnel spécialisé pour des périodes temporaires mais qui
pourront durer quelques années.

(a) Les employés expatriés pourront amener avec eux des
biens meubles, véhicules automobiles personnels, et effets
personnels et de ménage destinés à leur usage personnel
pendant la durée de leur séjour au Congo.  Ces biens
pourront-ils être importés et réexportés en fin de séjour
en franchise de droit ou taxe ?

(b) L'expatriation au Congo pourra entraîner pour ces em-
ployés des frais exceptionnels qui seront la conséquence
directe de leur détachement : maintien d'une double rési-
dence, scolarisation particulière des enfants et, en l'ab-
sence d'une convention particulière fiscale entre la Répu-
blique Populaire du Congo et les Etats-Unis d'Amérique,
double imposition éventuelle à l'impôt sur le revenu des

**GAR 00049**

3.

Monsieur le Ministre des    -2-        le 17 mai 1979
Finances

personnes physiques.  L'envoi de ce personnel au Congo
nous amènera probablement à verser à ce personnel une
indemnité destinée à rembourser les frais de cette na-
ture.  Une telle indemnité sera-t-elle assujettie à l'im-
pôt congolais sur le revenu des personnes physiques, en
sus de l'impôt applicable à la rémunération du personnel,
déduction faite de l'abattement de 30 % de droit commun
pour frais professionnels ?

2.  Au cas où l'Association serait amenée pour des raisons
de force majeure à interrompre l'exploitation pour une du-
rée appréciable, les participants à l'Association pourraient-
ils obtenir le remboursement de trop-versés éventuels au ti-
tre de l'impôt sur les sociétés ?

3.  En ce qui concerne l'ensemble des frais accumulés pen-
dant la période de recherche, nous avons compris que les
règles fiscales du Congo conduiraient à les traiter de la
manière suivante : ceux de ces frais correspondant à la
création d'immobilisations seront amortis, à compter du
premier exercice qui dégagera des revenus imposables, sui-
vant les taux d'amortissement figurant en annexe à la con-
vention susvisée.  Les autres constitueront des frais de
premier établissement, dont l'amortissement pourra à ce
titre être pratiqué, au choix du contribuable, sans limite
de temps.  Nous vous serions reconnaissants de bien vouloir
nous confirmer qu'il en est bien ainsi.

Nous vous prions d'agréer, Monsieur le Ministre, l'expression
de notre considération distinguée.

Diego O. Giordano
Vice-Président

GAR 00050

4.

*République* *Populaire* *du* *Congo*

n° 166/MF

*Ministère des Finances*

*Le Ministre*

**CONFIDENTIEL**

2 5 MAI 1979

Messieurs,

En réponse à votre lettre du 17 mai 1979, nous avons l'honneur de vous indiquer ce qui suit :

1. (a) Le mobilier et les effets personnels et de ménage peuvent être importés et réexportés en franchise, quelle que soit la durée du séjour, tant que leur usage est limité à l'usage personnel des employés expatriés. Les véhicules automobiles personnels ne peuvent être importés en franchise que pour une période de six (6) mois.

1. (b) Les indemnités décrites dans votre lettre ayant le caractère de remboursement de frais réels de nature exceptionnelle, différents par nature des frais que l'abattement de droit commun a pour objet de couvrir, ne seront pas comprises dans le revenu imposable des intéressés, sous réserve bien entendu de la production des justificatifs appropriés.

2. L'interruption d'exploitation dans les circonstances décrites dans votre lettre peut être interprétée comme une cessation d'activité entraînant l'application des dispositions de l'article 126 bis (4) du Code Général des Impôts.

3. Nous vous confirmons que votre description de l'amortissement des frais accumulés pendant la période de recherche est bien exacte. Ce point est d'ailleurs réglé dans des termes identiques par le dernier alinéa de l'Annexe III à la Convention que votre Société et les sociétés Cities Service Congo Petroleum Company et Canadian Superior Oil Ltd. signent ce jour avec la République Populaire du Congo et Hydro-Congo.

Je vous prie d'agréer, Messieurs, l'expression de mes sentiments distingués.

CONGOLESE SUPERIOR OIL COMPANY

26 th Floor

Brazzaville, le 25 mai 1979

- La République Populaire du Congo,

- Congolese Superior Oil Company,

- Cities Service Congo Petroleum Corporation,

- Canadian Superior Oil Ltd., et

- Société Nationale de Recherches et d'Exploitation Pétrolières "Hydro-Congo",

signent ce jour une convention ayant pour objet de définir les conditions dans lesquelles les parties feront des travaux de recherche et éventuellement d'exploitation d'hydrocarbures sur le permis marin dit "Marine 1".

Cette convention est rédigée et signée en français. En cas de difficulté d'interprétation, il sera fait référence à la traduction anglaise ci-jointe, dans un but de clarification.

Pour la République Populaire du Congo:

Rodolphe ADADA,
Ministre des Mines et de l'Energie

Pour Congolese Superior Oil Company

Diego V. Giordano-Echegoyen,
Vice-President

Pour Société Nationale de Recherche et d'Exploitation Pétrolières "HYDRO-CONGO"

Alphonse Mª Ebudó-Nesa,
Directeur Général

Pour Cities Service Congo Petroleum Corporation

Antoine Saadi,
Vice-President

Pour Canadian Superior Oil Ltd.

Robert C. Schrader,
Vice-President,
International Contracts

GAR 00052

Amendment No. 1

to the May 25, 1979

"Marine I" Convention


December 11, 1981


**French version not in our files.**

GAR 00053

**AVENANT N°2 A LA CONVENTION DU 25 MAI 1979**
**PORTANT SUR LE PERMIS MARINE-1**

**ENTRE**

- La République du Congo, ci-après désignée « Le Congo »), représentée par Monsieur **Nguila MOUNGOUNGA NKOMBO**, son Ministre de l'Economie, des Finances et du Plan chargé de la Prospective,

d'une part

**ET**

- La société Nationale de Recherche et d'Exploitation Pétrolières « Hydro-Congo », ci-après désignée « Hydro-Congo », entreprise publique ayant son siège social à Brazzaville République du Congo, représentée par Monsieur **Bernard OKIORINA**, son     Directeur Général Président,

- CMS NOMECO Congo Inc., ci-après désignée « NOMECO », société légalement constituée ayant son siège à Pointe-Noire, République du Congo,  représentée par Monsieur **K. CHARSINSKY**, son Directeur Général,

- Kuwait Foreign Petroleum Exploration Co. k.s.c. société légalement constituée selon les lois du Kuwait, ayant son siège à Kuwait, PO Box 5291, Safat 13053, Kuwait, représentée par Monsieur **Mahmoud A. AL RAHMANI**, son Président Directeur Général, pour le compte de KUFPEC (Congo) Limited, ci-après désignée « KUFPEC »,

- ~~The NUEVO Congo Company, ci-après désignée « NUEVO »~~, société légalement constituée ayant son siège à Houston (TEXAS), représentée par Monsieur **Michael D. WATFORD**, son Président,

    ci-après désignées collectivement « les Sociétés » ou individuellement « la Société »,

Etant précisé que la République du Congo, d'une part, Hydro-Congo, Nomeco, Kufpec et Nuevo d'autre part, sont collectivement désignées ci-après « les Parties », ou individuellement « la Partie ».

d'autre part,

**ETANT PREALABLEMENT EXPOSE CE QUI SUIT:**

Les Sociétés sont les ayant-droits des signataires de la Convention Marine-I en date du 25 mai 1979, ci-après désignée « la Convention », laquelle définit  en son article 7.01 l'assiette de la redevance minière proportionnelle.

Les Parties ayant constaté leurs divergences d'interprétation de l'article 7.01 de la Convention , ont convenu d'en clarifier et harmoniser la rédaction.

**IL A ETE CONVENU CE QUI SUIT:**

<u>Article 1:</u>  **Définitions**

Les définitions contenues dans la Convention s'appliqueront au présent Avenant, sauf si le contexte du présent Avenant indiquait clairement le contraire.

