EXHIBIT II

The base of calculation of the royalty and corporate income tax shall be the market value of the LIQUID HYDROCARBONS sold.

For the purpose of the royalty, the market value of the LIQUID HYDROCARBONS shall be deemed equal to the FOB Congo reference market value based on Middle East sales calculated as described below.

For the purpose of the corporate income tax, the market value of the LIQUID HYDROCARBONS shall be the realized sales price, provided however that in the case of sales to affiliated purchasers, the sales price shall not be lower than the weighted average realized sales price of the selling COMPANY from third party purchasers for the same period of reasonable quantities of LIQUID HYDROCARBONS of similar quality and gravity, or in the absence of such sales of reasonable quantities to third parties, the sales price shall not be lower than a price equal to the competitive value for the same period of LIQUID HYDROCARBONS of similar quality and gravity.

Calculation of the FOB

Congo Reference Market Value

The FOB Congo reference market value shall be computed by reference to the government sales price for Arab Light crude oil for the applicable period adjusted for freight, gravity, sulfur and other quality differentials.

Definitions

1. "Arab Light" means the crude oil produced in Saudi Arabia and sold at Ras Tanura, of API gravity 34 degrees.

2. "Berri" means the crude oil produced in Saudi Arabia and sold at Ras Tanura of API gravity 39 degrees.

3. "Government Sales Price" ("GSP") means the official state sales price of the Government of Saudi Arabia for the sale of Arab Light or Berri.

4. "AFRA VLCC" and "AFRA LR2" mean the freight costs as determined by the London Tanker Brokers Panel or by any

**GAR 00093**

## EXHIBIT II

      The base of calculation of the royalty and corporate income tax shall be the market value of the LIQUID HYDROCARBONS sold.

      For the purpose of the royalty, the market value of the LIQUID HYDROCARBONS shall be deemed equal to the FOB Congo reference market value based on Middle East sales calculated as described below.

      For the purpose of the corporate income tax, the market value of the LIQUID HYDROCARBONS shall be the realized sales price, provided however that in the case of sales to affiliated purchasers, the sales price shall not be lower than the weighted average realized sales price of the selling COMPANY from third party purchasers for the same period of reasonable quantities of LIQUID HYDROCARBONS of similar quality and gravity, or in the absence of such sales of reasonable quantities to third parties, the sales price shall not be lower than a price equal to the competitive value for the same period of LIQUID HYDROCARBONS of similar quality and gravity.

### Calculation of the FOB

### Congo Reference Market Value

The FOB Congo reference market value shall be computed by reference to the government sales price for Arab Light crude oil for the applicable period adjusted for freight, gravity, sulfur and other quality differentials.

### Definitions

1.   "Arab Light" means the crude oil produced in Saudi Arabia and sold at Ras Tanura, of API gravity 34 degrees.

2.   "Berri" means the crude oil produced in Saudi Arabia and sold at Ras Tanura of API gravity 39 degrees.

3.   "Government Sales Price" ("GSP") means the official state sales price of the Government of Saudi Arabia for the sale of Arab Light or Berri.

4.   "AFRA VLCC" and "AFRA LR2" mean the freight costs as determined by the London Tanker Brokers Panel or by any

**GAR 00094**

2.

other organization substituted therefor, for shipment in very large crude carriers and large range two tankers, respectively.

5. "SPOT VLCC" and "SPOT LR2" mean the freight costs calculated from the <u>Average Worldscale Rates for Single Voyage Dirty Fixture</u> published monthly by H.P. Drewry Ltd., London, in their Shipping Statistics and Economics - SSE Publication and would be a weighted average of Fixtures in the 70,000 - 174,999 Cargo Size DWCT for "SPOT LR2" and 175,000 - 300,000 for "SPOT VLCC", respectively. For the purpose of 2. and 3. hereof, the respective "SPOT VLCC" and "SPOT LR2" freights costs shall be based on the rates published for the month in which LIQUID HYDROCARBONS are lifted.

The FOB Congo reference market value shall be determined as follows:

1. Take the GSP of one barrel of Arab Light crude oil of 34.00 -34.09 degrees gravity.

2. Determine the freight per barrel of transporting Arab Light from Ras Tanura to Rotterdam via The Cape and returning from Rotterdam to Ras Tanura via The Cape by dividing the average of the published "AFRA VLCC" and "SPOT VLCC" freight per ton by the number of barrels of such crude oil per ton.

3. Determine the freight per barrel of transporting LIQUID HYDROCARBONS from Pointe Noire, Congo, to Rotterdam by dividing the average of the published "AFRA LR2" and "SPOT LR2" freight per ton by the number of barrels of such crude oil per ton. Subtract the resulting freight cost from the freight cost determined under 2 above and add the result to the GSP under 1 above.

The amount determined in accordance with the above procedure shall be adjusted upward or downward pursuant to the following quality factors which shall be computed as follows:

1. <u>Gravity factor:</u>

The differential for gravity will be determined as follows:

(a) Use 34 degrees API gravity for Arab Light.

(b) Deduct said gravity from the stated gravity of the LIQUID HYDROCARBONS. Any positive result will be added to the FOB Congo reference market value; any negative result will be subtracted from the FOB Congo reference market value.

GAR 00095

3.

(c)  Multiply said (b) remainder by ten and obtain a product.

(d)  Multiply the product (c) by the Arab Light quoted value for gravity differential per 0.1 (one tenth) API; the result will be the gravity adjustment.

2.  Sulfur factor:

(a)  Arab Light and Berri

(i)  Determine the difference in GSP between Arab Light and Berri.

(ii)  Determine the amount of (i) difference attributable to gravity by subtracting from such difference the product of the number of 1/10 degrees gravity between the two grades times the gravity differential value per 0.1 (one-tenth) degree API for the two grades.

(iii)  Deduct the product (ii) from the difference per (i).

(iv)  Divide the remainder per (iii) by the differential number of 0.1 (one-tenth) weight percent sulfur (SWT%) between the two grades. Use 1.8 SWT% for Arab Light and 1.1 SWT% for Berri until revised by mutual agreement.

(b)  Obtain the Congo sulfur adjustment by multiplying the difference in number of 0.1 SWT% between the LIQUID HYDROCARBONS sulfur content and the average of the Arab Light and Berri sulfur content by U.S. cents per 0.1 SWT% determined as set forth in sub-paragraph (a)(iv) above.

Such adjustment will increase the FOB Congo reference market value if Congo sulfur is less than said average, and reduce the FOB Congo reference market value if Congo sulfur exceeds said average.

3.  Other quality factors:

(a)  Should the heavy gas oil distilled from LIQUID HYDROCARBONS (meaning that product distilled between the range of the 600 to 960 degrees Fahrenheit cut pursuant to the American Society for Testing Metals -- or any organization substituted therefor -- distillation procedure) exceed 0.5 Neutralization number (Neutralization number means the number of

GAR 00096

4.

milligrams of potassium hydroxide required to neutralize the acid contained in one (1) gram of the heavy gas oil), or

(b) Should the heavy gas oil extracted from LIQUID HYDROCARBONS as defined in (a) above, contain over 0.24 parts per million of nickel and copper, or nickel equivalent (calculated by addition of the parts per million of vanadium divided by 4.3, plus parts per million of nickel and copper), or

(c) Should any currently unknown quality factors of the LIQUID HYDROCARBONS appear,

the Parties hereto shall meet to agree on an equitable adjustment of the FOB Congo reference market value determined pursuant to the foregoing, to the extent those characteristics are of significance.

GAR 00097

2.