**GAR 00054**

**Article 2**  De l'article 7.01 de la Convention

L'article 7.01 de la Convention se lit comme suit:

« L'assiette de la redevance minière proportionnelle payée en espèce ou en nature est égale pour chaque Société à la valeur des Hydrocarbures enlevés par celle-ci et calculée sur la base du prix déterminé conformément à l'Annexe II à la Convention ou à toute autre méthode sur laquelle les Parties s'accorderaient, diminuée des frais de transport intérieur, traitement, stockage et chargement tels que ces frais apparaissent dans les comptes de ladite Société.

Ne sont pas déductibles de l'assiette de la redevance minière proportionnelle, tous les frais autres que ceux rappelés au paragraphe ci-dessus, notamment les charges d'amortissement et les frais financiers relatifs aux investissements.

La redevance minière proportionnelle n'est pas due sur les quantités d'Hydrocarbures utilisées pour les besoins des travaux pétroliers ou perdues ».

**Article 3**  Autres dispositions

Toutes les autres dispositions de la Convention et ses avenants demeurent en conséquence inchangées et pleinement applicables.

**Article 4**  Prise d'effet

Le présent Avenant prend effet rétroactivement le 1er janvier 1994 et sera approuvé par une loi selon les formes requises.

Fait à Paris, en cinq (5) exemplaires, le 25 janvier 1997

Pour la République du Congo
le Ministre de l'Economie, des Finances
et du Plan, chargé de la Prospective

Pour la Société Nationale de Recherche et
d'Exploitation Pétrolières "Hydro-Congo"
le Directeur Général Président

**Nguila MOUNGOUNGA NKOMBO**

**Bernard OKIORINA**

Pour CMS Nomeco Congo
le Directeur Général

Pour The NUEVO Congo Company
le Président

**K. CHARSINSKY**

**Michael D. WATFORD**

Pour Kuwait Foreign Petroleum Exploration Co. k.s.c.
pour le compte de KUFPEC (Congo) Limited
le Président Directeur Général

**Mahmoud A. AL-RAHMANI**

GAR 00055

# ENGLISH

#3303-A

## CONVENTION

- The People's Republic of Congo
- Congolese Superior Oil Company
- Cities Service Congo Petroleum Corporation
- Canadian Superior Oil Ltd.
- Société Nationale de Recherches et
  d'Exploitation Pétrolières "HYDRO-CONGO"

May 25, 1979



ENGLISH
TRANSLATION

Copied from
ORIGINALS File

GAR 00056

<u>INDEX</u>

1.  Table of contents

2.  Convention

3.  Exhibit I:    Decree granting the "Marine 1" permit.

4.  Exhibit II.

5.  Exhibit III:  Depreciation rates applicable to the
                  COMPANIES.

6.  Exhibit IV:   Payment of the royalty and of the
                  corporate tax.

7.  Exhibit V:    Model of letter of guarantee.

8.  Appendix.

GAR 00057

Page

1. Definitions .................................................. 2
2. Purpose ...................................................... 4
3. Effective Date – Term - Exploitation Permit ........... 4
4. Beneficiaries ................................................ 4
5. Warranties ................................................... 5
6. Taxes ........................................................ 6
   6.03 Computation of the corporate tax on each of the
        COMPANIES ............................................... 7
7. Mining royalty ............................................... 8
8. Foreign exchange ............................................ 9
9. Lump sum payments ........................................... 11
10. Disposition of HYDROCARBONS ................................ 11
11. Employment and training of personnel ...................... 13
12. Congolese suppliers ........................................ 14
13. Provision of information ................................... 15
14. Transport and treatment of products ....................... 15
15. Force majeure .............................................. 16
16. Tax declaration and payment ............................... 17
17. Arbitration ................................................ 17
18. Applicable law ............................................. 18
19. Notices .................................................... 18
20. Amendments ................................................. 19
21. Guarantee by parent company ............................... 20

EXHIBIT I
  Copy of Decree Granting the PERMIT

EXHIBIT II

EXHIBIT III
  Depreciation Rates Applicable to the COMPANIES

EXHIBIT IV
   I – Payment of Royalty
  II – Payment of Corporate Tax

EXHIBIT V
  Model of Letter of Guarantee

(i)

GAR 00058

TRANSLATION

CONVENTION

BETWEEN

     The People's Republic of the Congo (hereinafter referred to as the "CONGO"), represented for the purposes hereof by its Minister of Mining and Energy Mr. Rodolphe Adada,

on the one hand,

AND

     Congolese Superior Oil Company (hereinafter sometimes referred to as "SUPERIOR"), a Nevada (U.S.A.) corporation with registered offices at 26th Floor, First City National Bank Building, Houston, Texas 77001, United States of America, represented by Mr. Diego O. Giordano-Echegoyen, duly authorized for this purpose,

     Cities Service Congo Petroleum Corporation (hereinafter sometimes referred to as "CITIES SERVICE") a Delaware (U.S.A.) corporation with registered offices at 306 South State Street, Dover, Delaware, United States of America, represented by Mr. Antoine Saadi, duly authorized for this purpose,

     Canadian Superior Oil Ltd. (hereinafter sometimes referred to as "CANADIAN"), a corporation incorporated under the laws of Canada, with registered offices at Three Calgary Place, 355 4th Avenue S.W., Calgary, Alberta, Canada, represented by Mr. Robert C. Schrader, duly authorized for this purpose,

     Société Nationale de Recherches et d'Exploitation Pétrolières "HYDRO-CONGO" (hereinafter sometimes referred to as "HYDRO-CONGO"), a société nationale with registered offices at Brazzaville, represented by Mr. Alphonse M'Boudo-Nesa, duly authorized for this purpose,

hereinafter collectively referred to as the "COMPANIES", and individually "one of the COMPANIES" or the "COMPANY",

on the other hand.

GAR 00059

PREAMBLE:

WHEREAS, the CONGO wishes to promote and conduct, under the best conditions of effectiveness, exploration and development of its liquid and/or gaseous hydrocarbon resources so as to enable thereafter exploitation of these resources on the best possible terms; and

WHEREAS, for this purpose, the CONGO wishes to obtain the cooperation of qualified and well-known oil companies in order to have them provide HYDRO-CONGO, within the framework of a joint venture, with assistance necessary for the implementation of certain hydrocarbon exploration and the development and exploitation of petroleum deposits discovered on the type "A" permit known as "Marine 1" granted to HYDRO-CONGO, which is more fully described below, and on the exploitation permits which may be granted in respect of such exploration permit; and

WHEREAS, the COMPANIES shall carry out their exploration and production activities in accordance with the principles of the petroleum policy of the CONGO as incorporated in this Convention.

NOW, THEREFORE, IT HAS BEEN AGREED AS FOLLOWS:

1.  Definitions

For the purpose of this Convention, the terms and expressions set forth below shall have the following meanings:

1.01  Convention:  This Convention between the CONGO and the COMPANIES.

1.02  Joint Venture:  The joint venture organized by the joint operating agreement for the petroleum works as this term is hereinafter defined in sub-paragraph 1.10 below.

1.03  Joint Operating Agreement:  The joint operating agreement for the exploration and exploitation of hydrocarbons entered into among the COMPANIES for the exploration and possible exploitation of hydrocarbon deposits on the permit as this term is hereinafter defined in sub-paragraph 1.04 below.

1.04  Permit:  The type "A" exploration permit known as "Marine 1", referred to in the preamble to the CONVENTION, granted to HYDRO-CONGO for the benefit of the JOINT VENTURE by the Decree, a copy of which is attached as Exhibit I to the CONVENTION, and all its extensions, amendments, variations or renewals, if any, as well as any exploitation permit which may be granted over any part of its surface.

1.05  Operator:  The COMPANY which is entrusted, on behalf of the members of the JOINT VENTURE, with the petroleum works -- as this term is hereinafter defined in sub-paragraph 1.10 below -- on the PERMIT, in accordance with the provisions of the JOINT OPERATING AGREEMENT.

GAR 00060

1.06  Hydrocarbons:  Solid, liquid and/or gaseous hydrocarbons discovered and/or produced on the PERMIT.

1.07  Natural Gas:  Gaseous HYDROCARBONS produced by the COMPANIES on the PERMIT, but excluding condensate which by normal field methods of processing is separated and recovered as a liquid.