Office or other furniture                                    10.0%
Telephone                                                    15.0%

LOADING AND STORAGE INSTALLATIONS

Annex III (Exhibit III)

Depreciation rates applicable to the COMPANIES

| Type of investments to be amortized | annual rate |
|---|---|
| subsurface and drilling works | |
| non-producing wells | 50 % |
| producing wells: in function with the | |
| estimated duration of production.  If no estimate | 12.5% |
| | |
| Transportation Equipment | |
| interior pipelines | 10  % |
| exterior pipelines | 7.5% |
| | |
| Drilling Equipment (in general) | 10 % |
| drilling pipe | 20 % |
| drilling tools | 20 % |
| diesel engines | 20 % |
| derrick and drive machinery | 20 % |
| | |
| Intangible Costs | |
| G + G | 20 % |
| | |
| Constructions | |
| permanent buildings, offices, labs, garages, | |
| housing, etc | 3½% |
| metallic-sided buildings | 3½% |
| semi-portable construcitons without foundation | 10 % |
| portable cabins or other assembled field buildings | 10 % |
| interior workshop facilities | 10 % |

GAR 00098

2.

| | |
|---|---|
| Office or other furniture | 10.0% |
| Telephone | 15.0% |

## LOADING AND STORAGE INSTALLATIONS

| | |
|---|---|
| Storage installations | 10.0% |
| Except pipe and tube yards | 20.0% |
| Loading pier | 3.1/3% |
| Loading installations | 10.0% |
| Floating pipelines | 20.0% |

## VEHICLES AND ACCESS ROADS

| | |
|---|---|
| Civil engineering machines | 30.0% |
| Automotive vehicles and their trailers | 33.0% |
| Except fire trucks, workshop trucks, cementing trucks | 20.0% |

## RIVER TRANSPORTS

| | |
|---|---|
| Pinnaces (lighters) | 15.0% |
| Tugboats, pusher-type tugs, tank-barges, barges | 10.0% |
| Access roads to geophysical works and improductive wells | 50.0% |
| Access roads to productive wells | 20.0% |

## OTHER FIXED ASSETS

| | |
|---|---|
| Water system | 10.0% |
| Compressed air system | 10.0% |
| Electricity system | 10.0% |

## POWER LINES

| | |
|---|---|
| Pylons | 3.1/3% |
| Other elements | 5.0% |

## TRANSFORMERS

| | |
|---|---|
| Buildings and fixed plant | 5.0% |
| Portable plant | 10.0% |

## FIXED MACHINES

| | |
|---|---|
| Compressors | 10.0% |
| Compressors at sea | 20.0% |
| Miscellaneous motors and pumps on land | 10.0% |
| Miscellaneous motors and pumps at sea | 20.0% |
| Machine tools on land | 10.0% |
| Machine tools at sea | 20.0% |
| Small tools | 15.0% |
| Fixed laboratory equipment | 10.0% |

GAR 00099

3.

| | |
|---|---|
| Mobile laboratory equipment | 20.0% |
| Topography equipment | 10.0% |
| Sea camp equipment | 50.0% |
| Land camp equipment | 20.0% |

SPECIFIC OFFSHORE EQUIPMENT

| | |
|---|---|
| Drilling barges | 20.0% |
| Drilling and production platforms | 15.0% |
| Offshore well equipment | 20.0% |
| Underwater energy transport cables | 20.0% |
| Mooring buoys | 25.0% |
| On-platform equipment | 20.0% |
| Underwater wellheads and wellhead supports | 20.0% |
| Gathering lines between wells and storage stations | 20.0% |
| Main lines | 10.0% |
| Underwater loading lines | 20.0% |

Costs and expenses accumulated by the COMPANIES in connection with EXPLORATION WORKS will be treated in the following fashion: those of such costs and expenses which relate to the creation of capitalized assets shall be amortized, beginning in the first fiscal year showing a taxable income, in accordance with the depreciation rates set forth above. The other costs and expenses shall constitute "frais de premier établissement" (costs of initial installation), which may as such be amortized, at each COMPANY's option, without time limit.

GAR 00100

# EXHIBIT IV

## I – PAYMENT OF ROYALTY

When the mining royalty is paid in cash, each COMPANY shall, at the latest on the 20th of each month, file a monthly declaration of HYDROCARBONS lifted by it during the preceding calendar month.

Eighty-five percent (85%) of the royalty due for such preceding month of each quarter shall be paid at the time the corresponding monthly declaration is filed. The balance of the royalty due for each quarter shall be calculated and paid at the same time as the monthly declaration made during the second month following the end of the said quarter.

## II- PAYMENT OF CORPORATE TAX

Each COMPANY will make prepayment of corporate taxes as follows:

(a)  During the course of the first quarter, each COMPANY will estimate the tax it will owe for the current year.

(b)  An amount equal to 8/120th of such estimate will be paid on or before the 20th of each of the months of April, May, June, July, August and September.

(c)  During the course of the third quarter, each COMPANY will review, on the basis of the actual results of the first semester, the estimate made by it of the annual tax.

(d)  An amount corresponding to 8/120th of the new estimate shall be paid at the latest on or before the 20th of each of the months of October, November, December, as well as January, February and March of the following year, the payment for the month of October being however adjusted in such a way that the total amount of the provisional payments paid on October 20, correspond to 56/120th of the new estimate.

(e)  The balance of the corporate tax shall be paid at the time of filing of the annual declaration, and taxes paid in excess, if any, shall be treated in accordance with Article 126 of the Code Général des Impôts du Congo.

GAR 00101

EXHIBIT V

MODEL OF LETTER OF GUARANTEE

GUARANTEE

WHEREAS the People's Republic of the Congo
(hereinafter referred to as the "CONGO"), Congolese Superior
Oil Company, Cities Service Congo Petroleum Corporation,
Canadian Superior Oil Ltd., and Société Nationale de Recherches
et d'Exploitation Pétrolières -- "HYDRO-CONGO" entered into a
Convention dated the 25th day of May 1979, for the exploration
and exploitation of liquid and gaseous hydrocarbon resources
offshore the CONGO (hereinafter referred to as the
"CONVENTION"),

and

WHEREAS /Name of the parent company_/ (hereinafter
referred to as the "PARENT COMPANY") as owner, directly or
indirectly, of all of the shares representing the capital stock
of /name of the affiliated company_/ (hereinafter referred to
as the "AFFILIATED COMPANY") desires to assure the CONGO of the
performance of the obligations of the AFFILIATED COMPANY under
the CONVENTION.

ACCORDINGLY,

The PARENT COMPANY hereby agrees and undertakes to
provide or cause to be provided to its AFFILIATED COMPANY the
funds necessary for it to comply with its obligations under the
CONVENTION.

Executed at _____, on_____ 1979

(Name of PARENT COMPANY)

By: _____
        (Title)

GAR 00102

<u>EXHIBIT V</u>

<u>MODEL OF LETTER OF GUARANTEE</u>

<u>GUARANTEE</u>

WHEREAS the People's Republic of the Congo (hereinafter referred to as the "CONGO"), Congolese Superior Oil Company, Cities Service Congo Petroleum Corporation, Canadian Superior Oil Ltd., and Société Nationale de Recherches et d'Exploitation Pétrolières -- "HYDRO-CONGO" entered into a Convention dated the 25th day of May 1979, for the exploration and exploitation of liquid and gaseous hydrocarbon resources offshore the CONGO (hereinafter referred to as the "CONVENTION"),

and

WHEREAS /Name of the parent company_/ (hereinafter referred to as the "PARENT COMPANY") as owner, directly or indirectly, of all of the shares representing the capital stock of. /name of the affiliated company_/ (hereinafter referred to as the "AFFILIATED COMPANY") desires to assure the CONGO of the performance of the obligations of the AFFILIATED COMPANY under the CONVENTION.

ACCORDINGLY,

The PARENT COMPANY hereby agrees and undertakes to provide or cause to be provided to its AFFILIATED COMPANY the funds necessary for it to comply with its obligations under the CONVENTION.

Executed at _____, on_____ 1979

(Name of PARENT COMPANY)

By: _____
            (Title)

**GAR 00103**

**A P P E N D I X**

GAR 00104

TRANSLATION

(Letterhead of Congolese Superior Oil Company)

Minister of Finances
istry of Finances
...raville

Houston, May 17, 1979

Minister:

Our company, together with Cities Service Congo Petroleum
...poration and Canadian Superior Oil Ltd. are signing on May 25,
...) with the People's Republic of the Congo, represented by its
...ister of Mining and Energy, a Convention relating to hydrocarbon
...ration and exploitation on the permit known as "Marine 1".
...this regard, we would like to request clarification with respect to
...following questions:

1. The works relating to the working of this permit will
...it necessary for us, as Operator for the Joint Venture, a ...
...ps to a lesser extent for the other non-Congolese members of the
...Venture, to send to the Congo specialized personnel for periods
...will be limited, but may extend over several years.

(a) The expatriate personnel may bring with them household
...ture, private cars and household furnishings for their personal
...ring their stay in the Congo. Can such goods be imported,
...-exported at the end of their stay, free of customs duties
...xes?

(b) The transfer to the Congo may entail for such personnel
...tional costs which are a direct consequence of such transfer:
...ance of two residences, special education expenses for their
...en, and, in the absence of a tax treaty between the People's
...ic of the Congo and the United States of America, double taxation
...r income. It will probably be necessary for us to pay such per-
...an indemnity intended to cover these additional costs. Will
... indemnity be subject to Congolese personal income tax, in
...n to the tax payable on their salary after deduction of the
...d 30% deduction for professional expenses?

2. Should the Joint Venture, for reasons of Force Majeure,
... discontinue the exploitation for an appreciable length of time,
...ross income tax payments, if any, be reimbursable?