1.08  Liquid Hydrocarbons:  HYDROCARBONS produced by the COMPANIES on the PERMIT, but excluding NATURAL GAS.

1.09  Affiliated Company:

1.09.1    Any company in which more than 50% of the voting rights in ordinary shareholders' meetings are held directly or indirectly by one of the COMPANIES;

1.09.2    Any company which holds, directly or indirectly, more than 50% of the voting rights in the ordinary shareholders' meetings of one of the COMPANIES;

1.09.3    Any company whose voting rights in ordinary shareholders' meetings are subject to more than 50% control by a company which itself holds, directly or indirectly, more than 50% of the voting rights in the ordinary shareholders' meetings of one of the COMPANIES;

1.09.4    Any company in which more than 50% of the voting rights in ordinary shareholders' meetings are held directly or indirectly by several COMPANIES or by several companies as described in sub-paragraph 1.09.1 to 1.09.3 above.

1.10  Petroleum Works:  All the activities, wherever carried out, relating to exploration, development, exploitation, transportation, storage and disposition of HYDROCARBONS in the CONGO or for export.

1.11  Exploration Work:  That part of the PETROLEUM WORKS which is undertaken with the goal of discovering HYDROCARBON deposits, including the discovery well and appraisal works, undertaken until the day on which the Operating Committee provided for in the JOINT OPERATING AGREEMENT decides, pursuant to Article 5 of the JOINT OPERATING AGREEMENT, that a discovered deposit is commercially exploitable.

1.12  Development and Exploitation Works:  All PETROLEUM WORKS other than EXPLORATION WORKS, including transportation of HYDROCARBONS to the point of lifting by the COMPANIES.

1.13  Foreign Companies:  The COMPANIES, except HYDRO-CONGO.

1.14  CFA Franc:  Currency defined in Title II of the "Convention de coopération monétaire" between the member States of the Banque des Etats de l'Afrique Centrale (B.E.A.C.) and the French Republic, as signed in Brazzaville on November 23, 1972.

GAR 00061

2.  Purpose

2.01  The purpose of the CONVENTION and of the Exhibits hereto is to define the conditions of the participation of the COMPANIES in the PETROLEUM WORKS on the PERMIT within the framework of the JOINT VENTURE.

3.  Effective Date – Term – Exploitation Permit

3.01  The CONVENTION shall be approved by an act having the force of law and shall come into force upon the publication of such act in the Official Journal of the CONGO.

3.02  The CONVENTION is entered into for the term of the PERMIT.

3.03  Each exploitation PERMIT shall have a duration of thirty (30) years.

4.  Beneficiaries

4.01  The provisions of the CONVENTION shall apply as a matter of law to the COMPANIES and to any assignee of the rights of each COMPANY on the PERMIT, as well as to any company to which the COMPANIES or one of the COMPANIES shall have decided to associate by assigning to such company all or part of their rights and obligations on the PERMIT. However, any assignment must be submitted to the Minister in charge for approval prior to its coming into force.

If the decision of the Minister in charge is not rendered within one (1) month from the notification of the assignment, which approval to the assignment must be sought, such approval shall be deemed not to have been granted.

4.01.1   If the proposed assignee is a company wholly-controlled by the assignor or by the parent company of its group, the authorization of the Minister in charge shall be automatically granted and, in this case, notwithstanding the provisions of paragraph 4.01 above, the authorization shall be deemed granted one (1) month after the request is made.  If the proposed assignee is an AFFILIATED COMPANY, the authorization of the Minister in charge shall not be withheld unreasonably or in a discretionary manner.

4.01.2   Any subsequent action which would result in modifying the qualification of the assignee as a company wholly-controlled by the assignor or as an AFFILIATED COMPANY shall be considered as a new assignment and shall be subject, under the same conditions, to the prior authorization of the Minister in charge.



**GAR 00062**

4.01.3    In accordance with the petroleum policy of the CONGO, HYDRO-CONGO shall not assign its participating interest in the JOINT VENTURE unless the assignee is wholly-controlled by the CONGO.

5. Warranties

5.01    Subject to the provisions of sub-paragraph 5.01.3 below, the CONGO warrants to the COMPANIES for the term of the CONVENTION, stable legal, financial, mining and economic conditions within which the COMPANIES will perform their activities in the CONGO, as such conditions arise from the laws and regulations in effect on the date of execution of the CONVENTION, and from the terms and conditions of the CONVENTION.

5.01.1    Therefore, the COMPANIES shall not be subject in any area whatsoever to any measure that would represent an aggravation of the situation described in paragraph 5.01 above.

5.01.2    In particular, any measure which would have the effect of either reducing net profits from the activities performed within the framework of the CONVENTION by decreasing gross income or by increasing the operating expenses of the COMPANIES, or generally jeopardizing the execution or the conduct of the PETROLEUM WORKS by restricting the COMPANIES' rights, shall be deemed to constitute an aggravation of the situation for the purpose of sub-paragraph 5.01.1 above.

5.01.3    Nonetheless, changes in labor, safety and environmental protection legislation and income taxation of individuals shall be applicable as a matter of law to the COMPANIES and to their staff, except if such legislation includes restrictions on the COMPANIES' rights concerning the ownership of their property or the free disposal of HYDROCARBONS to which they are entitled under Article 10 of the CONVENTION.

5.01.4    In addition, the COMPANIES shall not be subject to any discriminatory measures, in law or in fact, particularly with respect to the regulation of property or individuals.

5.02    The CONGO warrants to the COMPANIES for the term of the CONVENTION that, with respect to the corporate tax referred to in Article 6 of the CONVENTION, the tax conditions of the performance of their activities in the CONGO pursuant to the CONVENTION shall be governed by the Code Général des Impôts du CONGO, by amendments and regulations thereto and by the CONVENTION. Therefore, the COMPANIES shall not be subject, with respect to their activities in the CONGO under the CONVENTION, to any discriminatory tax measure in relation to the standard provisions applicable to Congolese or foreign companies, except those resulting from the CONVENTION.

GAR 00063

5.03  The CONGO warrants to the COMPANIES for the term of the CONVENTION that, pursuant to the Code Général des Impôts du CONGO, the mining royalty paid to the CONGO on the quantities of HYDROCARBONS to which the COMPANIES are entitled pursuant to the JOINT OPERATING AGREEMENT shall be fourteen and one half percent (14 1/2%) for LIQUID HYDROCARBONS and nine percent (9%) for NATURAL GAS.

6.  Taxes

6.01  For PETROLEUM WORKS, each of the COMPANIES shall be subject only to the mining royalty referred to in paragraph 5.03 and in Article 7 of the CONVENTION and to the corporate tax referred to in Articles 106 to 126 of the Code Général des Impôts du CONGO, to the exclusion of any other levy.

6.02  Consequently, each of the COMPANIES shall be exempt, for the PETROLEUM WORKS and for the term of the CONVENTION, from all other taxes and imposts.  This exemption includes among others:

6.02.1    The exemption from any customs duty and any importation tax or deposit for all pieces of equipment, material and supplies and spare parts destined for the PETROLEUM WORKS, whether imported directly by the COMPANY or indirectly by the OPERATOR in the name of the COMPANY or through suppliers or subcontractors.

6.02.2    The exemption from any export duties or taxes applicable to equipment and spare parts for such equipment when such equipment and spare parts have been imported tax-free in accordance with sub-paragraph 6.02.1 above as well as to HYDROCARBONS produced on the PERMIT and belonging to the COMPANY in accordance with Article 10 below.

6.02.3    The exemption from the internal turnover tax, the taxe unique, the tax on transactions and all other indirect taxes relating to the furnishing of goods (material, equipment, spare parts, etc.), services and work of any kind relating to the PETROLEUM WORKS provided for in the CONVENTION, whether such goods, services or work are furnished by the COMPANY, by the OPERATOR, or by contractors, or by suppliers and entities providing such services, working directly or indirectly for the COMPANY.

6.02.4    The exemption from any registration tax (droit d'enregistrement) relating to any deed or instrument of any nature whatsoever to which the COMPANY, or OPERATOR on behalf of the COMPANY, may be a party within the scope of the PETROLEUM WORKS on the PERMIT; relating to any conveyance of ownership or transfer of use to the COMPANY of movables or immovables for the carrying out of the PETROLEUM WORKS; or relating to the insurance contracts to which the COMPANY or OPERATOR on its behalf may be a party, and concerning the PETROLEUM WORKS.