3. With respect to the costs and expenses accumulat-
...he exploration phase, we understand that the Congolese tax
...law will result in treating such costs and expenses in the foll-
...on: those of such costs and expenses which relate to the

**GAR 00105**

The Minister of Finances          -2-          May 17, 1979

creation of capitalized assets shall be amortized, beginning in the
first fiscal year showing a taxable income, in accordance with the
depreciation rates attached as an exhibit to the aforementioned
Convention.  The other costs and expenses shall constitute "Frais de
premier établissement" (costs of initial installation), which may
as such be amortized, at the taxpayer's option, without time limit.
We would be grateful if you could confirm that this would be the case.

                    Very truly yours,


                    (s) Diego C. Giordano
                    Diego C. Giordano
                    Vice-President

GAR 00106

TRANSLATION

(Letterhead of the Ministry of Finances)

Brazzaville, May 25, 1979

...golese Superior Oil Company
..h Floor
..st City National Bank Building
..ston, Texas

.r Sirs:

In reply to your letter of May 17, 1979, we are pleased
..let you know the following:

1.(a)  Household furniture, furnishings and materials
..n be imported and re-exported free of customs duties and taxes,
..atever the length of the stay, so long as their use is limited to
..sonal use by the expatriate personnel.  Private cars can be
..ported free of duties and taxes only for a period of six months.

1.(b)  Since the indemnities described in your letter
..a reimbursement of exceptional costs actually incurred, differ....ng
..nature from the professional expenses that the standard deduction is
..nded to cover, they shall not be included in the taxable income
..the employees in question, subject of course to the furnishing of
..per justification.

2.  The discontinuation of exploitation in the circumstances
..scribed in your letter can be interpreted as a discontinuation of
..tivities, with corresponding application of the provisions of Article
..bis (?) of the General Tax Code.

3.  We confirm to you that your description of the amor-
..zation of costs and expenses accumulated during the exploration phase
.. accurate.  This matter is indeed covered in identical terms by
..e last sub-paragraph of Exhibit III to the Convention that your
..pany and Cities Service Congo Petroleum  Company and Canadian
..perior Oil Ltd. are signing today with the People's Republic of  .
..e Congo and Hydro-Congo.

Very truly yours,

_____
Minister of Finances



**GAR 00107**

REPUBLIQUE POPULAIRE DU C  GO
Travail * Démocratie * P   x

- - - - - - -

60/83                    II/8/198

/ OI N° _____ / DU _____

Complétant la loi n°17/83 du
27/01/83 portant approbation des
Accords particuliers signés l
11 Décembre 1981 pour le Perm s
"MARINE 1" respectivement ave
BRASPETRO et I.E.D.C. (Congo)
Ltd.--

- - - - - -

L'ASSEMBLEE NATIONALE POPULAIRE A DELIBERE ET AD PTE ;

LE PRESIDENT DU COMITE CENTRAL DU PARTI CONGOLAI  DU
TRAVAIL, PRESIDENT DE LA REPUBLIQUE, CHEF DE L'E AT,
PRESIDENT DU CONSEIL DES MINISTRES, PROMULGUE LA LOI
DONT LA TENEUR SUIT :

ARTICLE 1ER.- L'article 1er de la loi n°17/83 du 27/ 1/83
portant approbation des accords particuliers signés  e
11 Décembre 1981 pour l'exploitation du Permis Marin  1
est complété comme suit :

     après : sont approuvés les accords ci-après sig és le
11 Décembre 1981 pour l'exploitation du Permis Marin   1 :

     ajouter : Avenant n°1 A LA CONVENTION DU 25 MAI 1979

     Le reste sans changement.

ARTICLE 2.- La présente loi sera publiée au Journal  ffi-
ciel de la République Populaire du Congo et exécutée comme
loi de l'Etat./-

               Fait à Brazzaville, le  II AOUT 19 3

                                             GAR 00108

          COLONEL Denis SASSOU - NGUESSO.--

(Free) Translation

PEOPLE'S REPUBLIC OF THE CONGO

Work – Democracy – Peace

- - - - - - - - -
- - - - - - - - - -

Law No. 60/83 of August 11, 1983
completing Law No. 17/83 of
January 27, 1983 approving
the Accords particuliers signed
December 11, 1981 re
"the Marine I Permit" with
BRASPETRO & I.E.D.C. (Congo)
Ltd.

- - - - - - - - -
- - - - - - - - - -

The People's National Assembly has deliberated and adopted;

The President of the Central Committee and
The Congolese Worker's Party, President of
the Republic, Chief of State, President of
the Council of Ministres,  promulgates the
Law the text of which follows:

Article 1    Article 1 of Law No. 17/83 of January 27, 1983 approving the
Accords particuliers signed December 11, 1981 for the exploitation of the
Marine I Permit is completed as follows:

    After "have approved the accords below signed December 11, 1981
for the exploitation of the Marine I Permit"

    Add: "Amendment No. 1 to the Convention of May 25, 1979."

    The remainder is unchanged.

Article 2    This Law will be published in the Official Journal of the
People's Republic and executed as a law of the State.

            Made in Brazzaville, August 11, 1983

            COLONEL Denis SASSOU – NGUESSO

                                    GAR 00109

ENGLISH TRANSLATION

o o o o

AMENDMENT N° 1
TO THE MAY 25, 1979
"MARINE 1" CONVENTION

December 11, 1981

GAR 00110

ENGLISH TRANSLATION

• • • •

AMENDMENT N° 1
TO THE MAY 25, 1979
"MARINE 1" CONVENTION

BETWEEN

The People's Republic of the Congo (hereinafter referred to as the "CONGO"), represented for the purposes hereof by its Minister of Mining and Energy Mr. Rodolphe Adada,

on the one hand,

AND

Cities Service Congo Petroleum Corporation (hereinafter referred to as "CITIES SERVICE") a Delaware (U.S.A.) corporation with registered offices at 306 South State Steet, Dover, Delaware, United States of America, represented by Mr. Lewis Greenwald, duly authorized for this purpose,

Société Nationale de Recherches et d'Exploitation Pétrolières -- HYDRO-CONGO (hereinafter referred to as "HYDRO-CONGO"), a société nationale with registered offices at Brazzaville, represented by Mr. Camille Okamba, duly authorized for this purpose,

IEDC (Congo) Ltd. (hereinafter referred to as "IEDC") a Bermuda company with registered offices at 5th Floor, Bank of Bermuda Building, Hamilton, Bermuda, represented by Mr. Nordine Aït-Laoussine, duly authorized for this purpose,

Petrobras Internacional S.A. BRASPETRO (hereinafter referred to as "BRASPETRO") a Brazilian corporation with registered offices at Rio de Janeiro, Federative Republic of Brazil, represented by Mr. Joel Mendes Renno, duly authorized for this purpose,

on the other hand.

PREAMBLE

On May 25, 1979, the CONGO, HYDRO-CONGO, CITIES SERVICE, Congolese Superior Oil Company ("SUPERIOR") and Canadian Superior Oil Ltd. ("CANADIAN") signed a

GAR 00111

2.

Convention (the "CONVENTION") for the exploration and possible exploitation of liquid and gaseous hydrocarbons on the territory of the People's Republic of the Congo. The CONVENTION was ratified by Government Order N° 24/79 of July 7, 1979.

HYDRO-CONGO, CITIES SERVICE, SUPERIOR and CANADIAN also signed in Brazzaville on May 25, 1979 a joint operating agreement (the "JOA") to carry out petroleum works on the "Marine 1" Type "A" exploration permit granted to HYDRO-CONGO by decree N° 79/253 of May 16, 1979.

On March 12, 1981, SUPERIOR and CANADIAN withdrew from the joint venture organized under the JOA (the "JOINT VENTURE"), effective immediately.

IEDC and BRASPETRO informed the Minister of Mining and Energy of the CONGO of their interest to participate in the operations of the JOINT VENTURE and, by reason of these two groups' experience in petroleum operations, the Minister of Mining and Energy of the CONGO agreed, in Heads of Agreements signed respectively with International Energy Development Corporation B.V. and BRASPETRO on July 28 and August 7, 1981, that these groups participate in the JOINT VENTURE and, as a result, that they take part in the petroleum works on the "Marine 1" permit.

NOW, THEREFORE, IT HAS BEEN AGREED AS FOLLOWS:

Article 1

1.01.A.  IEDC and BRASPETRO hereby agree to and ratify all the provisions of the CONVENTION, a copy of which is attached hereto as an exhibit, and they become parties thereto in replacement for SUPERIOR and CANADIAN, respectively.  The CONGO hereby confirms all the provisions of the CONVENTION and agrees that all such provisions shall apply to IEDC and BRASPETRO in the same manner as they applied to SUPERIOR and CANADIAN.