GAR 00064

6.02.5    The exemption from any tax or impost relating to the payment of interest or dividend by the COMPANY.

6.03    Computation of the corporate tax on each of the COMPANIES

6.03.1    Except for the rules stipulated in this paragraph 6.03, the rules governing the basis and collection of the corporate tax are those fixed by the Code Général des Impôts du CONGO.

6.03.2    Each of the COMPANIES shall be subject to the corporate tax, in accordance with the provisions of the Code Général des Impôts du CONGO, and if the corporate tax rate prescribed in the Code Général des Impôts du CCNGO is less than fifty-five percent (55%), to an additional tax equal to the taxable income multiplied by the excess between fifty-five percent (55%) over said corporate tax rate.

6.03.3    The basis for computation of the corporate tax for each of the COMPANIES for its activities performed within the framework of the CONVENTION shall be computed on the basis of the prices set forth in Exhibit II to the CONVENTION. Depreciation shall be computed by each of the COMPANIES in accordance with rules set forth by the Code Général des Impôts du CONGO; nonetheless, each of the COMPANIES shall apply, item by item, the rates set forth in the table attached hereto as Exhibit III.

6.03.4    In order to permit the computation of the corporate tax owed by each of the COMPANIES for its activities performed within the framework of the CONVENTION, each COMPANY shall, from the effective date and for the term of the CONVENTION, maintain accounting books in accordance with the rules set forth by the Code Général des Impôts du CONGO.

6.03.5    The provisions of Article 109 of the Code Général des Impôts du CONGO shall not apply to the COMPANIES.

6.03.6    By exception to Article 116 of the Code Général des Impôts du CONGO, the COMPANIES shall not be authorized to deduct from their taxable income for the purpose of the corporate tax interest or agios paid on loans which may be made for the financing of the PETROLEUM WORKS from AFFILIATED COMPANIES. From the date on which the Operating Committee provided for in the JOINT OPERATING AGREEMENT shall have determined, in accordance with the JOINT OPERATING AGREEMENT, that a commercially exploitable discovery has been made, each COMPANY shall be permitted to deduct from its taxable income interest or agios paid on loans made for the financing of DEVELOPMENT AND EXPLOITATION WORKS by financial institutions independent from the COMPANIES, upon presentation by the borrowing COMPANY to the tax authorities of certificates issued by such financial institutions.

8.

6.03.7    The mining royalty referred to in Article 7 below is deductible from taxable income and can in no case be treated as an advance payment toward the corporate tax.

6.03.8    The ten per cent (10%) limit set by the second paragraph of Article 20.I.6° of the Code Général des Impôts du Congo, as amended by Article 5 of Law No. 30/74, shall not be applicable to the COMPANIES.

6.04  Remunerations and wages paid to the COMPANIES' personnel based in the CONGO for the performance of the PETROLEUM WORKS shall be subject to taxes on income in accordance with the provisions of the Code Général des Impôts du CONGO.

6.05  The corporate tax is paid by provisional monthly installments in accordance with the procedure set forth in Exhibit IV to the CONVENTION.

7.  Mining royalty

7.01  The basis of computation of the mining royalty paid in cash or in kind is equal, for each COMPANY, to the value of the HYDROCARBONS lifted by such COMPANY, computed on the basis of the price determined in accordance with Exhibit II to the CONVENTION, less domestic transportation, processing, storage and loading charges as said charges appear from the COMPANY's accounts and constitute tax deductible expenses.  The royalty is not due on those quantities of HYDROCARBONS lost or used for the PETROLEUM WORKS.

7.02  The mining royalty provided for in this Article 7 is payable in cash or in kind, at the option of the CONGO.

7.03  The OPERATOR shall communicate to the competent authority of the CONGO the expected date for the first exportation of HYDROCARBONS at least six (6) months in advance, so that this authority can advise the COMPANY or the OPERATOR within five (5) months following receipt of such notification, of the manner of payment of the mining royalty chosen by the Government.  The Government shall always be able to modify the manner of payment so elected by notifying the COMPANY, or the OPERATOR acting on its behalf, at least three (3) months in advance.  However, the Government shall be deemed to have initially opted for cash payment of the mining royalty.

If, at any time while the Government is taking the mining royalty in cash, the COMPANIES have the opportunity to enter into sales commitments extending beyond a three (3) month period, which commitment could not be satisfied if the Government should decide to take the mining royalty in kind, the COMPANIES may submit the draft of the sales contract to the Minister in charge, who will, at his discretion, approve it or not.  If the draft contract is so approved, the mining royalty shall continue to be taken in cash for the duration of said contract.

GAR 00066

9.

7.04  The quantity of HYDROCARBONS to which the mining royalty applies shall be measured at the point of delivery, as described in sub-paragraph 10.02.1.  The methods for measurements to be used shall be approved by the competent authority of the CONGO which shall be advised of the progress of such operations so as to be able to be represented thereat and to exercise any control it may deem necessary.

Within one month from the end of the period for which the mining royalty is due, each COMPANY, or the OPERATOR on behalf of the COMPANY, shall provide the competent authority of the CONGO with a statement of the quantities of HYDROCARBONS to which the mining royalty applies, including any appropriate supporting documents.

7.05  The mining royalty, whether in cash or in kind, shall be computed and paid on a quarterly basis, in accordance with the conditions set forth below:

7.05.1    The payment in kind of the mining royalty shall be made to HYDRO-CONGO for the account of the CONGO pursuant to the terms set forth in paragraph 4.11 and in Articles 9 and 10 of the JOINT OPERATING AGREEMENT for the allocation to HYDRO-CONGO of the portion of production to which it is entitled.  The quantities of HYDROCARBONS to which the CONGO is entitled pursuant to this Article 7 shall be delivered to HYDRO-CONGO during the month following that for which the mining royalty is due.

7.05.2    The payment in cash of the mining royalty shall be made during the month following the end of the calendar quarter for which the mining royalty in cash is due.

7.06  When the mining royalty is elected to be paid in cash, monthly declarations and provisional payments shall be made in accordance with the terms set forth in Exhibit IV to the CONVENTION.

7.07  By virtue of the special characteristics of NATURAL GAS the parties hereto shall consult, in the event NATURAL GAS is discovered, to settle upon the terms for payment in kind of the mining royalty on NATURAL GAS pursuant to the principles set forth in this Article 7.

8.  Foreign exchange

8.01  The CONGO warrants, for the term of the CONVENTION, to the COMPANIES, to all individuals duly employed by them and to all individuals or entities entrusted by them with implementing or financing the PETROLEUM WORKS or with marketing the HYDROCARBONS that:

GAR 00067

10.

8.01.1    The CONGO shall not require the COMPANIES to repatriate the funds arising from export sales of the HYDROCARBONS.

8.01.2    The COMPANIES may pay contractors, suppliers and lenders abroad in foreign currency, using funds maintained abroad by them, in execution of contracts entered into for the performance of the PETROLEUM WORKS.

8.01.3    The COMPANIES may borrow abroad all amounts which they may require to carry out the PETROLEUM WORKS.

8.01.4    The COMPANIES may transfer to suppliers residing outside of the franc zone all amounts owing thereto.

8.01.5    The COMPANIES may freely repatriate from the CONGO to member countries of the franc zone capital originating from these countries invested in the CONGO within the scope of the PETROLEUM WORKS, and may transfer, under the same conditions, the return on such capital, if any.

8.01.6    The COMPANIES may repatriate from the CONGO to countries outside of the franc zone any capital originating from these countries invested in the CONGO within the scope of the PETROLEUM WORKS, and may transfer, under the same conditions, the return on such capital, if any.  The CONGO warrants to the COMPANIES that they shall obtain the means of payment to countries outside of the franc zone necessary to carry out the operations contemplated by the CONVENTION.

8.01.7    The COMPANIES may freely export from the CONGO to member countries of the franc zone all amounts which they may owe to suppliers, shippers and other entities providing services, as well as to their shareholders residing in the franc zone, and in general, all amounts which the COMPANIES may owe in any respect whatsoever during the term of the CONVENTION.