1.01.B.  The CONGO warrants to IEDC and BRASPETRO that SUPERIOR and CANADIAN have withdrawn from the CONVENTION effective March 12, 1981 and neither SUPERIOR nor CANADIAN or any person claiming through or under SUPERIOR or CANADIAN have any rights or interest thereunder or in any HYDROCARBONS which may be produced on the PERMIT.

The CONGO also warrants that it did not approve any encumbrance (hypothèque, nantissement or mise en gage) on the PERMIT.

GAR 00112

3.

1.01.C.  Notwithstanding anything elsewhere contained in this Amendment N° 1, nothing herein contained shall be construed as imposing upon IEDC or BRASPETRO any liability for any failure of SUPERIOR or CANADIAN to fulfill any of their obligations or liabilities under the CONVENTION prior to the date of their withdrawal and the rights and interests of IEDC and BRASPETRO under the CONVENTION shall not be prejudiced in any way as a result of any such failure of SUPERIOR or CANADIAN.

1.02  For the purposes of the CONVENTION

(a) instead of "Congolese Superior Oil Company", read "IEDC (Congo) Ltd."

(b) instead of "SUPERIOR", read "IEDC";

(c) instead of "Canadian Superior Oil Ltd.", read "Petrobras Internacional S.A. BRASPETRO";  and

(d) instead of "CANADIAN", read "BRASPETRO".

1.03  For the purposes of paragraph 19.01 of the CONVENTION,

(a) amend sub-paragraph (b) of said paragraph 19.01 to read as follows:

"(b) for IEDC:

IEDC (Congo) Ltd.
5th floor
Bank of Bermuda Building
Hamilton
Bermuda

With copy to:

IEDC Services (U.K.) Ltd.
The Lower Mill
Kingston Road
Ewell, Surrey KT17 2AP
United Kingdom

Telex:  295277 IEDC (UK) - G

Attention:  Exploration Manager".

(b) Amend sub-paragraph (d) of said paragraph 19.01 to read as follows:

GAR 00113

4.

"(d) for BRASPETRO:

Petrobras Internacional S.A. BRASPETRO
Plaça Pio X, 119 Centro
20,040 Rio de Janeiro, R.J.
Brésil
(P.O. Box 2027, Rio de Janeiro, RJ, Brazil)

Télex:  2122640
        2121889

<u>Attention:  Vice President</u>".

<u>Article 2</u>

2.01  IEDC shall provide to the CONGO the
guarantee issued by its parent company pursuant to Article
21 of the CONVENTION at the latest on December 31, 1981.

<u>Article 3</u>

3.01  This amendment N° 1 shall enter into force
upon its ratification by law, but it will be retro-
actively effective as of March 13, 1981.

Done in seven originals in French,
in Brazzaville,
on December 11, 1981.

The CONGO:


By: _____
    Rodolphe Adada,
    Minister of Mines and Energy


CITIES SERVICE:                     HYDRO-CONGO:


By: _____             By: _____
    Lewis Greenwald                  Camille Okamba,
                                      General Manager


IEDC:                               BRASPETRO:


By: _____             By: _____
    Nordine Ait Laoussine            Joel Mendas Renno,
                                     Vice-President


**GAR 00114**

#3303-A

<u>PERMIS "MARINE 1"</u>

o  o  o  o  o

<u>ACCORD PARTICULIER</u>
<u>BRASPETRO</u>

<u>11 décembre 1981</u>

GAR 00115

PERMIS "MARINE 1"

· · · · ·

ACCORD PARTICULIER


ENTRE

   La République Populaire du Congo (ci-après désignée le "CONGO"), représentée par Monsieur Rodolphe Adada, Ministre des Mines et de l'Energie,

           d'une part,

ET

   IEDC (Congo) Ltd. (ci-après désignée "IEDC"), une société des Bermudes dont le siège social est à Hamilton, Bermudes, 5ème étage, Bank of Bermuda Building, représentée par Monsieur Nordine Aït-Laoussine, dûment autorisé aux fins des présentes,

           d'autre part.

EXPOSE PRELIMINAIRE

   Le 25 mai 1979, le CONGO, HYDRO-CONGO, CITIES SERVICE, Congolese Superior Oil Company ("SUPERIOR") et Canadian Superior Oil Ltd. ("CANADIAN") ont signé une Convention (la "CONVENTION") pour la recherche et l'exploitation éventuelle d'hydrocarbures liquides et/ou gazeux sur le territoire de la République Populaire du Congo. La CONVENTION a été ratifiée par l'Ordonnance N° 24/79 du 7 juillet 1979.

   HYDRO-CONGO, CITIES SERVICE, SUPERIOR et CANADIAN ont également signé à Brazzaville le 25 mai 1979 un contrat d'association (le "CONTRAT D'ASSOCIATION") pour l'exécution de travaux pétroliers sur le permis de recherche de type "A" dit Permis "Marine 1" accordé à HYDRO-CONGO par le décret N° 79/253 en date du 16 mai 1979.

GAR 00116

2.

Le 12 mars 1981, SUPERIOR et CANADIAN se sont retirées de l'association constituée aux termes du CONTRAT D'ASSOCIATION ("l'ASSOCIATION") et ce avec effet immédiat.

IEDC a fait connaître à Monsieur le Ministre des Mines et de l'Energie du CONGO son intérêt à participer aux travaux de l'ASSOCIATION, et son désir d'améliorer la situation du CONGO au sein de la CONVENTION.

CELA ETANT EXPOSE, LES PARTIES SONT CONVENUES DE CE QUI SUIT:

### Article 1
#### Redevance Minière

Le taux de la redevance minière pour les hydrocarbures liquides prévu au paragraphe 5.03 de la CONVENTION est porté de quatorze et demi pour cent (14,5%) à seize deux-tiers pour cent (16 2/3%). Le taux de la redevance minière pour les hydrocarbures gazeux reste inchangé.

### Article 2
#### Impôt sur les sociétés

En ce qui concerne IEDC, l'impôt sur les sociétés sera calculé au taux de soixante cinq pour cent (65%). A cet effet, si le taux de l'impôt sur les sociétés fixé par le Code Général des Impôts du CONGO est inférieur à soixante cinq pour cent (65%), IEDC sera soumise à l'impôt sur les sociétés calculé conformément aux dispositions du Code Général des Impôts du CONGO ainsi qu'à un impôt additionnel dont le montant sera calculé en appliquant au bénéfice imposable un pourcentage égal à la différence entre le taux de l'impôt sur les sociétés, tel qu'il résulte du Code Général des Impôts, et soixante cinq pour cent (65%).

### Article 3
#### Cession à une société du groupe IEDC

En raison de la structure du groupe IEDC, le CONGO accepte que l'autorisation du Ministre de tutelle soit automatiquement accordée à toute cession par IEDC de

GAR 00117

3.

ses droits et obligations au titre de la CONVENTION et du
CONTRAT D'ASSOCIATION à un ou plusieurs de ses action-
naires ultimes, lesquels sont AZL Resources Inc., Arab
Petroleum Investments Corporation, Kuwait Petroleum
Corporation, Sulpetro Ltd. et A.B. Volvo (ou, sous réserve
d'obtenir l'accord préalable du Ministre de tutelle,
lequel accord ne sera pas refusé sans raison, à toute
filiale entièrement contrôlée par l'un quelconque desdits
actionnaires) à condition qu'IEDC reste responsable de
l'exécution de toutes les obligations et responsabilités
cédées à un tel cessionnaire et qu'IEDC représente ce
cessionnaire pour les besoins de la CONVENTION et du
CONTRAT D'ASSOCIATION.

### Article 4
### Entrée en vigueur; ratification

Le présent accord particulier entrera en vigueur
dès sa ratification par une loi, mais il prendra effet
rétroactivement à compter du 13 mars 1981. Le texte
français seul fait foi, mais une traduction anglaise
approuvée par les parties y est jointe et il pourra y être
fait référence dans un but de clarification.

Fait en quatre exemplaires
à Brazzaville,
le 11 décembre 1981.

Pour le CONGO:                    Pour IEDC:


Rodolphe Adada,                   Nordine Aït-Laoussine
Ministre des Mines
et de l'Energie

GAR 00118

(Note: Agreement in same terms executed
          by Bras tro  December 11, 1981)

ENGLISH TRANSLATION

"MARINE 1" PERMIT

• • • •

AD HOC

AGREEMENT

BETWEEN

The People's Republic of the Congo (hereinafter
referred to as the "CONGO"), represented for the purposes
hereof by its Minister of Mining and Energy Mr. Rodolphe
Adada,

on the one hand,

AND

IEDC (Congo) Ltd. (hereinafter referred to as
"IEDC") a Bermuda company with registered offices at 5th
Floor, Bank of Bermuda Building, Hamilton, Bermuda,
represented by Mr. Nordine Aït Laoussine, duly authorized
for this purpose,

on the other hand.