8.01.8    Staff members who are nationals of member countries of the franc zone duly employed by the COMPANIES may freely export from the CONGO to countries of the franc zone any portion of their salaries they have saved.

8.01.9    The COMPANIES may export from the CONGO to countries outside of the franc zone all amounts which they may owe to suppliers, shippers and other entities offering services, as well as to their shareholders residing in these countries.

8.01.10   Staff members who are nationals of the countries outside of the franc zone duly employed by the COMPANIES may export from the CONGO to such countries any portion of their salaries they have saved.

GAR 00068

11.

8.02  All currency transfers to or from the franc zone made pursuant to sub-paragraphs 8.01.4, 8.01.6, 8.01.9 and 8.01.10 above shall be carried out under the supervision of the <u>Bureau des Relations Financières avec l'Etranger /Bureau of Financial Relations with Foreign Countries /</u> ("B.R.F.E.") in accordance with the rules in effect in the CONGO pertaining to the franc zone.

8.03  All transactions contemplated by sub-paragraphs 8.01.4, 8.01.6, 8.01.9 and 8.01.10 above shall not be made more onerous for the COMPANIES, through the imposition of different rates or special taxes or commissions, than for other purchasers and sellers of currency in commercial transactions.

9.  <u>Lump sum payments</u>

9.01  The COMPANY appointed as OPERATOR by the JOINT OPERATING AGREEMENT shall make the following lump sum payments to the CONGO on behalf of the FOREIGN COMPANIES:

9.01.1    Two hundred and fifty million (250,000,000) CFA FRANCS when the daily production of LIQUID HYDROCARBONS on the PERMIT shall have reached thirty thousand (30,000) barrels per day and thereafter averaged thirty thousand (30,000) barrels per day for a period of one hundred and twenty (120) consecutive days;  and

9.01.2    <u>Six hundred and twenty five million</u> (625,000,000) CFA FRANCS when the daily production of LIQUID HYDROCARBONS on the PERMIT shall have reached seventy five thousand (75,000) barrels per day and thereafter averaged seventy five thousand (75,000) barrels per day for a period of one hundred and twenty (120) consecutive days.

9.01.3    The lump sum amounts set forth in sub-paragraphs 9.01.1 and 9.01.2 above shall become due thirty (30) days following the expiration of each one of the one hundred and twenty (120) day periods referred to in said sub-paragraphs.

9.02  The amounts set forth in sub-paragraphs 9.01.1 and 9.01.2 above may be capitalized and depreciated for tax purposes by the FOREIGN COMPANIES.

10.  <u>Disposition of HYDROCARBONS</u>

10.01  Each COMPANY shall have the right to take freely the portion of the HYDROCARBONS to which it is entitled pursuant to the JOINT OPERATING AGREEMENT.  It may freely sell, transfer, transport, consume or export, directly or indirectly, such portion.

10.02  Nonetheless, and by derogation to the principle set forth in paragraph 10.01 above, each COMPANY shall, at the request of the CONGO, affect by priority to the satisfaction of the needs of the Congolese industry, under the conditions

**GAR 00069**

defined hereinafter, the HYDROCARBONS derived from its exploitation, provided that: (a) HYDRO-CONGO's share of production shall have been first used to satisfy the needs of the Congolese industry; and (b) the maximum of the share of production of each FOREIGN COMPANY so affected to satisfy the needs of the Congolese industry shall not exceed thirty percent (30%) of all HYDROCARBONS to which each FOREIGN COMPANY is entitled.

10.02.1    Delivery of the quantities of HYDROCARBONS to which the CONGO is entitled, including the LIQUID HYDROCARBONS destined for the Pointe-Noire refinery, shall be made either at well head or at the gathering point, should the parties to the JOINT OPERATING AGREEMENT decide to build one in accordance with the provisions of said JOINT OPERATING AGREEMENT.  In the event deliveries of LIQUID HYDROCARBONS to the CONGO pursuant to this paragraph exceed the CONGO's mining royalty share as provided in paragraph 5.03 above, the sales price of such excess shall be the weighted average of the prices actually realized by the COMPANIES in sales to non-affiliated purchasers concluded during the calendar month preceding the month during which such LIQUID HYDROCARBON sale to the CONGO took place.

10.02.2    The commitment of each COMPANY to sell a part of its production of HYDROCARBONS from the PERMIT as described in paragraph 10.02 above and at the price defined in sub-paragraph 10.02.1 above is limited for each calendar year to the share of the needs of the Congolese industry for the HYDROCARBONS of the quality required by the Congolese industry equal to the ratio of the portion of the production of HYDROCARBONS of this quality to which the COMPANY is entitled pursuant to the JOINT OPERATING AGREEMENT and the total production of HYDROCARBONS of such quality from the territory of the CONGO for the same calendar year.  The CONGO shall notify the COMPANY, before the commencement of each calendar year, of the tonnage required by it for such calendar year pursuant to the commitment set forth hereinabove.

10.02.3    The CONGO may choose the quality which is the most appropriate to its needs among those qualities available, and to the extent to which the OPERATOR determines that it is possible within the framework of the operations contemplated by the CONVENTION, the OPERATOR shall endeavor to furnish to the CONGO the various qualities which the CONGO may request.

10.02.4    The quantities of HYDROCARBONS sold pursuant to the provisions of this Article 10 shall be paid for by the CONGO within fifteen (15) days from the end of the calendar month in which delivery is effected, upon presentation of the pertinent invoice by each COMPANY.

10.03  In the event NATURAL GAS is discovered, the parties hereto shall meet as soon as possible to work out the changes, if any, which may have to be made to this Article 10 to apply the principles of the CONVENTION to the exploitation of such deposits.

GAR 00070

13.

10.03.1   The exploitation, if any, of NATURAL GAS deposits shall be carried out pursuant to the principles which govern the relationship between the members of the JOINT VENTURE.

10.03.2   If the use of NATURAL GAS discovered on the PERMIT is not judged profitable by the members of the JOINT VENTURE pursuant to the provisions of the JOINT OPERATING AGREEMENT, the CONGO shall have the right, directly or through HYDRO-CONGO, to use this NATURAL GAS at its own expense.

In the event the CONGO exercises its right to use NATURAL GAS for its own benefit as contemplated hereinabove, HYDRO-CONGO shall provide at its own expense facilities necessary for the development, exploitation, transportation and processing, including but not limited to, separation, compression or liquefaction, of the NATURAL GAS from the first separator after the point of production, and of sufficient capacity to handle NATURAL GAS.  The COMPANIES agree to provide, on terms and conditions to be agreed at that time, such technical assistance and cooperation as may be required by HYDRO-CONGO for the development and exploitation of NATURAL GAS deposits, and for the laying out, construction, operation and maintenance of these facilities.  In no event shall the aforesaid activities interfere with the PETROLEUM WORKS of the JOINT VENTURE.

10.03.3   All NATURAL GAS produced on the PERMIT and not used directly for the PETROLEUM WORKS or pursuant to sub-paragraph 10.03.2 hereinabove, may be burnt off.

11.  Employment and training of personnel

11.01  In accordance with sub-paragraph 5.01.3 hereinabove, each of the COMPANIES shall be subject to the labor legislation and regulations embodied in the laws relating in particular to general working conditions, the regulation of pay and the prevention of work accidents and work-related illnesses and indemnification therefor, as well as to the laws relating to professional associations and labor organizations.  On its part, the CONGO shall not apply to any COMPANY or its personnel any labor and welfare regulation in a manner which may be considered discriminatory in relation to the laws regulating other companies exercising their activity in the CONGO.

11.02  Each one of the COMPANIES agrees to undertake, jointly with other members of the JOINT VENTURE and in proportion to the percentage of its participation in the JOINT VENTURE, for the training, technically and administratively, of the Congolese supervisory employees, foremen and personnel required for the exploitation activities, by organizing apprenticeship programs in the CONGO or abroad, by payment of scholarships for study abroad and by the establishment of professional training centers in the CONGO, in a way commensurate with the magnitude of such activities.