PREAMBLE

On May 25, 1979, the CONGO, HYDRO-CONGO, CITIES
SERVICE, Congolese Superior Oil Company ("SUPERIOR") and
Canadian Superior Oil Ltd. ("CANADIAN") signed a
Convention (the "CONVENTION") for the exploration and
possible exploitation of liquid and gaseous hydrocarbons
on the territory of the People's Republic of the Congo.
The CONVENTION was ratified by Government Order N° 24/79
of July 7, 1979.

HYDRO-CONGO, CITES SERVICE, SUPERIOR and CANADIAN
also signed in Brazzaville on May 25, 1979 a joint

GAR 00119

2.

operating agreement (the "JOA") to carry out petroleum works on the "Marine 1" Type "A" exploration permit granted to HYDRO-CONGO by decree N° 79/253 of May 16, 1979.

On March 12, 1981, SUPERIOR and CANADIAN withdrew from the joint venture organized under the JOA (the "JOINT VENTURE"), effective immediately.

IEDC informed the Minister of Mining and Energy of the CONGO of its interest to participate in the operations of the JOINT VENTURE and of its intention to improve the CONGO's situation under the CONVENTION.

NOW, THEREFORE, IT HAS BEEN AGREED AS FOLLOWS:

## Article 1
### Mining Royalty

The rate of the mining royalty for liquid hydrocarbons set forth in paragraph 5.03 of the CONVENTION is hereby increased from fourteen and one half percent (14.5%) to sixteen and two thirds percent (16 2/3%). The rate of the mining royalty for gaseous hydrocarbons remains unchanged.

## Article 2
### Corporate Tax

With respect to IEDC, the corporate tax shall be computed at the rate of sixty five percent (65%). Therefore, should the corporate tax rate, as set forth in the Code Général des Impôts of the CONGO, be less than sixty five percent (65%), IEDC shall be subject to the corporate tax computed in accordance with the provisions of the Code Général des Impôts of the CONGO, as well as to an additional tax the amount of which shall be determined by applying to the taxable income a percentage rate equal to the difference between the corporate tax rate, as set in the Code Général des Impôts, and sixty five per cent (65%).

## Article 3
### Assignment to a company of the IEDC group

In view of the nature of the IEDC group corporate structure, the CONGO agrees that the authorization of the

3.

Minister in charge shall be automatically granted to any assignment by IEDC of its rights and obligations under the CONVENTION and the JOA to all or any of its ultimate shareholders being AZL Resources Inc., Arab Petroleum Investments Corporation, Kuwait Petroleum Corporation, Sulpetro Ltd. and A.B. Volvo (or, subject to the authorization of the Minister in charge, such not to be unreasonably withheld, any wholly-owned subsidiary of any such ultimate shareholder), provided IEDC remains responsible for the fulfilment of all obligations and liabilities assigned to such assignee and represents such assignee for all purposes under the CONVENTION and the JOA.

<u>Article 4</u>
<u>Effective date; ratification</u>

This <u>ad hoc</u> agreement shall enter into force upon of its ratification by law, but it will be retroactively effective as of March 13, 1981. The French text governs, but an English translation approved by the parties is attached, to which reference may be made for the purpose of clarification.

Done in four copies
in Brazzaville,
on December 11, 1981.

For the CONGO:                                    For IEDC:


_____                    _____
Rodolphe Adada,                                    Nordine Ait-Laoussine
   Ministre des Mines et
   de l'Energie

GAR 00121

```
┌─────────────────────────────────────────────────┐
│         ASSESSORIA JURÍDICA                      │
│  Contrato: 119          C ☒ E ☐  n.º:            │
│  Distribuído e :                Data:            │
└─────────────────────────────────────────────────┘
```

PERMIS "MARINE 1"

ACCORD PARTICULIER

ENTRE

    La République Populaire du Congo (ci-après désignée le "CONGO"), représentée par Monsieur Rodolphe Adada, Ministre des Mines et de l'Energie,

                                   d'une part,

ET

    Petrobras Internacional S.A. BRASPETRO, (ci-après désignée "BRASPETRO"), société d'économie mixte de droit brésilien dont le siège est à Rio de Janeiro, République Fédérative du Brésil, représenté par Monsieur Joel Mendes Renno, dûment autorisé aux fins des présentes,

                                   d'autre part.

EXPOSE PRELIMINAIRE

    Le 25 mai 1979, le CONGO, HYDRO-CONGO, CITIES SERVICE, Congolese Superior Oil Company ("SUPERIOR") et Canadian Superior Oil Ltd. ("CANADIAN") ont signé une Convention (la "CONVENTION") pour la recherche et l'exploitation éventuelle d'hydrocarbures liquides et/ou gazeux sur le territoire de la République Populaire du Congo. La CONVENTION a été ratifiée par l'Ordonnance N° 24/79 du 7 juillet 1979.

    HYDRO-CONGO, CITIES SERVICE, SUPERIOR et CANADIAN ont également signé à Brazzaville le 25 mai 1979 un contrat d'association (le "CONTRAT D'ASSOCIATION") pour l'exécution de travaux pétroliers sur le permis de recherche de type "A" dit Permis "Marine 1" accordé à HYDRO-CONGO par le décret N° 79/253 en date du 16 mai 1979.

    Le 12 mars 1981, SUPERIOR et CANADIAN se sont retirées de l'association constituée aux termes du CONTRAT D'ASSOCIATION ("l'ASSOCIATION") et ce avec effet immédiat.

    BRASPETRO a fait connaître à Monsieur le Ministre des Mines et de l'Energie du CONGO son intérêt à participer aux travaux de l'ASSOCIATION, et son désir d'améliorer la situation du CONGO au sein de la CONVENTION.

GAR 00122

2.

CELA ETANT EXPOSE, LES PARTIES SONT CONVENUES DE CE QUI SUIT:

## Article 1
### Redevance Minière

Le taux de la redevance minière pour les hydrocarbures liquides prévu au paragraphe 5.03 de la CONVENTION est porté de quatorze et demi pour cent (14,5%) à seize deux-tiers pour cent (16 2/3%). Le taux de la redevance minière pour les hydrocarbures gazeux reste inchangé.

## Article 2
### Impôt sur les sociétés

En ce qui concerne BRASPETRO, l'impôt sur les sociétés sera calculé au taux de soixante cinq pour cent (65%). A cet effet, si le taux de l'impôt sur les sociétés fixé par le Code Général des Impôts du CONGO est inférieur à soixante cinq pour cent (65%), BRASPETRO sera soumise à l'impôt sur les sociétés calculé conformément aux dispositions du Code Général des Impôts du CONGO ainsi qu'à un impôt additionnel dont le montant sera calculé en appliquant au bénéfice imposable un pourcentage égal à la différence entre le taux de l'impôt sur les sociétés, tel qu'il résulte du Code Général des Impôts, et soixante cinq pour cent (65%).

## Article 3
### Entrée en vigueur; ratification

Le présent accord particulier entrera en vigueur dès sa ratification par une loi, mais il prendra effet rétroactivement à compter du 13 mars 1981.

Fait en quatre exemplaires en français,
à Brazzaville,
le 11 décembre 1981.

Pour le CONGO:

Rodolphe Adada,
Ministre des Mines
et de l'Energie

Pour BRASPETRO:

Joel Mendes Renno,
Vice-President

GAR 00123

CONGO

cc. J. Vincent
Central File
14-12-81 R.

1

PERMIS "MARINE 1"

o   o   o   o

ACCORD PARTICULIER

IEDC (Congo) Ltd.

11 décembre 1981

GAR 00124



Amoco Congo Exploration Company
Amoco Congo Petroleum Company
200 East Randolph Drive,
Chicago,
Illinois 60680,
U.S.A.

le 29 juin 1984

Monsieur Auxence Ickonga,
Directeur Général-Président,
Hydro-Congo,
Brazzaville

Monsieur le Directeur Général-Président,

Lors de nos récents entretiens à Brazzaville au sujet de
la cession en notre faveur de certains intérêts dans la Con-
vention et l'Accord d'Association du Permis Marine I, nous
vous avons fait connaître notre désir de recevoir sur certains
points importants des clarifications ou des confirmations
de la part d'Hydro-Congo ou des services administratifs
Congolais éventuellement compétents. Ces points sont les
suivants:

1.     Hydro-Congo étant une société entièrement controlée
       par la Republique Populaire du Congo, Amoco s'inquiete
       de la généralité de l'Article 18.03 du Contrat d'Associ-
       ation.