GAR 00071



11.02.1    The professional training programs and the budgets therefor shall be approved by the Operating Committee referred to in the JOINT OPERATING AGREEMENT after consultation with the Congolese Government.

11.02.2    Each of the COMPANIES shall jointly with the other members of the JOINT VENTURE, give priority in employment in its facilities and installations to equally qualified Congolese personnel. Each COMPANY shall assure the professional and technical training of said Congolese personnel so as to facilitate their access, at all levels, to jobs commensurate with their abilities.

11.02.3    On the production work sites situated outside or near cities and towns, the COMPANIES shall provide jointly lodging for the workers in normal conditions of hygiene and cleaniless, and shall create, if necessary, the medical, scholastic, athletic and cultural infrastructure corresponding to the normal needs of the workers and their families.

11.02.4    The means provided jointly by the COMPANIES for the application of the provisions of this Article 11 purport to permit the gradual replacement of foreign personnel of the COMPANIES assigned to the PETROLEUM WORKS by Congolese personnel. Therefore, the COMPANIES shall use their best efforts so that, at the expiration of the tenth year from the beginning of the DEVELOPMENT AND EXPLOITATION WORKS, the personnel used by the OPERATOR for the PETROLEUM WORKS in the CONGO include one hundred per cent (100%) of laborers and clerks, eighty percent (80%) of foremen and technicians, and fifty percent (50%) of management and supervisory employees, of Congolese citizenship.

11.02.5    The personnel of Congolese citizenship used by the OPERATOR for PETROLEUM WORKS in the CONGO shall be recruited by the OPERATOR and hired, at his request, by HYDRO-CONGO which will assign such personnel to the OPERATOR for purposes of being trained by the OPERATOR and, at the end of the professional training period, of employment in the PETROLEUM WORKS. From the end of such professional training period, those members of such personnel whom the OPERATOR will have decided to retain for the PETROLEUM WORKS shall be the OPERATOR's employees for the entire duration of their assignment to the OPERATOR.

12.  Congolese suppliers

12.01  In carrying out the PETROLEUM WORKS, the COMPANIES or the OPERATOR on their behalf shall give priority to Congolese companies in the acquisition of goods and services where such companies offer quality, quantity, terms of sale, conditions of delivery and related services equal to those available for the acquisition of goods and services abroad.

GAR 00072

12.02  Notwithstanding the foregoing, and subject to conditions of general applicability which the CONGO may impose, the COMPANIES, or the OPERATOR on their behalf, may freely choose the charterers and ships of any registry for their use for whatever purpose.  To the extent available, the COMPANIES shall use the Congolese merchant fleet during the term of the CONVENTION if the rates and other conditions offered by such fleet are no less favorable than those offered on the international market.

13.  Supply of information

13.01  The COMPANIES shall supply the CONGO with all information in their possession required to be communicated by the Mining Code.  On its part, the CONGO may communicate to the COMPANIES information, particulary of a technical nature, which may be useful in the PETROLEUM WORKS.  The COMPANIES agree not to divulge this information and these documents to third parties, except as required for the PETROLEUM WORKS, provided that, in this case, a commitment be obtained from the recipient to treat such information and documents as confidential.

13.02  In addition to the information the COMPANIES are required to communicate pursuant to the Mining Code, they shall, without charge, place at the disposition of the CONGO all geological information which may be useful in the exploration for and exploitation of mineral substances within the PERMIT other than HYDROCARBONS.  The COMPANY which acts as OPERATOR must notify to the competent Congolese authorities all discoveries made on the PERMIT of mineral substances other than HYDROCARBONS; the COMPANIES shall consult to evaluate the possibility, in view of technical and economic factors, of participating jointly in the exploitation of said mineral substances.  The COMPANIES agree not to divulge this information to third parties.  The CONGO may freely use any information received under this paragraph if the COMPANIES express their lack of interest or fail to submit within four (4) months from the receipt of the information a proposal acceptable to the CONGO for a specific exploration or exploitation permit covering said mineral substance or substances.

13.03  At the request of the Minister in charge, the COMPANIES will consider all available information concerning possibilities for the exploration for mineral substances in any part of the Congolese territory indicated to them by said authority and shall consult to evaluate the possibility, in view of technical and ecomomic factors, of participating jointly in the exploration for the said mineral substances.

14.  Transport and treatment of products

14.01  The Minister in charge may request the COMPANIES to participate with other producers in the CONGO in the joint

GAR 00073

16.

installation or use of facilities or pipelines to pump out all or part of the production of HYDROCARBONS, on the condition that (i) the installation of such facilities or pipelines is technically feasible under normal economic conditions, and (ii) that their use does not jeopardize directly or indirectly the economic profitablilty of the deposits discovered.

14.01.1   After consultation with the competent Congolese authority, transport rates for pumping out the production shall be established by the companies exploiting the deposits.

14.02  In the event that production permits and a market for finished products is assured, the CONGO may ask the COMPANIES to consult and evaluate, in view of economic conditions and forecasts of profitability, the possibility of constructing a HYDROCARBON refinery in the CONGO jointly with the CONGO and/or other partners approved by the CONGO.

15.  Force majeure

15.01  In the event that the CONGO or one or several of the COMPANIES finds it impossible, either partially or totally, to perform one or more of their obligations contemplated by the CONVENTION, or arising therefrom, by reason of force majeure, an unforeseeable circumstance (cas fortuit) or an occurrence which may be considered as similar to force majeure (hereinafter collectively referred to as "FORCE MAJEURE"), the party invoking FORCE MAJEURE shall inform the other parties as soon as possible.

15.02  Said notification shall be addressed in writing either by telex confirmed by letter or by registered letter, return receipt requested, and shall set forth those circumstances which establish FORCE MAJEURE.

15.03  All occurrences independent of the will or control of one or the other party, which the parties cannot reasonably overcome or avoid and whose consequence is to prevent partially or totally or to delay significantly the performance of the obligations of the parties, shall be considered as events of FORCE MAJEURE.  For the purpose of the CONVENTION, FORCE MAJEURE shall include but not be limited to: war, serious civil disturbances, insurrection, national strikes and any strikes of a general nature, earthquake, fire, explosion, other catastrophes and all hindrances which result directly or indirectly from orders or prohibitions of a government authority.

15.04  FORCE MAJEURE shall nonetheless not be validly invoked if the events, acts or occurrences in question were reasonably foreseeable or could have been remedied by the exercise of reasonable diligence.  FORCE MAJEURE will exist if necessary equipment cannot be found, or can be found only at a prohibitive price.  Lack of funds shall not constitute FORCE MAJEURE.

GAR 00074

15.05  Time periods for the performance of the obligations of each COMPANY affected by the event of FORCE MAJEURE shall be extended automatically for a term equal to the delay caused by said FORCE MAJEURE;  it being understood (i) that all such extensions shall not give rise to any penalty to the party responsible for performing these obligations, and (ii) that obligations other than those affected by FORCE MAJEURE shall continue to be fulfilled in accordance with the provisions of the CONVENTION.

15.06  In all cases, the party affected shall take, in agreement with the other parties, all appropriate measures to assure the normal resumption of the performance of the obligations affected by FORCE MAJEURE.  If, following FORCE MAJEURE, one of the parties is not able to perform its obligations as contemplated by the CONVENTION for a period of three (3) months following the notification contemplated hereinabove, the parties shall meet as soon as possible to examine the consequences of the occurrences in question and in particular the consequences on the time periods for performance of their respective obligations.  Should the parties not reach an agreement on said consequences, they shall submit their dispute to arbitration in accordance with the provisions of Article 17 below.

16. <u>Tax declaration and payment</u>

Each COMPANY shall be responsible for its declaration to the CONGO's tax authorities and for the payment of its taxes arising from its participation in the activities of the JOINT VENTURE in the CONGO on the basis of its net income from all of its activities covered by the CONVENTION.

17. <u>Arbitration</u>

17.01  All disputes arising in connection with the CONVENTION between the CONGO on the one hand and any COMPANY on the other hand which cannot be resolved otherwise amicably shall be finally settled by arbitration in accordance with the rules then in effect of the International Center for the Settlement of Investment Disputes (the "Center") created by the Convention on the Settlement of Investment Disputes between States and Nationals of other States to which the CONGO became a party on October 14, 1966.