       A cet égard, Amoco désirerait qu'Hydro-Congo lui con-
       firme qu'elle ne considèrera pas que des actes de la
       puissance publique affectant Hydro-Congo seule mais
       non les autres parties au Contrat d'Association, peuv-
       ent constituer des événements de force majeure dans
       le cadre du Contrat d'Association.

2.     Arbitrage

       Le permis de recherche de type "A" dit permis "Marine
       1" figure en annexe 1 à la Convention. Il ne semble
       pas clair à Amoco que cela implique nécessairement
       que le permis et la Convention doivent être lus en-
       semble.

       Amoco désirerait obtenir confirmation  du fait que
       l'Article 17 de la Convention, qui traite de l'arbit-
       rage, autoriserait bien une partie à la Convention
       à invoquer le cas échéant la clause d'arbitrage dans
       le cadre de contestations portant sur le permis (ou
       sur tout permis d'exploitation qui pourrait en result-
       er) dans les mêmes conditions que pour des contestat-
       ions portant sur la Convention elle-même.

-1-

GAR 00125



3.   Amoco désirerait obtenir confirmation du fait que la loi N°23/82 du 7 juillet 1982 faisant référence au Code Minier n'a pas de raison de s'appliquer au permis "Marine 1" (ou à l'u.i quelconque des permis d'exploit-ation qui pourrait en résulter) ou à la Convention, et que l'Article 19.03 de la Convention exclut l'appli-cation tant de l'Article 20 de la loi N°29-62 du 20 juin 1962 que de la loi N°35-65 du 12 août 1965, de telle sorte qu'il ne peut être question pour l'État Congolais d'acquérir une participation dans toute suc-cursale creée, ou dans toute société constituée par Amoco pour les besoins de ses activités au Congo dans le cadre du permis "Marine 1".

4.   <u>Impôt sur les Sociétés</u>

Amoco désirerait obtenir confirmation que les points suivants concernant la fiscalité lui seront applicables:

(A)   Conformément au paragraphe 4.A (A) du procès-verbal signé le 8 mars 1984:

   I.   Les modalités fiscales applicables au pour-centage de participation qu'Amoco doit acquérir de Cities Service seront identiques à celles qui étaient applicables au pour-centage de participation de Cities Service dans le cadre de la Convention du 25 mai 1979. En particulier, le taux de l'impôt sur les sociétés applicable aux revenus D'Amoco en provenance du pourcentage de participation achetée à Cities sera de 55 pour cent, et les taux de redevance applic-ables à ce pourcentage de participation seront de 14 1/2 pour cent pour les hydrocar-bures liquides et de 9 pour cent pour le gaz naturel.

   II.   Les modalités fiscales applicables aux pour-centages de participation qu'Amoco doit acquérir de Braspetro, IEDC et KUFPEC seront identiques à celles qui étaient incluses dans la Convention du 25 mai 1979, à l'ex-ception de la redevance minière pour les hydrocarbures liquides, qui sera de 16 2/3 pour cent au lieu de 14 1/2 pour cent, et du taux de l'impôt sur les sociétés appli-cable a ce pourcentage de participation, qui sera de 65 pour cent au lieu de 55 pour cent. A tout autre point de vue, ce sont les modalités fiscales d'origine de la Con-vention du 25 mai 1979 qui s'appliqueront.

-2-

GAR 00126

(B)  La mention dans l'Article 6.03.2 de la Convention du "taux de l'impôt du Congo" se réfère au taux général d'impôt sur les sociétés qui s'applique à toutes les sociétés qu'elles poursuivent des activités pétrolières ou bien d'autres activités industrielles et commerciales.

(C)  Au cas où une production commerciale d'hydro-carbures serait obtenue, il a été convenu qu'Amoco paierait une Portion du Bénéfice Net (PBN) à Cities Service et à Braspetro, qui n'auront plus alors de représentation permanente au Congo. Ces versements seront faits après paiement des impôts congolais. Amoco voudrait avoir la confirmation qu'il ne sera pas appliqué sur ces versements aucune autre retenue à la source ou impôt congolais sur les sociétés, dans la mesure où ces versements seraient faits hors du Congo et prélevés par Amoco sur des bénéfices qui auront déjà été asujettis aux impôts congolais.

(D)  Amoco voudrait avoir la confirmation que les versements de PBN faits par Amoco à Cities Service et à Braspetro pourront être payés à l'étranger par Amoco en devises sur les fonds conservés à l'étranger par Amoco.

(E)  Amoco bénéficiera entièrement, pour le calcul de sa charge d'impôt sur les sociétés, de tous les frais et charges encourus par Cities Service et Braspetro avant la date d'entrée en vigueur de la cession par celles-ci de leurs pourcentages de participtions respectifs en faveur d'Amoco.

(F)  Amoco désire obtenir confirmation de ce que sa comptabilité visée à l'Article 6.03.4 de la Convention peut être tenue en dollars des Etats-Unis, et que cette même comptabilité constituera la base sur laquelle sera calculé l'impôt sur les sociétés du par Amoco.

5.  Remboursement des avances par Hydro-Congo

Conformément au paragraphe 4.A(C) du procès-verbal, Amoco désirerait qu'il lui soit confirmé que, du fait des cessions envisagées, le "compte-avance" (visé à l'Article 9.01 du Contrat d'Association) établi au nom de Cities Service et de Braspetro et qui reprend toutes les avances faites par ces sociétés avant la date de la cession sera transmis à Amoco et qu'Amoco

-3-

GAR 00127

se verra en conséquence autorisée à recevoir le rem-
boursement complet par Hydro-Congo de ces comptes-
avances conformément à l'Article 9.02 du Contrat
d'Association.

Nous vous prions, Monsieur le Directeur Général-Président,
d'agréer l'expression de nos sentiments respectueux.

T.J. Gorton
Vice Président

TJG/ed

-4-

GAR 00128

Letter 3 of 29th June 1984

Mr. Auxence Ickonga,
Chairman and Managing Director
Hydro-Congo
Brazzaville

Dear Sir,

At our recent meetings in Brazzaville on the subject of the assignment in
our favour of certain interests in the Convention and the
Partnership Agreement of the Marine 1 Permit, we informed you of our
desire to receive clarifications or confirmations from Hydro-Congo or the
competent Congolese administrative departments on certain important
points. The points in question are the following:

1.    Hydro-Congo being a company that is wholly controlled by the
People's Republic of the Congo, Amoco is concerned about the general
nature of Article 18.03 of the Partnership Agreement.

With regard to this, Amoco would like Hydro-Congo to confirm to it
that it will not consider governmental acts which only affect
Hydro-Congo but not the other parties to the Partnership Agreement
as constituting instances of force majeure under the Partnership
Agreement.

2.    Arbitration
The type "A" research permit known as permit "Marine 1" appears in
appendix 1 of the Convention. It does not seem clear to Amoco that
it necessarily implies that the permit and the Convention must be
read together.

Amoco wishes to obtain confirmation of the fact that Article 17 of
the Convention, which deals with arbitration, would authorize a
party to the Convention to invoke, where necessary, the arbitration
clause under the disputes procedure relating to the permit (or any
operating permit which might result from it) under the same
conditions as disputes relating to the Convention itself.

3.    Amoco wishes to obtain confirmation of the fact that Law No. 23/82
of 7th July 1982 referring to the Mining Code does not apply to the
"Marine 1" permit (or to any operating permit which may result from
it) or to the Convention, and that Article 19.03 of the Convention
excludes the application of Article 20 of Law No. 29-62 of 20th June
1962 and of Law No. 35-65 of 12th August 1965, so that there is no
question of the Congolese State acquiring a share in any subsidiary
created or in any company formed by Amoco for the purposes of its
activities in the Congo under permit "Marine 1".

GAR 00129

4.    Company Tax

Amoco wishes to obtain confirmation that the following points concerning tax matters will be applicable to it:

(A)    In accordance with paragraph 4.A (A) of the minutes signed on 8th March 1984:

I.    The tax procedures applicable to the percentage share that Amoco is to acquire from Cities Service will be identical to those which were applicable to the percentage share of Cities Service under the Convention of 25th May 1979. In particular, the rate of the company tax applicable to Amoco income resulting from the percentage share purchased from Cities will be 55 percent, and the rate of royalty applicable to this percentage share will be 14 1/2 percent for liquid hydrocarbons and 9 percent for natural gas.