17.02  Each party to a dispute shall be entitled to appoint one arbitrator and the arbitrators so appointed shall agree on another arbitrator, if necessary, to achieve an odd number of arbitrators.  In the event that agreement upon another arbitrator cannot be reached, such arbitrator shall be appointed by the President of the Center.

17.03  Arbitration shall take place in Geneva, Switzerland.  The award which will be rendered in English and French with both texts having equal validity shall be final and

**GAR 00075**

binding upon the parties to the arbitration. Judgment upon the award rendered may be entered in any court or other authority having jurisdiction, or application may be made to said court or other authority for a judicial acceptance of the award and an order of enforcement, as the case may be.

17.04  The Center's fees for arbitrating a dispute shall be borne equally by the disputants.

17.05  Any dispute which may arise among the COMPANIES shall be settled in accordance with the arbitration clause of the JOINT OPERATING AGREEMENT.

## 18. Applicable law

The CONVENTION shall be governed by Congolese law.

## 19. Notices

19.01  All notices shall be validly given by mail, cable or telex, addressed to the other party or parties at the address indicated below:

(a)        for the CONGO:

Minister of Mines and Energy
Ministry of Mines and Energy
Brazzaville
People's Republic of the Congo

attention:
The Minister

(b)        for SUPERIOR:

Congolese Superior Oil Company
P.O. Box 1521
Houston, Texas 77001
United States of America

Telex:  0775369

attention:
Vice-President Exploration

(c)        for CITIES SERVICE:

Cities Service Congo Petroleum Corporation
P.O. Box 642
Houston, Texas 77001
United States of America

GAR 00076

19.

```
                    Telex:  762056

                    attention:
                    Vice-President Operations

        (d)         for CANADIAN:

                    Canadian Superior Oil Ltd.
                    Three Calgary Place
                    355 4th Avenue S.W.
                    Calgary, Alberta T2P 0J3

                    Telex:  03826640

                    attention:
                    Vice-President Exploration

        (e)         for HYDRO-CONGO:

                    Société Nationale de Recherches
                     et d'Exploitation--HYDRO-CONGO
                    B.P. 2008
                    Brazzaville
                    République Populaire du Congo

                    Telex: 5220

                    attention:
                    The General Manager
```

All formal notices will be sent by registered mail, return receipt requested, or, if sent by cable or telex, confirmed by registered mail, return receipt requested.

19.02  Each of the parties may change the above address by advising the other parties in writing in accordance with the provisions of this Article 19.

19.03  During the exploration stage, each of the COMPANIES shall designate a representative in the CONGO to whom all formal notices may be validly given.  If a commercially exploitable discovery is made, each of the COMPANIES shall establish a branch in the CONGO, duly registered with the Registry of Commerce.  By derogation to Article 20 of Law No. 29/62 of June 16, 1962, as amended, the COMPANIES shall not be required to organize a subsidiary company formed under Congolese law.

20.  Amendments

Amendments may be made to one or several provisions of the CONVENTION, at a party's request, by mutual agreement of the parties.

GAR 00077

20.

21. <u>Guarantee by parent company</u>

      The obligations of the COMPANIES pursuant to this CONVENTION are guaranteed by the parent companies of their respective groups, if the case arises, pursuant to letters of guarantee, a form of which is annexed hereto as Exhibit V.

Done at Brazzaville, on May 15, 1979.

For the People's Republic of
the Congo

_____
Rodolphe Adada,
Minister of Mining and Energy

| For Congolese Superior Oil Company | For Société Nationale de Recherches et d'Exploitation Pétrolières "HYDRO-CONGO" |
|---|---|
| _____ Diego O. Giordano-Echegoyen, Vice-President | _____ Alphonse M'Boudo-Nesa, General Manager |
| For Cities Service Congo Petroleum Corporation | For Canadian Superior Oil Ltd. |
| _____ Antoine Saadi, Vice-President | _____ Robert C. Schrader, Vice-President, International Contracts |

GAR 00078

<u>EXHIBIT I</u>

<u>COPY OF DECREE GRANTING THE PERMIT</u>

GAR 00079

## EXHIBIT I

## COPY OF DECREE GRANTING THE PERMIT

GAR 00080

TRANSLATION

DECREE N° 253/79 of May 16, 1979, granting
to HYDRO-CONGO a type "A" hydrocarbons exploration permit
(known as "Marine 1")

The President of the Central Committee of the Parti Congolais
du Travail, President of the Republic, Chief of State,
President of the Council of Ministers;

- Having reviewed Act N° 032/PCT/CC of March 30, 1979, establishing, orga-
  nizing and regulating Public Institutions;

- Having reviewed Decree N° 79/154 of April 4, 1979 appointing the Prime
  Minister;

- Having reviewed Decree N° 79/155 of April 4, 1979 appointing the members
  of the Council of Ministers;

- Having reviewed Law N° 20/62 of June 16, 1962 embodying the Mining Code;

- Having reviewed Law N° 34/62 of June 16, 1962 setting the rates and
  rules for the payment of duties on mining titles;

- Having reviewed Law N° 35/65 of August 12, 1967 completing the provisions
  of the Mining Code;

- Having reviewed Decree N° 62/347 of August 17 1962 setting forth various
  conditions of application of Law N°20/62 referred to above;

- Having reviewed Government Order N° 14/73 of June 4, 1973 deciding
  the creation of Hydro-Congo;

- Having reviewed the permit application introduced by Hydro-Congo
  on January 15, 1979 under N° DRE/EC/SBC/253/DIFN/TM;

- Having reviewed Decree N° 79/111 of March 13, 1979 granting the
  "Autorisation personnelle minière" to Hydro-Congo;

  After consultation with the Council of Ministers;

  D E C R E E S :

  Article 1

      It is hereby granted to Hydro-Congo pursuant to the conditions
set in the present Decree a type "A" exploration permit, known as
"Marine 1", valid for liquid and gaseous hydrocarbons, and the surface of
which is found equal to 1,432 (one thousand four hundred and thirty two)
square kilometers, and is shown on the map attached hereto as Exhibit 1;
which surface is included within the perimeter defined by:

GAR 00081

1. a. The straight lines joining the points 1
and 2, 2 and 3, 3 and 4, 4 and 5, 5 and
6, 6 and 7, 7 and 8, 8 and 9, 9 and 10;
these lines are reportedly coincident with
the limit separating the renewed "Madingo
Maritime (A)" permit and the "Marine 1"
permit.

b. The straight line joining the points 10
and 11; this straight line being repor-
tedly partially coincident in part with the
limit separating the renewed "Madingo
Maritime (A)" permit and in part with the
limit separating the "Loango East" conces-
sion and the "Marine 1" permit.

c. The straight lines joining the points 11
and 12, 12 and 13, 13 and 14, 14 and 15,
15 and 16, and 16 and 17; these straight
lines reportedly coincide with the limit
separating the "Loango East" concession
and the "Marine 1" permit.

d. The straight lines joining the points 17
and 18, and 18 and 19; these straight
lines reportedly coincide with the limit
separating the "Loango West" concession
and the "Marine 1" permit.

e. The straight lines joining the points 19
and 20, 20 and 21, 21 and 22, 22 and 23,
23 and 24, 24 and 25; these straight lines
are reportedly coincident with the limit
separating the renewed "Pointe-Noire Grands

**GAR 00082**

Fonds (A)" permit and the "Marine 1"
permit.

f. The straight line joining the points 25
and 26; this straight line reportedly
coincides with the limit separating the
"Mer Profonde" permit and the "Marine 1"
permit.

g. The straight line joining the points 26
and 1, _i.e._, a section of the straight
line passing on the intersection of the low-
tide mark and the limit of the territories
of Congo and Gabon in a geographic azimuth
of 212°; this straight line is reportedly
coincident with the limit separating the
territorial waters of Congo and Gabon.