II.    The tax procedures applicable to the percentage shares that Amoco is to purchase from Braspetro, IEDC and KUFPEC will be identical to those which were included in the Convention of 25th May 1979, with the exception of mineral royalty for liquid hydrocarbons, which will be 16 2/3 percent instead of 14 1/2 percent, and the rate of company tax applicable to this percentage share, which will be 65 instead of 55 percent. In every other respect, the original tax procedures of the Convention of 25th May 1979 will apply.

(B)    The words in Article 6.03.2 of the Convention of the "rate of the tax of the Congo" refers to the general rate of company tax which applies to all companies pursuing oil activities or other industrial and commercial activities.

(C)    In the event of commercial production of hydrocarbons being achieved, it has been agreed that Amoco would pay a portion of the net profit (PBN) to Cities Service and Braspetro, which would no longer have a permanent representation in the Congo. These payments will be made after payment of Congolese taxes. Amoco wishes to have confirmation that no other deduction at source or Congolese company tax will be applied to these payments, in so far as these payments will be made outside the Congo and deducted by Amoco from the profits which will have already been subject to Congolese taxes.

(D)    Amoco whishes to have confirmation that these PBN payments made by Amoco to Cities Service and to Braspetro may be paid abroad by Amoco in currencies on the funds held abroad by Amoco.

GAR 00130

(E)    Amoco will benefit fully, for the calculation of
       its company tax burden, from all the costs and
       charges incurred by Cities Service and Braspetro
       prior to the date of the assignment by the latter
       of their respective percentage shares in favour of
       Amoco coming into force.

(F)    Amoco wishes to obtain confirmation that its
       accounts as referred to in Article 6.03.4 of the
       Convention may be kept in United States Dollars,
       and that the same accounts will constitute the
       basis on which the company tax owed by Amoco will
       be calculated.

5.    Repayment of Advances by Hydro-Congo

In accordance with paragraph 4.A (C) of the minutes, Amoco would
like to receive confirmation that, by reason of the assignments
envisaged, the "advance account" (referred to in Article 9.01 of the
Partnership Agreement) established in the name of Cities Service and
Braspetro and which covers all the advances made by these companies
prior to the date of assignment will be transferred to Amoco and
that Amoco will consequently be authorized to receive the full
repayment by Hydro-Congo of these advance accounts in accordance
with Article 9.02 of the Partnership Agreement.

Yours sincerely,

T.J. Gorton
Vice President

TJG/ed

GAR 00131



SOCIETE NATIONALE
DE
RECHERCHE ET D'EXPLOITATION
PETROLIERES

# HYDRO-CONGO

Capital : 710.000.000 F. CFA

R. C. : 83 B 931

Siège Social : Brazzaville

Nº 130/100-21/DGP/HC          et

REPUBLIQUE POPULAIRE DU CONGO

Brazzaville, le   29  JUIN  1984.-

*Le Directeur Général Président,*

A

Amoco Congo Exploration Company
Amoco Congo Petroleum Company
1 Stephen Street
Tottenham Court Road
London W1 2AU
Royaume-Uni

Messieurs,

    Par lettre en date du 29 Juin 1984, vous nous avez soumis plusieurs questions relatives au statut du Permis "Marine 1" et aux effets des cessions de pourcentages de participation actuellement détenus par Cities Service Congo Petroleum Corporation, Petrobras Internacional S.A. -- BRASPETRO, IEDC (Congo) Ltd. et Kuwait Foreign Petroleum Exploration Company K.S.C. La plupart de ces questions concernant l'Etat, nous les avons transmises à notre autorité de tutelle qui les considère et vous fera connaître sa position directement. La présente lettre ne porte donc que sur vos questions numérotées 1 et 5.

## 1. Question numéro 1 : Force majeure

    HYDRO-CONGO est une Société Nationale de droit Congolais dont les organes de gestion sont indépendants des services de l'Etat, et notamment du Ministère des Mines et de l'Energie. HYDRO-CONGO estime donc ne pas être en mesure de vous donner la confirmation demandée. HYDRO-CONGO tient toutefois à préciser qu'elle n'invoquera les dispositions de l'article 18.03 du Contrat d'Association que de manière raisonnable et sans abuser du droit qui lui est reconnu.

.../...

GAR 00132

B. P. 2008 - Brazzaville — Tél. : 81.41.26 — Télex : 5215 KG/5232 KG/5300 KG

.../...                                                          ( 2 )

2. Question numéro 5 : Remboursement des Avances

HYDRO-CONGO admet que les avances qui lui ont été consenties par les Sociétés cédantes conformément à l'article 9 du Contrat d'Association et qui ont été inscrites aux comptes avances sous le nom des Sociétés cédantes seront bien transmises à vos deux Sociétés du fait des cessions. A ce titre, et conformément aux dispositions de l'article 9 précité du Contrat d'Association, la ou les Sociétés cessionnaires seront autorisées à recevoir les sommes versées par HYDRO-CONGO à titre de remboursement desdites avances.

Veuillez agréer, Messieurs, l'expression de nos salutations distinguées.

Le Directeur Général,
Président du Conseil d'Administration
d' HYDRO-CONGO,

A. TCHONGA

cc : Ministère des Mines et de l'Energie.

GAR 00133

from the Chairman and Managing Director
     Hydro-Congo

No. 130/100-21/DGP/HC

29th June 1984


to  Amoco Congo Exploration Company
and Amoco Congo Petroleum Company
     1, Stephen Street,
     Tottenham Court Road,
     London W1 2AU
     United Kingdom


Dear Sirs,
     In your letter of 29th June 1984 you have submitted to us several
questions regarding the status of the "Marine 1" Permit and the
effects of the assignments of the percentage shares presently held
by Cities Service Congo Petroleum Corporation, Petrobras
Internacional S.A. — BRASPEIRO, IEDC (Congo) Ltd. and Kuwait
Foreign Petroleum Exploration Company K.S.C. The majority of these
questions concern the State and we have forwarded them to our higher
authority, which will consider them and inform you of its position
directly. Consequently, this letter only deals with your questions
numbered 1 and 5.

     1. Question Number 1:    Force Majeure

     HYDRO-CONGO is a National Company incorporated under Congolese
law whose administrative bodies are independent of the State
departments and, in particular of the Ministry of Mines and Energy.
HYDRO-CONGO therefore considers that it is not in a position to give
you the confirmation requested. HYDRO-CONGO undertakes nevertheless
to state that it will only invoke the provisions of Article 18.03 of
the Partnership Agreement in a reasonable manner and without abusing
the right which is accorded it.

GAR 00134

2. <u>Question Number 5:</u>    <u>Repayment of Advances</u>

HYDRO-CONGO acknowledges that the advances which have been granted it by the assigning companies in accordance with Article 9 of the Partnership Agreement and which have been entered in the advance accounts under the name of the assigning companies will be transferred to your two companies by virtue of the assignments. In this regard, and in accordance with the provisions of Article 9 referred to above of the Partnership Agreement, the assignee company or companies will be authorized to receive the sums paid by HYDRO-CONGO by way of repayments of the said advances.

Yours sincerely,

The Managing Director,
Chairman of the Board of Directors
of HYDRO-CONGO

A. ICKONGA

cc: Ministry of Mines and Energy

GAR 00135

RÉPUBLIQUE POPULAIRE DU CONGO
Travail -:- Démocratie -:- Paix
—-ooo-—

*Brazzaville, le* ...29. juin. 1984.............

MINISTERE DES MINES
ET DE L'ENERGIE

*Le Ministre des Mines*
*et de l'Energie*

CABINET

B.P. 2120 — Tél : 81-12-81

N°———————/ MME - CAB.

002388

*à*

Amoco Congo Exploration Company

et

Amoco Congo Petroleum Company
1 Stephen Street

Tottenham Court Road

LONDON W1 2AU

Royaume - Uni

Messieurs,

J'ai pris bonne note de votre lettre du 29 juin 1984 adressée à la Société Nationale de Recherches et d'Exploitation Pétrolières "HYDRO-CONGO" dans laquelle vous posez certaines questions qui sont du ressort des services de l'Etat et que le Directeur Général - Président d'HYDRO-CONGO m'a soumises.

Il ressort de cette lettre que vos sociétés désirent reprendre en tant que cessionnaires, tout ou partie des pourcentages de participation actuellement détenus par Cities Service Congo Petroleum Corporation, Petrobras Internacional S. A. -- BRASPETRO, IEDC (Congo) Ltd. et Kuwait Foreign Petroleum Exploration Company K. S. C.

La présente lettre a pour objet de vous apporter, lorsque cela est possible, les précisions que vous demandez.