    2. The points 1, 2, 3, 4, 5, 6, 7, 8, 9, 10,
11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24,
25 and 26 are defined as follows:

    (see next page).

| | Coordonnées Géographiques Ellipsoïde de Clarke 1880 | | Coordonnées U.T.M. (Clarke 1880) Fuseau 32-Ha: 9°E | |
|---|---|---|---|---|
| ints | Longitude EAST | Latitude SOUTH | EAST | NORTH |
| | Point located at 38 km from the low-tide mark on the straight line defined in paragraph 1.g. above. | | | |
| | 10°58'14''260 | 4°14'54''590 | 718.233 | 9.520.178 |
| 2 | 11°02'31''668 | 4°18'29''055 | 726.652 | 9.523.560 |
| 3 | 11°05'15''851 | 4°15'11''228 | 731.714 | 9.529.624 |
| 4 | 11°09'50''804 | 4°15'10''466 | 740.214 | 9.529.624 |
| 5 | 11°09'51''271 | 4°17'56''970 | 740.214 | 9.524.508,561 |
| 6 | 11°15'05''727 | 4°17'56''058 | 749.914 | 9.524.508,561 |
| 7 | 11°15'05''241 | 4°15'09''563 | 749.914 | 9.529.624 |
| 8 | 11°23'36''921 | 4°15'08''018 | 765.700 | 9.529.624 |
| 9 | 11°27'26''845 | 4°18'20''070 | 772.775 | 9.523.700 |
| 10 | 11°27'28''782 | 4°28'12''323 | 772.775 | 9.505.500 |
| 11 | 11°16'15''217 | 4°28'14''496 | 752.000 | 9.505.500 |
| 12 | 11°16'15''066 | 4°27'25''678 | 752.000 | 9.507.000 |
| 13 | 11°15'10''219 | 4°27'25''878 | 750.000 | 9.507.000 |
| 14 | 11°15'09''972 | 4°26'04''513 | 750.000 | 9.509.500 |
| 15 | 11°14'21''337 | 4°26'04''661 | 748.500 | 9.509.500 |
| 16 | 11°14'21''191 | 4°25'15''841 | 748.500 | 9.511.000 |
| 17 | 11°10'40''712 | 4°25'16''499 | 741.700 | 9.511.000 |
| 18 | 11°09'55''210 | 4°24'38''710 | 740.000 | 9.512.400 |
| 19 | 11°09'55''600 | 4°26'54''240 | 740.000 | 9.508.000 |
| 20 | 11°07'32''384 | 4°26'54''636 | 736.500 | 9.508.000 |
| 21 | 11°07'53''139 | 4°31'15''025 | 736.500 | 9.500.000 |
| 22 | 11°04'54''774 | 4°31'15''544 | 731.000 | 9.500.000 |
| 23 | 11°04'54''312 | 4°28'32''796 | 731.000 | 9.505.000 |
| 24 | 11°00'46''128 | 4°28'33''491 | 723.346,900 | 9.505.000 |

Intersection of Longitude East 11°00'46''944 meridian and straight line J-K of the original "Pointe Noire Grand Fonds" permit, as defined in Decree No. 68-270/M CAEIM of October 17, 1968.

Point Located 65 km from the low-tide mark on the straight line defined in paragraph 1.g. above.

## ARTICLE 2

The minimum work program to be performed on the exploration permit described in Article 1 above is defined in Exhibit 2 hereto.

## ARTICLE 3

Hydro-Congo is hereby authorized to become a party in association with the companies executing a convention with the People's Republic of the Congo, for the implementation of the exploration permit described in Article 1 above as well as any exploitation and transportation permits which may derive therefrom.

## ARTICLE 4

The exploration permit described in Article 1 above may be renewed for a period of three (3) years in accordance with the conditions set forth in the Mining Code ("Code Minier").

The minimum work program to be conducted within the initial period and the renewal period as well as the areas to be relinquished on the exploration permit described in Article 1 above, are set forth in Exhibit 2 hereto.

## ARTICLE 5

In the event a discovery of an exploitable reservoir is made on the area of the exploration permit described in Article 1 above, Hydro-Congo shall request an exploitation permit for hydrocarbons, which shall be granted as a matter of law.

GAR 00085

Each hydrocarbons exploitation permit is valid for thirty (30) years. The hydrocarbons exploitation permit may not be renewed.

All matters not defined by the present Decree regarding the hydrocarbons exploitation permit derived from the exploration permit described in Article 1 above are governed by the provision of the Mining Code relating to concessions.

ARTICLE 6

The sub-contractors hired by Hydro-Congo or by any company associated with Hydro-Congo shall comply with the Mining Code.

ARTICLE 7

The Minister of Mines and Energy is hereby entrusted with the implementation hereof which shall be registered, communicated wherever necessary and published in the Official Journal of the People's Republic of the Congo.

Done in Brazzaville on May 13, 1979.

President of the Central
tee of the Parti Congolais du
..., President of the Republic,
of State, President of the
l of Ministers

Prime Minister,
the Government

... Sylvain-Comb
Louis SYLVAIN-GOMA

(s) Denis Sassou-Nguesso

Colonel Denis SASSOU-NGUESSO

By the Minister of Mines

(s) R. Ralph Okoye

Rodolphe ADADA

**GAR 00086**

EXHIBIT 1

MAP OF THE "MARINE 1" PERMIT

GAR 00088

ANNEXE 2

I - Minimum Work Program

A. Initial Period

The term of the first period shall be five (5) years.

Phase I

The term of Phase I shall be three (3) years and shall consist of the following:

(a) One thousand (1000) kilometers of Marine seismic.

(b) Within six (6) months after receipt of the processed data commit to drill a pre-salt test well to be commenced within twenty-four (24) months from the date of signing the Convention with the State, but not later than thirty (30) months from such date, depending upon availability of suitable equipment at competitive rates, or relinquish the entire permit.

(c) The permit holder shall have the option to relinquish the permit at the later of the following two dates: (i) ninety (90) days after completion of the exploration well, or (ii) ninety (90) days before the end of Phase I, or proceed into Phase II.

**GAR 00089**

ANNEXE 2

## I - Minimum Work Program

### A. Initial Period

The term of the first period shall be
five (5) years.

### Phase I

The term of Phase I shall be three (3)
years and shall consist of the following:

(a) One thousand (1000) kilometers of
Marine seismic.

(b) Within six (6) months after receipt of
the processed data commit to drill a pre-salt test well
to be commenced within twenty-four (24) months from the
date of signing the Convention with the State, but not
later than thirty (30) months from such date, depending
upon availability of suitable equipment at competitive
rates, or relinquish the entire permit.

(c) The permit holder shall have the option
to relinquish the permit at the later of the following
two dates: (i) ninety (90) days after completion of the
exploration well, or (ii) ninety (90) days before the end
of Phase I, or proceed into Phase II.



11.

2.

### Phase II

The term of Phase II shall be two (2) years.

During the course of Phase II, the permit holder shall drill two (2) pre-salt exploration wells. The permit holder shall have the option to relinquish the permit upon completion of each well.

### B. Renewal period

The exploration permit shall be renewed upon request from the permit holder for a three (3) year renewal period, during the course of which at least three (3) wells will be drilled. However, the permit holder shall have the right to relinquish the permit upon completion of each well.

C. For purposes of paragraphs A and B above, the obligation to drill a well shall be deemed satisfied by the permit holder when the objective depth of formation is reached, or expenses actually incurred for such well shall have reached an amount equal to one hundred and fifty percent (150 %) of the estimated cost of such well, as budgeted by the Operating Committee of the Joint Venture to be formed by the permit holder of the Convention with the People's Republic of Congo described in Article 3 of the Decree.

### II - Relinquishments

The permit holder shall relinquish the original area as follows:

GAR 00091

3.

(a) An area equal to twenty-five percent (25%) of the original contract area shall be relinquished at the end of Phase I of the initial period;

(b) Another area equal to twenty-five percent (25%) of the original contract area shall be relinquished at the end of Phase II of the initial period; and

(c) The remainder of the orginal contract area shall be entirely relinquished upon termination of the renewal period, except for the area or areas of the permit which are covered by one or several exploitation permits, if any;

(d) Areas of the permit that the Operating Committee of the Joint Venture described above has determined, before the effective date of the relinquishments or the expiration of the renewal period, to cover commercial reservoirs shall be excluded from areas relinquished by the permit holder upon termination of Phase I and Phase II of the first period and upon termination of the renewal period.





**GAR 00092**