### 1.  Question numéro  2 : Arbitrage

La Convention du 25 mai 1979 relative au permis "Marine 1" (la "Convention"), vise expressément dans son paragraphe 1.04 le permis en question, lequel figure de plus en annexe 1 à ladite Convention. Toutefois celui-ci constitue un acte administratif unilatéral adopté avant l'entrée en vigueur de la Convention et dont la validité ne pourrait être remise en cause par une décision arbitrale.

..../...

GAR 00136

2.    Question numéro  3 : Code Minier

Il me semble ressortir des dispositions de la Convention que les droits et obligations des parties à cette Convention en matière minière restent régis par la loi n° 35-65 du 12 août 1965.

En ce qui concerne la deuxième partie de votre question, l'article 10.03, in fine, de la Convention  prévoit clairement que :

"Par dérogation à l'article 20 de la loi n° 29-62 du 16 juin 1962, tel que modifié, les SOCIETES ne seront pas requises de constituer une Société filiale de droit congolais".

3.    Question  numéro 4 : Fiscalité

Votre paragraphe 4 comporte plusieurs questions que j'aborderai successivement :

A - Dans le cadre des cessions envisagées, la Société cessionnaire bénéficie des droits et obligations de la Société cédante au titre de la Convention.

B - La référence faite par le sous-paragraphe 6.03.2 de la Convention à "l'impôt sur les sociétés" vise bien l'impôt de ce nom prévu par le Code Général des Impôts du Congo et applicable d'une manière générale à toutes les entreprises industrielles et commerciales établies au Congo et dotées de la personnalité morale. Le taux de cet   impôt est actuellement de 49 %.

C - Les versements faits par Amoco Congo Exploration Company à Cities Service Congo Petroleum Corporation et par Amoco Congo Petroleum Company à Braspetro consistant en une distribution hors du Congo de bénéfices nets d'impôts congolais réalisés dans le cadre des travaux pétroliers, ces sommes sont exonérées de tout impôt par application de ladite Convention.

D - Je vous rappelle les dispositions suivantes de la Convention :

"8.01.1 - Le CONGO n'impose pas aux SOCIETES d'obligation de rapatriement du produit de la vente à l'exportation d'HYDROCARBURES.

8.01.6 - Les SOCIETES pourront rapatrier du CONGO vers les pays extérieurs à la zone franc les capitaux provenant de ces pays investis au CONGO dans le cadre des TRAVAUX PETROLIERS, et transférer dans les mêmes conditions leurs produits éventuels. Le CONGO garantit aux SOCIETES qu'elles obtiendront des moyens de règlement sur les pays extérieurs à la zone franc nécessaires à la réalisation des opérations visées à la CONVENTION. "

i....../...

GAR 00137

3. -

E - Veuillez vous référer à la réponse que j'ai appor-
tée sous la lettre A ci-dessus.

F - Je vous rappelle les dispositions du sous para-
graphe 6.03.4 de la Convention :

"6.03.4 - Afin de permettre le calcul de l'impôt
sur les Sociétés (...) chaque SOCIETE devra (...)
tenir une comptabilité conforme aux règles fixées
par le Code Général des Impôts".

Veuillez agréer, Messieurs, l'expression de ma
considération distinguée.

Pour le Ministre des Mines et de l'Energie,
le Ministre de l'Industrie et de la Pêche,

J.   I T A D I

cc : HYDRO-CONGO

GAR 00138

From  The Minister of Mines and Energy

29th June 1984

To      Amoco Congo Exploration Company
and     Amoco Congo Petroleum Company
        1 Stephen Street,
        Tottenham Court Road
        London W1 2AU
        UK

Dear Sirs,
    I have taken note of your letter of 29th June 1984 addressed to
the Societe Nationale de Recherches et d´Exploitation Petrolieres
"HYDRO-CONGO" in which you raise several questions which are the
province of Government departments and which the Chairman and
Managing Director of HYDRO-CONGO has submitted to me.

    It appears from this letter that your companies wish to assume as
assignees all or part of the percentage shares presently held by
Cities Service Congo Petroleum Corporation, Petrobras Internacional
S.A. — BRASPEIRO, IEDC (Congo) Ltd. and Kuwait Foreign Petroleum
Exploration Company K.S.C.

    The purpose of the present letter is to give you, where possible,
the answers you requested.

    1. Question Number 2:    Arbitration

    Paragraph 1.04 of the Convention of 25th May 1979 concerning the
"Marine 1" Permit (The "Convention") expressly refers to the Permit
in question, which is also referred to in Appendix 1 to the said
Convention. However, this constitutes a unilateral administrative
act adopted prior to the Convention coming into force and the
validity of it cannot be affected by an arbitration decision.

    2. Question Number 3:    Mining Code

    It seems clear to me from the provisions of the Convention that
the rights and obligations of the parties to this Convention with
regard to mining questions remain governed by law No. 35-65 of 12th
August 1965.

    In so far as the second part of your question is concerned,
Article 19.03, in fine, of the Convention, clearly lays down that:

    "Notwithstanding Article 20 of law 29-62 of 16th June 1962, as
amended, the COMPANIES will not be required to incorporate a
subsidiary company under Congolese law".

GAR 00139

3.  Question Number 4:  Tax

Your paragraph 4 contains several questions which I will deal with in turn:

A - Under the assignments envisaged, the assignee company enjoys the rights and obligations of the assigning company by virtue of the Convention.

B - The reference made by sub-paragraph 6.03.2 of the Convention to "the company tax" clearly refers to the tax of this name laid down by the General Code of Taxes of the Congo and applicable, in a general manner, to all industrial and commercial enterprises established in the Congo with a legal entity. The rate of this tax is at present 49%.

C - The payments made by Amoco Congo Exploration Company to Cities Service Congo Petroleum Corporation and by Amoco Congo Petroleum Company to Braspetro consisting of a distribution made outside the Congo of profits net of Congolese taxes realized within the framework of oil works are exempted from any tax by application of the said Convention.

D - I would draw your attention to the following provisions of the Convention:

"8.01.1 - The CONGO does not impose on the COMPANIES the obligation of repatriating the proceeds of the sale of HYDROCARBON exports.

"8.01.6 - The COMPANIES may repatriate from the CONGO to countries outside the Franc zone capital originating from these countries invested in the CONGO under the framework of OIL WORKS, and transfer under the same conditions their possible proceeds. The CONGO guarantees the COMPANIES that they will obtain the means of settlement in countries outside the Franc zone necessary for the realization of the transactions referred to in the CONVENTION."

E - Please refer to the answer I made to A above.

F - I would draw your attention to the provisions of sub-paragraph 6.03.4 of the Convention:

"6.03.4 - in order to permit the calculation of the company tax (...) each COMPANY will (...) keep accounts in accordance with the rules laid down by the General Code of Taxes."

Yours sincerely

For the Minister of Mines and Energy
The Minister of Industry and Fisheries

J. I T A D I

cc: HYDRO-CONGO

GAR 00140

AMENDMENT No. 1 TO THE CONVENTION DATED 25 MAY 1979
FOR THE MARINE PERMIT

Between:



- The Republic of the Congo (hereinafter the "Congo") represented for the purposes hereof by Mr. Nguila MOUNGOUNGA NKOMBO its Minister of the Economy, Finances and Planning

on the one hand,

and

- Société Nationale de Recherches et d'Exploration Pétrolière "Hydro-Congo" (hereinafter "Hydro-Congo") a national company with registered offices at Brazzaville, Republic of the Congo, represented by Mr. BERNARD OKIORINA, its General Manager,

- CMS NOMECO Congo Inc. (hereinafter "NOMECO") a legally constituted company with registered offices at Pointe-Noire, Republic of the Congo, represented by Mr. K. Charsinsky, its General manager,

- Kuwait Foreign Petroleum Exploration Co. k.s.c., a legally constituted company under the laws of Kuwait with registered offices in Kuwait at P.O. Box 5291, Safat 13053, Kuwait, represented by Mr. MAHMOUD A. AL RAHMANI, its President and General Manager, on behalf of KUFPEC (Congo) Limited (hereinafter "KUFPEC"),

- The NUEVO Congo Company (hereinafter "NUEVO"), a legally constituted Company with registered offices at Houston, Texas, represented by Mr. Michael D. Watford, its President



Hereinafter referred to collectively as the "COMPANIES" or individually as "COMPANY"

on the other hand,

In this respect the Republic of the Congo on the one hand, Hydro-Congo, NOMECO, KUFPEC and NUEVO on the other hand, are jointly referred to hereinafter as the "Parties" or individually as the "Party".

PREAMBLE:

Whereas the Companies' predecessors in right entered into a Convention Marine I dated 25 May 1979, hereinafter referred to as the "Convention", which defines in its Article 7.01 the calculation basis of the proportional mining royalty.

GAR 00141