# EXHIBIT A

IN THE UNITED STATES COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States Courts
Southern District of Texas
FILED

AUG 1 9 2005

Michael N. Milby, Clerk

| | | |
|---|---|---|
| FG HEMISPHERE ASSOCIATES, L.L.C. | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| THE, REPUBLIQUE DU CONGO, | § | |
| Defendant, | § | |
| | § | |
| and | § | C. A. NO. H-02-4261 |
| | § | |
| CMS OIL AND GAS COMPANY, et. al., | § | |
| | § | |
| Putative Garnishees. | § | |

**GARNISHEES' RESPONSE TO EMERGENCY OPPOSED SECOND APPLICATIONS
TO ISSUE WRITS OF GARNISHMENT WITH RESPECT
TO THE REPUBLIQUE DU CONGO AND WITH RESPECT TO SOCIETE
NATIONALE DES PETROLES DU CONGO**

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Garnishees CMS Nomeco Congo, LLC (formerly known as CMS Nomeco Congo Inc.),

The Nuevo Congo LLC (formerly known as The Nuevo Congo Company), and Nuevo Congo

Ltd. ("Garnishees"), respectfully submit this Response to FG Hemisphere's Emergency Opposed

Second Applications to issue writs of garnishment with respect to both the Republique du Congo

("the Congo") and Societe Nationale Des Petroles du Congo ("SNPC") .

I.

**INTRODUCTION**

On August 12, 2005, FG Hemisphere filed two motions asking the Court to issue new

writs of garnishment against Garnishees with regard to the Congo and SNPC. These motions

constitute the latest effort by FG Hemisphere to impose double liability on Garnishees. FG

Hemisphere is fully aware that Garnishees are subject to Congo court orders issued on July 4,

2005, that compel delivery of oil to SNPC that includes royalty oil of the Congo and working interest oil of SNPC. Garnishees operate in the Congo and have no option to disregard the orders of the Congo court. FG Hemisphere nevertheless asks this Court to issue writs in connection with the August 30, 2005 SNPC oil lifting, asking this Court to impose an obligation on Garnishees which directly conflicts with the Congo court orders and imposes conflicting obligations on Garnishees.

When Judge Hoyt issued writs in October 2004 and December 2004, he did not have the benefit of Judge Sparks' February 4, 2005 order holding that non-monetary obligations are not subject to garnishment in Texas, precluding garnishment writs against the Garnishees, nor did he have the benefit of the Fifth Circuit's decision in *Walker International Holdings, Inc. v. Republic of Congo*, 395 F.3d 229 (5th Cir. 2004), decided on December 22, 2004, which adopts a "commercial use" rule under the FSIA that precludes issuance of writs against SNPC's property. Nor did Judge Hoyt have the benefit of FG Hemisphere's admissions made in a recent Fifth Circuit brief in which it admits that the SNPC property it seeks to garnish is oil located in the Congo, and the only SNPC property "used" by SNPC was oil in the Congo, which the Fifth Circuit held in *Af-Cap v. Republic of Congo*, 383 F.3d 361, *clarified on rehearing*, 389 F.3d 503 (5th Cir. 2004) is not subject to garnishment. Nor did Judge Hoyt have the benefit of Judge Sparks' Order dated August 17, 2005, a copy of which is attached hereto as Exhibit A, in which Judge Sparks denied a similar request for issuance of new garnishment writs filed by Af-Cap in the Western District.

Garnishees respectfully submit that this Court should take the same action taken by Judge Sparks with regard to Af-Cap's request for new writs, and deny FG Hemisphere's Applications for new writs, for a variety of reasons:

1.    The issuance of new garnishment writs is properly considered a separate action, and this Court lacks personal jurisdiction over Garnishees with regard to a new garnishment action based on the circumstances that currently exist.

2.    FG Hemisphere has not shown that the property sought to be garnished is currently located "in the United States" for purposes of the threshold requirement under the Foreign Sovereign Immunities Act for execution against the assets of a foreign state such as the Congo.

3.    FG Hemisphere has not shown that the SNPC property that it seeks to garnish is intangible property that has been used for commercial activity in the United States, and its recently filed Fifth Circuit brief affirmatively demonstrates that it cannot make such a showing.

4.    Only monetary obligations are subject to garnishment in Texas, precluding issuance of garnishment writs with regard to in-kind royalty oil and working interest oil.

5.    FG Hemisphere has presented no basis by which Garnishees can be protected from double liability by virtue of the July 4, 2005 Congo court orders, which construe Congolese law (which governs the Convention) as requiring delivery of oil notwithstanding any U.S. court orders.

6.    Under Section 441 of the Restatement (Third) of Foreign Relations Law of the United States, the doctrine of foreign state compulsion requires that the orders of the Congo court take preference over any writs of garnishment that this Court might issue and precludes this Court from issuing conflicting commands.

7.    The act of state doctrine prevents this Court from adjudicating whether the Congo court orders are improper.

3

For all of these reasons, the Court should deny each of the applications that FG Hemisphere has filed.

## II.

## ARGUMENT AND AUTHORITIES

### A.  The Court Lacks Personal Jurisdiction Over Garnishees With Regard to Any New Writs of Garnishment

Garnishees challenged personal jurisdiction with regard to previous writs issued in this case. The evidence attached to Garnishees' motions to dismiss demonstrates that Garnishees are not currently subject to personal jurisdiction in Texas. FG Hemisphere has made no showing of current contacts of Garnishees with Texas that would be sufficient to satisfy due process concerns. Instead, FG Hemisphere continues to rely on prior conduct in this Court in connection with prior applications for writs and prior writs issued in response to those applications.

This argument ignores the established Texas rule that the issuance of new garnishment writs constitutes a separate action that requires a separate determination of jurisdiction. As the Court held in *Citizens Nat'l Bank in Ennis v. Hart*, 321 S.W.2d 319, 320-21 (Tex. Civ. App. – Fort Worth 1959, writ ref'd)[1], "[i]n garnishment matters the writ is . . . the original process and initiatory step in the prosecution of a suit." In the Order signed on August 17, 2005 denying Af-Cap's motion for new writs, Judge Sparks said that "the procedurally correct way to begin new garnishment proceedings is the initiation of a new lawsuit naming the garnishees as party defendants." Exhibit A at 5. The Court noted that Af-Cap had sought to have the new writs issued in a prior garnishment action, rather than filing a new lawsuit, because "unless the Court were able to rely on the CMS Entities' appearances in [the prior garnishment case], it would probably not have personal jurisdiction over them. The Court is unwilling to adopt a rule,

---

[1] A writ refused case has the precedential effect of a decision of the Texas Supreme Court.

however, whereby personal jurisdiction obtained over a party in one suit, based on the facts existing at the outset of that suit, would forever subject that party to appear in all new proceedings which are in some way related to the original suit." Exhibit A at 6 n. 2. The Court held that its prior holding in *Af-Cap* that allowed garnishment writs to issue against the Garnishees following remand from the Fifth Circuit, without a new analysis of personal jurisdiction, was due to the fact that the Court was required to "craft an appropriate remedy to cure an error following remand." *Id.*

For the reasons set out in Judge Sparks' order, the "procedurally correct way" for FG Hemisphere to request new writs is "the initiation of a new lawsuit," and it would be inappropriate for this Court to base personal jurisdiction "on the facts existing at the outset of suit" that "would forever subject [Garnishees] to appear in all new proceedings which are in some way related to the original suit." Exhibit A at 5, 6 n. 2. Because FG Hemisphere has made no showing that Garnishees are subject to personal jurisdiction with regard to a new garnishment action, and because the evidence before this Court in the prior motions to dismiss filed in October 2004 and January 2005 (which are incorporated by reference herein) demonstrate that Garnishees are not subject to personal jurisdiction, the request for new writs should be denied.

**B.    FG Hemisphere Has Failed to Demonstrate that Royalty Obligations Sought to be Garnished Are Currently "in the United States" as Required by the FSIA**

FG Hemisphere concedes that the property of a foreign state must be located "in the United States" to satisfy the requirements for exceptions to immunity under the FSIA. The Fifth Circuit held in *Connecticut Bank of Commerce v. Republic of Congo*, 390 F.3d 240, 247 (5th Cir. 2002) that under the FSIA, a district court must first make a determination that the property sought to be garnished falls within an exception to immunity before it issues writs of garnishment. Although it is undisputed that the FSIA requires that the property of a foreign state

that a creditor seeks to garnish must be located "in the United States," FG Hemisphere has made no showing that the royalty obligations sought to be garnished are currently located in the United States, relying instead on prior determinations on that issue at prior points in time.

Established principles of in-rem jurisdiction mandate that the determination of the location of property on which execution is sought must be made at the time the writ is issued. A garnishment proceeding "is operative in rem upon the property of the defendant debtor in the hands of the garnishee." *In re T.B. Westex Foods*, 950 F.2d 1187, 1191 n. 7 (5th Cir. 1992) (quoting *Citizens Nat'l Bank in Ennis v. Hart*, 321 S.W.2d at 320-21). The United States Supreme Court has said that "the seizure of property, or that which, in this case, is the same in effect, the levy of the writ of attachment on it, is the one essential requisite to jurisdiction." *Cooper v. Reynolds*, 77 U.S. 308, 319 (1870). If the property is not present within the jurisdiction of the court at the time of issuance and service of the writ, the court is without jurisdiction. Id.

The same approach is appropriate in applying the FSIA's "in the United States" requirement for exceptions to execution immunity under Section 1610(a). Just as a court's in rem jurisdiction to seize property depends on the location of the property at the time it is "seized" by service of writs issued by the court (not at the time of filing of an application), the court's authority to execute on a foreign state's property under the FSIA's "in the United States" requirement should depend on the property being "in the United States" at the time of service of the writs. It is the exercise of judicial power in seizing the property of a foreign state that has the potential to interfere with the United States government's foreign relations with foreign nations, and the exercise of that judicial power occurs when the writs are issued and served, not before.

If the property is not located in the United States at the time of its "seizure" by a U.S. court through issuance and service of writs, the writs are not authorized under the FSIA. Such a seizure at a point in time when the property is located outside the United States would constitute an extraterritorial exercise of jurisdiction that is inconsistent with Congress' intent to limit the courts' exercise of such power to the territorial jurisdiction of the United States. *Cf. Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 441 (1989) (holding that the term "in the United States" for purposes of the non-commercial tort exception to immunity from suit in Section 1605(a)(5) of the FSIA refers to the geographical area that is "within the territorial jurisdiction of the United States" and that the statutory language conferring jurisdiction over claims against foreign states for damage to property occurring "in the United States" did not evince a legislative intent that the provision apply to property damaged by foreign states outside of U.S. territorial jurisdiction).

In the Fifth Circuit's *Af-Cap* decision relied on by FG Hemisphere for its "in the United States" contentions, the Court applied the state law rule that "the situs of the debt is the situs of the debtor" in determining whether the royalty obligations at issue in that case were located "in the United States." 383 F.3d at 371-372. The question with regard to the newly requested writs, which was not answered in *Af-Cap*, is whether any royalty obligations owed by Garnishees to the Congo in August 2005 are located in the United States as of August 2005. There is no basis for an affirmative answer to that question.

It is undisputed that Garnishee Nuevo Congo Ltd. has no current connection to the United States. It is a Cayman Islands corporation that has no offices, assets, or activities in the United States. With regard to the other Garnishees, their only current connection to the United States is that they are Delaware entities.

7

*Af-Cap* does not stand for the proposition that mere incorporation in the United States of a debtor of a foreign state renders the debt owed to the foreign state "in the United States" for purposes of the FSIA. The Court in *Af-Cap* emphasized that at the point in time relevant to the determination of that appeal, the Garnishees were "headquartered" in the United States. 383 F.3d at 372-373. *Af-Cap* did not hold, and it does not require a holding in this case, that a foreign state's debtor that has no business activities in the United States, that has its principal place of business in the foreign state, and that incurs its debt to the foreign state based on activities undertaken within the territory of the foreign state, has its "situs" in the United States for purposes of the FSIA, merely by virtue of its incorporation in Delaware. Considering the totality of the circumstances that existed in October 2004, Garnishees do not have their "situs" in the United States for purposes of the FSIA.

Furthermore, FG Hemisphere's argument that the situs of a debt can be in multiple locations for purposes of the FSIA is inconsistent with this Court's decisions in *Callejo v. Bancomer, S.A.*, 764 F.2d 1101, 1122 (5th Cir. 1985) and *Tabacalara Severiano Jorge, S.A. v. Standard Cigar Co.*, 392 F.2d 706, 714-15 (5th Cir. 1968). Those cases require that the court discern the "true situs" of intangible property where an "overriding national concern" is implicated. There is no basis for concluding that the true situs of the obligations of CMS Nomeco Congo Inc. and The Nuevo Congo Company is in Delaware based solely on their incorporation there, when (1) their principal place of business is in the Congo, (2) the activities giving rise to their obligations to the Congo take place in the Congo, (3) they engage in no business activities in Delaware or anywhere else in the United States, and (4) they have no physical offices or personnel there.

Though *Callejo* and *Tabacalara* were act of state cases (rather than FSIA cases), that is no valid distinction. In *Callejo*, the Court acknowledged the interrelated policies of foreign sovereign immunity and the act of state doctrine, both of which limit "'involvement of the courts'" that "'might frustrate the conduct of the Nation's foreign policy.'" *Callejo*, 764 F.2d at 1113 (quoting *First Nat'l City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 769 (1972)). As a result, the Fifth Circuit noted that courts "traverse much of the same path" in their respective application of the FSIA and the act of state doctrine and "focus...on preventing friction with coequal sovereigns." *Callejo*, 764 F.2d at 1113.

Consistent with *Callejo*, and contrary to FG Hemisphere's contentions, a rule that allows more than one situs of a foreign state's property for purposes of Section 1610(a) implicates the same foreign relations issues that underlie the act of state doctrine. Just as the act of state doctrine requires that the U.S. courts not attempt to adjudicate the actions of a foreign state within its own territory, Section 1610(a) of the FSIA requires that U.S. courts not interfere with a foreign state's exercise of its property rights within its own borders. A "multiple situs" rule that allows a U.S. court to seize property that has a situs in the foreign state's territory would permit the very type of interference that the "in the United States" requirement of the FSIA is designed to prevent.

A "common sense appraisal of the requirements of justice and convenience in this particular context," *Af-Cap*, 383 F.3d at 371, compels the conclusion that the "true situs" of any obligations owed by Garnishees to the Congo in August 2005 is in the Congo, not the United States, and the issuance of the writs would violated Section 1610(a) and (c) of the FSIA.

9

C.   **There Has Been No Showing that Either the "in the United States" or the "Commercial Use" Requirement of the FSIA Has Been Satisfied with Regard to the SNPC Property**

1.   *The SNPC Property Sought to be Garnished is Not "In the United States"*

FG Hemisphere's "in the United States" argument with regard to its request for issuance of writs against SNPC's property is predicated on the same argument on which it bases its "in the United States" argument with regard to the royalty obligations. For the same reasons set out above with regard to the royalty obligations, FG Hemisphere's "in the United States" argument fails. Yet, the argument fails for another independent reason with regard to the SNPC property: the SNPC property that FG Hemisphere seeks to garnish is SNPC's working interest oil, tangible property located in the Congo, not any intangible obligation allegedly owed by Garnishees.

In its recently-filed Fifth Circuit Brief addressing the immunity of SNPC's property, a copy of which is attached as Exhibit B, FG Hemisphere readily and repeatedly acknowledged that the property it is seeking to garnish is SNPC's working interest in oil produced in the Congo. That oil is a tangible asset located in the Congo, not in the United States.

For example, in the concluding paragraph of its Fifth Circuit Brief, FG Hemisphere summarizes its position by stating that "[t]he property FG Hemisphere is garnishing is SNPC's 50% interest in the oil produced." Exhibit B at 42. FG Hemisphere urged the Fifth Circuit to find that "SNPC's entire working interest in the Yombo field is available for execution." *Id.* FG Hemisphere describes "SNPC's full working interest" as "50% of the oil produced." Exhibit B at 11. These admissions demonstrate that FG Hemisphere is improperly seeking to garnish tangible oil located in the Congo, not intangible property located in the United States.

Even if FG Hemisphere had not made these admissions, there is no basis for any contention that the Joint Operating Agreement creates any intangible obligations owed by

Garnishees to SNPC. SNPC and Garnishees have property interests as working-interest owners

in the concession for oil production granted by Congo under the Convention. Section 10.01 of

the Convention provides that "[e]ach COMPANY shall have the right to take freely the portion

of the HYDROCARBONS to which it is entitled pursuant to the JOINT OPERATING

AGREEMENT." Garnishees make liftings of oil stored on the Conkouati for their own account,

and sell 100% of the oil so lifted for their own account. CMS Nomeco, as operator, calculates

the effect of liftings on the over- or under-delivered position of SNPC and Congo, on a barrel

basis, and records that effect on an "over/under statement." Once the combined under-delivered

position of SNPC and Congo reaches at least 275,000 barrels, SNPC is entitled to take a lifting

of oil for itself and for Congo. When SNPC takes a lifting, SNPC sells, for its account and for

the account of Congo, all of the barrels that it lifts. The SNPC lifting comprises the in-kind

royalty obligation to Congo and SNPC's working-interest oil. After SNPC takes a lifting, it is in

an over-delivered position. The Garnishees take future liftings until the combined under-

delivered position of SNPC and Congo again exceeds 275,000 barrels, when SNPC again has the

right to take and sell another lifting.

There are no property interests of SNPC that can be considered "obligations" owed by

Garnishees to SNPC in connection with the parties' agreements relating to the taking of liftings

of working-interest oil. Article 10 of the JOA provides each party with "make-up rights" with

regard to deficiencies in liftings of oil as compared to its participating interest share.

Specifically, Section 10.04 of the JOA provides: "If any PARTY has lifted . . . less than its

PARTICIPATING INTEREST share of the Available Oil taken by the PARTIES under regular

nominations during any QUARTER, such PARTY shall be deemed deficient in lifting its share

of Available Oil to the extent of the additional quantity of Available Oil that would be required

to make the quantity of Available Oil lifted by such PARTY equal to its PARTICIPATING INTEREST share of all Available Oil lifted by the PARTIES during such QUARTER pursuant to regular nominations. A PARTY so underlifting for any QUARTER shall be entitled to make up such deficiency in its liftings only during the twenty (20) succeeding QUARTERS...." Section 10.11 provides that "[t]he right of such other PARTY to make up its deficiency shall be limited to make-up provisions of this Article." These provisions make it clear that any under-lifted position of a working-interest owner does not give rise to an "obligation" owed by other working-interest owners to the under-lifted party, but instead simply creates a right to make-up the under-delivered position by taking additional liftings of oil.

The Amendment to the Lifting Agreement provides the mechanism by which SNPC takes liftings when the combined under-lifted position of SNPC and Congo exceeds 275,000 barrels, as described above. That amendment does not convert under-lifted positions of SNPC into an "obligation" on the part of the Garnishees. It simply addresses the logistics and timing of liftings by the parties. Under Section 10.11 of the JOA, SNPC has no rights to make-up deficiencies other than in accordance with its make-up rights. No "obligation" to SNPC on the part of the Garnishees ever exists. SNPC simply has a contractual right to periodically take liftings of working-interest oil.

As confirmed in FG Hemisphere's Fifth Circuit brief, what FG Hemisphere seeks to garnish is SNPC's tangible working interest oil in the Congo. These facts distinguish the SNPC property from that at issue in *Af-Cap*. In that case, the Court was sensitive to the distinction between the two forms of property – intangible obligations to deliver oil versus the tangible oil itself – in stating "Af-Cap is *not* seeking to attach any of the Congo's physical property (like its oil) but instead it seeks to attach the *obligations* to pay royalties owed by the Garnishees. As

noted previously, such debtor obligations are intangible assets, which by definition have no physical existence." *Af-Cap*, 383 F.3d 361, 371 (emphasis added). Thus, *Af-Cap*'s holding that "the situs of the debt obligation [owed to the Congo by the Garnishees] is the situs of the debtor [Garnishees]" applied to the intangible royalty obligations, and not to tangible property like the oil that FG Hemisphere is here seeking to garnish.

Just as the royalty and tax obligations in *Af-Cap* were "intangible," the working interest oil of SNPC that FG Hemisphere is seeking to garnish here is indisputably tangible and has a "physical existence," which is in the Congo, not in the United States. The request for issuance of new SNPC writs should be denied.

    2.    *FG Hemisphere Has Not Demonstrated any Commercial Use in the United States of Property in the United States*

        a.    *Walker* Compels the Conclusion that the "Commercial Use" Requirement is not Satisfied

With regard to the separate "commercial use" requirement under the FSIA, FG Hemisphere relies on *Af-Cap* and Judge Hoyt's prior issuance of garnishment writs as to SNPC property in support of its argument that new writs should issue as to the SNPC working interest oil. FG Hemisphere fails to point out that Judge Hoyt did not have the benefit of a Fifth Circuit decision in another FSIA case involving the Congo that was handed down at virtually the same time that Judge Hoyt issued his decision in another FSIA case and which was not considered by Judge Hoyt. That Fifth Circuit decision demonstrates that the prior issuance of the SNPC writs was improper, and that no new writs should issue now.

In support of its "commercial use" contentions, FG Hemisphere argues that SNPC uses its working interest oil to reimburse Garnishees for advances of expenses and lifting costs incurred in operations under the Convention, and that this activity satisfies the "commercial use"

requirement.  An identical argument was rejected by the Fifth Circuit in *Walker International Holdings, Inc. v. Republic of Congo*, 395 F.3d 229 (5th Cir. 2004), decided on December 22, 2004, the day before Judge Hoyt issued the prior writs.  In *Walker*, the Fifth Circuit held that where the foreign state's property is alleged to be commercially used to pay expenses necessary for the property's existence, the property is not thereby used "for a commercial activity" within the meaning of FSIA § 1610(a) because "there [is] no commercial activity separate from the transaction that generate[s] the property in the first place. *Walker*, 395 F.3d at 236.

In *Walker*, the garnishee had entered into an oil production sharing agreement with Congo and SNPC under which the garnishee promised to pay certain signing bonuses and make other payments to Congo.  Before the Fifth Circuit, Walker argued that because Congo pledged its oil revenue to pay for various administrative rand transactional expenses related to the negotiation of oil contracts with the garnishee, the property was used for commercial activity. *Walker*, 395 F.3d at 235.  The Court rejected this argument because the use related to the same activity that generated the property. *Id.*

The activity analyzed by the Court in *Walker* precisely mirrors the activity at issue here. Under the advance account, the Garnishees advance certain expenses to SNPC that are reimbursed from a portion of SNPC's share of working interest oil.  Like in *Walker*, the advance account has not been used for any separate commercial activity, such as servicing a debt to a third-party.  Its working interest therefore has not been used "for a commercial activity in the United States."

        b.      The Property Allegedly "Used" is Tangible Oil in the Congo, Not Intangible Obligations

FG Hemisphere's recently-filed Fifth Circuit Brief (Exhibit B) also acknowledges that the alleged "commercial use" was SNPC's use of tangible royalty oil, not any intangible

"obligation." SNPC's use of tangible royalty oil located in the Congo provides no basis for a finding that the FSIA's requirements are satisfied.

With reference to the repayment of advances under the advance account provisions of the Joint Operating Agreement, FG Hemisphere claims in its Fifth Circuit Brief that "*SNPC uses its working interest in the oil* . . . as collateral for a revolving loan extended by the Garnishees to SNPC to finance the commercial production of oil." Exhibit B at 13 (emphasis added). FG Hemisphere asserts that "the commercial use is plain: *SNPC is pledging its proportionate share of oil* toward the repayment of a loan made by the Garnishees to SNPC in connection with the commercial activity of producing and marketing oil from the facility." Exhibit B at 14 (emphasis added). FG Hemisphere concedes that "[t]his loan from the Garnishees to SNPC . . . *is repaid out of SNPC's share of the oil produced*." Exhibit B at 36. These concessions that SNPC is using *oil*, not a debt owed by Garnishees, to reimburse advances under the advance account provisions of the JOA are confirmed by the language of the JOA itself. Section 9.03 provides: "Advances provided by paragraph 9.01 above shall be reimbursed by [SNPC] . . . exclusively *by allocation of a part of the share of production* to which it is entitled under the AGREEMENT." (emphasis added). It is undisputed and beyond dispute that what is being "used" to repay advances under the advance account is tangible oil in the Congo, not an alleged debt owed by Garnishees to SNPC.

With reference to the repayment of lifting costs advanced by the Garnishees under the Amendment to the Lifting Agreement, FG Hemisphere states in its Fifth Circuit Brief that "*repayment of that debt comes from SNPC's proportionate share of the production of oil* taken in the next lifting following SNPC's lifting. That is, . . . *SNPC's working interest oil . . . is used to repay the Garnishees* who advanced SNPC's lifting costs during SNPC's lifting." Exhibit B at

37-38 (emphasis added). These concessions that the oil, not a debt, is being used to repay lifting costs are confirmed by the language of the Amendment to the Lifting Agreement. Section 5.1 of the Lifting Agreement says that "if the SNPC does not pay its lifting costs, the Parties agree that the [Garnishees] will bear and pay SNPC's Lifting Costs, subject to reimbursement in the form of the receipt and marketing of a portion of SNPC's Oil Entitlement." The Amendment to Lifting Agreement in Section 4.2 defines "SNPC's Oil Entitlement" as "[q]uantities of oil to be taken in kind, in accordance with this Lifting Agreement as amended and, suprearely marketed by the SNPC." Thus, it is "quantities of oil" that are used for "reimbursement" of the lifting costs.

The FSIA requires a showing that property that is "in the United States" is being used for commercial activity in the United States. The only property "used" to repay advances and lifting costs is tangible oil located in the Congo, and the FSIA's "commercial use" requirement is not satisfied.

        c.    Even if Intangible Contract Obligations, Not Oil, Were Being Used to Repay the Advances and Lifting Costs, Such Contract Rights Are Not Garnishable Under Texas Law

Even if FG Hemisphere could show that SNPC's contract rights, rather than the oil itself, were being use to repay advances and lifting costs (and it cannot), those contract rights are not subject to garnishment under Texas garnishment law. Garnishees are not in the possession of SNPC's contract rights. Judge Sparks held in the *AF-Cap* case, in the context of a claim that royalty obligations are "effects" that are subject to garnishment, that the contract rights to receive royalties are not "effects" that are subject to garnishment under Texas law. In his Order dated February 4, 2005, a copy of which is attached hereto as Exhibit C, Judge Sparks correctly held that the Congo's contract rights under the Convention cannot be garnished as "effects" under

Rule 669, inasmuch as "Garnishees simply do not have the capacity to *deliver* the Congo's contract rights to the Court for the purpose of facilitating a sale as contemplated by the rules." Exhibit C at 18 (emphasis in original). Judge Sparks' holding represents a recognition that Garnishees are not in possession of the Congo's contract rights: a debtor does not "possess" its creditor's contract rights. For the same reasons, Garnishees are not in possession of SNPC's contract rights. Judge Hoyt did not have the benefit of Judge Sparks' careful and correct analysis of the "effects" issue. For this Court to issue new writs, it must determine that Judge Sparks was incorrect in his "effects" ruling.

Garnishees respectfully submit that Judge Sparks' reasoning is valid and that FG Hemisphere's "effects" argument is untenable under Texas law. Nothing in the Convention assigns to Garnishees or otherwise places in the hands of the Garnishees the Congo's contract rights to receive oil. Judge Sparks also noted that "it makes no sense to construe an ongoing and accruing obligation as a personal effect of an obligor in the possession of his or her obligee under Texas law," as doing so "would contravene the conclusion of the Texas courts that 'the policy of the law [is] to impound existing debts, rather than future accruing debts.'" Exhibit C at 18 n. 6 (citing *Newsome v. Charter Bank Colonial*, 940 S.W.2d at 163 and *Consolidated Gasoline Co. v. Jarecki Mfg. Co.*, 72 S.W.2d at 353). As Judge Sparks pointed out, "[i]f an ongoing obligation owed by a garnishee could be construed as an effect of the judgment debtor in the garnishee's hands, plaintiffs in garnishment could easily evade the prohibition on the garnishment of future debts by simply re-labeling such debts as presently garnishable effects." Exhibit C at 18 n. 6. Under that same rationale, FG Hemisphere's efforts to garnish the SNPC's contractual right to receive working interest oil as "effects" under Rule 669 fail as a matter of law.

**D.    Garnishment Writs are Not Proper Because, as Held by Judge Sparks, Only Monetary Obligations Are Subject to Garnishment**

In Judge Sparks' decision on August 17, 2005, that denied Af-Cap's motion for new writs, he said "[s]ince the Court has already made the determination in the February 4, 2005 order . . . that the royalty obligations at issue in this suit are not garnishable under Texas law, Af-Cap faces a significant hurdle in urging the re-issuance of garnishment writs." Exhibit A at 4. Af-Cap did not overcome that "hurdle," and the request for new writs was denied.

In this case, in order to issue new writs, this Court must determine that non-monetary obligations are subject to garnishment under Texas law.    There is no basis for such a determination.

In his February 4, 2005 Order in the *Af-Cap* case attached hereto as Exhibit C, Judge Sparks granted Garnishees' motion for summary judgment with regard to writs of garnishment issued in the *Af-Cap* case in connection with the same royalty obligations that FG Hemisphere seeks to garnish in this case. Judge Sparks held that under Texas garnishment law, "only debts in money are subject to garnishment, . . .Texas garnishment law does not authorize the garnishment of a non-monetary obligation, . . . [and] the Garnishees' obligations to deliver oil to the Congo are not garnishable as debts under Texas law." Exhibit C at 16-17. Judge Sparks correctly noted that the Texas garnishment rule relating to the garnishment of debts only contemplates a money judgment for the amount of the debt. Exhibit C at 13 (citing Tex. R. Civ. P. 668). Specifically, Tex. R. Civ. P. 668 provides that in the event it is determined that "the garnishee is indebted to the defendant in any amount, or was so indebted when the writ of garnishment was served, the court shall render judgment for the plaintiff against the garnishee for the amount so admitted or found to be due to the defendant from the garnishee . . . ." Judge Sparks cited with approval the decision of the Alabama Supreme Court in *Jones's Adm'r v.*

*Crews*, 64 Ala. 368 (1879), which interpreted analogous Alabama garnishment statutes as providing for garnishment only of monetary obligations and concluded that it would be unfair to compel a garnishee who agreed only to deliver goods to instead make a payment in money. Exhibit C at 14; *Jone's Adm'r*, 64 Ala. at 374. Judge Sparks's decision is consistent with the generally recognized rule that "[i]n the absence of specific statutory sanction, obligations other than for the payment of money are generally not subject to garnishment prior to a default which gives the debtor a cause of action for money." 38 C.J.S. *Garnishment* §105.

Because, as held by Judge Sparks, non-monetary obligations are not subject to garnishment, no new writs should issue in this case. Judge Hoyt did not have the benefit of Judge Sparks' well-reasoned decision on this issue in connection with his prior issuance of writs. For this additional reason, new writs should not be issued.

**E.    Because the Court Cannot Protect Garnishees From Double Liability, No Writs Should Issue**

FG Hemisphere must concede that July 2005 Congo court orders compel Garnishees to deliver oil in the Congo, yet they seek garnishment writs purportedly for the purpose of halting the delivery of oil. By virtue of the Congo court orders, copies of which are attached hereto as Exhibits D and E, Garnishees are under compulsion of a Congo court to permit SNPC to take delivery of royalty oil of the Congo and working interest oil of SNPC on August 30, 2005. Garnishees' operations are within the Congo's sovereign territory, and the Congo court orders compel action by Garnishees within the Congo's borders relating to their activities there. The Congo court orders require Garnishees to deliver oil in the Congo, notwithstanding the U.S. garnishment writs. FG Hemisphere contends that the consequences of those orders "fall on Garnishees," offering no proposal on how Garnishees can avoid double liability or how this Court can protect Garnishees from double liability.

19

It is an established rule of garnishment law that a garnishee should not be forced to pay a debt twice. *See Harris v. Balk*, 198 U.S. 215, 226 (1905) ("It ought to be and it is the object of courts to prevent the payment of any debt twice over"). The Texas courts have applied that rule to garnishment proceedings in Texas. *See Iglehart v. Moore*, 21 Tex. 501, 502, 1858 WL 5508 (Tex. 1858) ("the garnishee cannot be placed by the garnishment in a worse condition than he would otherwise be, and . . . no judgment should be rendered against a garnishee when he answers fully, unless it would be available to him as a defense against any action brought for the same debt"); *Home Nat. Bank v. Barnes-Piazzek Co.*, 278 S.W. 299, 300 (Tex. App. 1925, writ ref'd) ("[i]t is a familiar principle that the garnishee is a mere stakeholder, and that under no circumstances can he, by operation of the garnishment proceedings against him, be placed in any worse position than he would be if the claim made against him by the plaintiff in garnishment were sought to be enforced by the defendant himself").

Authorities from other jurisdictions involving comparable circumstances confirm the conclusion that writs of garnishment cannot be enforced in such circumstances. *See Parker, Peebles & Knox v. Nat'l Fire Ins. Co.*, 150 A. 313 (Conn. 1930) (court upheld the dissolution of writs of garnishment because it was probable that payment to the judgment creditor would not provide a defense under the foreign law applicable to the contractual relationship between the garnishee and the judgment debtor); *Weitzel v. Weitzel*, 27 Ariz. 117, 230 P. 1106 (Ariz. 1924) (court upheld the dissolution of writs of garnishment of debts owed in a foreign country because the writs would not be recognized as a defense to performance of the obligations in the foreign country); *West v. Baker*, 510 P.2d 731, 734 (Ariz. 1973) (dissolution of the writs of garnishment is proper when the court "cannot insure that [garnishees] will not incur double liability").

FG Hemisphere's principal response to this line of authorities is to suggest that there is circumstantial evidence creating an inference that there was collusion between Garnishees and the Congo with regard to the Congo court orders, and that such collusion would cause the consequences of the Congo court orders to "fall on Garnishees." However, FG Hemisphere has submitted nothing to the Court proving its allegations of collusion with regard to the Congo court orders, other than unsupported conjecture and speculation.

Because Garnishees cannot avoid the Congo court orders and because the Court cannot provide protection against Garnishees against double liability, no new writs should issue.

**F.      Under the Doctrine of "Foreign State Compulsion," This Court Should Not Issue Writs of Garnishment that Conflict with Congo Court Orders Compelling Delivery of Oil in the Congo**

As discussed above, FG Hemisphere does not dispute that Garnishees have no choice but to comply with the Congo court orders. Under the doctrine of "foreign state compulsion" recognized in Section 441 of the Restatement (Third) of Foreign Relations Law of the United States ("Restatement Section 441"), preference among conflicting commands of the courts of different nations is accorded to the orders of the nation in which the act is to be done or not to be done. In this case, such preference must be given to the Congo court orders, and no new writs should issue.

Subsection (1)(b) of the Restatement Section 441 states, in pertinent part: "In general, a state may not require a person . . . to refrain from doing an act in another state that is required by the law of that state." Comment a to this section states:

> This section applies . . . to protect persons caught between conflicting commands. In determining preference between conflicting exercises of jurisdiction to prescribe, this section generally accords preference to the state in which the act is to be done (or is not to be done).

Restatement Section 441, comment a.

21

These principles were applied on facts indistinguishable from those presented in this case in *Reebok Intern. Ltd. v. McLaughlin*, 49 F.3d 1387 (9th Cir. 1995). In that case, a federal district court granted a temporary restraining order enjoining a Luxembourg bank from transferring funds of the defendant which were in the bank's hands. The defendant sought and obtained an order from a Luxembourg court that instructed the bank to release the funds to the defendant because the U.S. order was not legally valid in Luxembourg, as it had not been registered there. The bank then released the funds. The federal district court that had issued the temporary restraining order against the bank then found the bank in contempt for delivering the funds to the defendant, but the Ninth Circuit reversed. The Ninth Circuit relied on Restatement 441 in concluding that the bank was entitled to comply with the Luxembourg court order notwithstanding the temporary restraining order entered by the U.S. court, stating that "it would defy logic were we to decide that the district court could hold [the bank] in contempt for complying with the order of the Luxembourg court," and that the bank "was under no obligation to comply" with the temporary restraining order. 49 F.3d at 1392-1393. The court said that this would be true, even if the contempt respondent had suggested the filing of the Luxembourg lawsuit that resulted in the conflicting Luxembourg court order. *Id.*

Under the authority of Section 441 of the Restatement and *Reebok*, the doctrine of foreign state compulsion precludes the issuance of new writs of garnishment.

**G.    Under the Act of State Doctrine, This Court Should Not Issue New Writs**

In *Underhill v. Hernandez*, 168 U.S. 250, 252 (1897), the United States Supreme Court said:

> Every sovereign state is bound to respect the independence of every other sovereign state, and the courts in one country will not sit in judgment on the acts of the government of another, done within its own territory. Redress of grievance by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves.

This principle, known as the "act of state" doctrine, reflects "'the strong sense of the judicial branch that its engagement in the task of passing on the validity of foreign acts of state may hinder' the conduct of foreign affairs." *W.S. Kirkpatrick & Co. v. Evntl. Tectonics Corp., Int'l*, 493 U.S. 400, 404 (1990) (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 423 (1964))..

FG Hemisphere, in making its allegations regarding the Congo court orders, asks this Court to sit in judgment of the conduct of the Congo and its courts within the Congo's own territory in compelling Garnishees to deliver oil to SNPC in Congolese waters by issuing garnishment writs in conflict with the Congo court orders. Authorization of issuance of writs in these circumstances would violate the act of state doctrine.

The correctness of this conclusion is illustrated by the recent decision of the Ninth Circuit Court of Appeals in *Philippine National Bank v. United States District Court*, 397 F.3d 768 (9th Cir. 2005). The federal district court in Hawaii had entered an injunction prohibiting transfer of assets of the Estate of Ferdinand Marcos. Subsequently, the Philippine Supreme Court entered an order that required that certain funds of the estate that were held by the Philippine National Bank be forfeited to the Republic of the Philippines. The bank transferred the assets in compliance with the order of the Philippine Supreme Court. The district court in Hawaii then entered a show cause order requiring that the Philippine National Bank show cause why it was not in contempt of the earlier injunction that enjoined transfers of assets of the estate. Prior to the show cause hearing, the Philippine National Bank filed a petition for writ of mandamus with the Ninth Circuit, seeking to restrain the district court from enforcing its show cause order on the grounds that the order violated the act of state doctrine. The Ninth Circuit granted the petition, vacated the show cause order, and directed the district court to refrain from further action against

the Philippine National Bank or the funds that were the subject of the Philippine Supreme

Court's order. *Id.* at 772-775. The Ninth Circuit reasoned that because the Philippine Supreme

Court's order was obtained at the request of the Philippine government in furtherance of

governmental interests, the act of state doctrine prevented the district court from holding the

bank in contempt for transferring the funds in compliance with the Philippine Supreme Court's

order. *Id.*

The same rationale applies in this case. The Congo court orders were the result of

applications filed with the Congolese court by the Congo and its state-owned company, SNPC, to

obtain delivery of oil produced in the Congo's territorial waters. The Congo's rights in its

natural resources are sovereign in nature because they are "'affected with the public interest,'"

and "'goods in which only the sovereign may deal.'" *See World Wide Minerals, Ltd. v. Republic*

*of Kazakhstan*, 296 F.3d 1154, 1164 (D.C. Cir. 2002) (quoting *Rush-Presbyterian-St. Luke's*

*Med. Ctr. v. Hellenic Republic*, 877 F.2d 574, 578 (7th Cir.1989); accord *People of the State of*

*California v. NRG Energy*, 2004 WL 2808555 (9th Cir. Dec. 8, 2004). The Congo court orders

were obtained in furtherance of the Congo's sovereign interests, and under the rationale of the

*Philippine National Bank* case, the act of state doctrine precludes contempt proceedings against

Garnishees based on compliance with the Congo court orders.

The *Philippine National Bank* case demonstrates that the application of the act of state

doctrine is not limited to claims against the foreign state itself. The Philippine National Bank

was in precisely the same position as Garnishees, and the Ninth Circuit held that it was entitled

to assert the protection of the act of state doctrine. In the same vein, the court in *Timberlane*

*Lumber Co. v. Bank of America, N.T. & S.A.*, 549 F.2d 597, 606 (9th Cir. 1976) said in the

context of an antitrust case that "corporate conduct which is compelled by a foreign sovereign is

also protected from antitrust liability, as if it were an act of the state itself." The Ninth Circuit quoted *Interamerican Refining Corp v. Texaco Maracaibo, Inc.*, 307 F.Supp. 1291, 1298 (D. Del 1970) for the proposition that "when a nation compels a trade practice, firms there have no choice but to obey. Acts of business become effectively acts of the sovereign." 549 F.2d at 606.

Under *Philippine National Bank* and the act of state doctrine as applied therein, this Court should deny FG Hemisphere's requests for new writs.

## III.

## CONCLUSION

For these reasons, Garnishees respectfully request that the Court deny FG Hemisphere's Emergency Opposed Second Applications to Issue Writs of Garnishment with respect to both the Congo and SNPC. Garnishees also seek such other and further relief to which they may be justly entitled.

Respectfully submitted,

GUY S. LIPE
State Bar No. 12394600
VINSON & ELKINS L.L.P.
2300 First City Tower
1001 Fannin
Houston, Texas 77002-6760
(713) 758-1109
(713) 615-5607 fax

ATTORNEYS FOR CMS NOMECO CONGO INC.,
THE NUEVO CONGO COMPANY, AND NUEVO
CONGO LTD.

25

## CERTIFICATE OF SERVICE

I hereby certify that on August 19, 2005 a true and correct copy of the foregoing instrument was delivered in the following manners to:

Dillon J. Ferguson                    (*Via Hand Delivery*)
Andrews & Kurth L.L.P.
600 Travis, Suite 4200
Houston, Texas  77002

Andrew L. Jefferson                   (*Via Hand Delivery*)
1314 Texas Street, Suite 500
Houston, Texas  77002-3513

Danforth Newcomb                      (*Via Federal Express*)
Shearman & Sterling
599 Lexington Avenue
New York, N.Y.  10022-6069

Boaz S. Morag                         (*Via Federal Express*)
Cleary, Gottlieb, Steen & Hamilton
One Liberty Plaza
New York, New York  10006

_____
Guy S. Lipe

2396283_1.DOC

Exhibit A

 

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED

2005 AUG 18  AM 9: 06

CLERK  US DISTRICT  COURT
WESTERN DISTRICT OF TEXAS

BY _____

AF-CAP, INC.,

           **Plaintiff,**

-vs-

THE REPUBLIC OF CONGO,

           **Defendant.**

Case No. A-01-CA-321-SS

---

## ORDER

    BE IT REMEMBERED on the 17th day of August 2005, the Court reviewed the file in the above-styled cause, and specifically, Plaintiff Af-Cap, Inc.'s ("Af-Cap") Emergency Motion for Order Authorizing Issuance of Garnishment Writs [#168]. Having considered the motion, the response, the relevant law, and the case file as a whole, the Court now enters the following opinion and order.

### Background

    This judgment collection action was originally filed in state court by a predecessor-in-interest of Af-Cap as part of an ongoing effort to collect a judgment against Defendant Republic of Congo ("the Congo"). Around the time the judgment action was filed, Af-Cap's predecessor-in-interest also filed a number of individual garnishment actions by which it sought to garnish the obligations of several companies that owed royalties to the Congo under a Convention for the production of oil and gas in the Congo dated May 25, 1979 ("the Convention").

    Each of these actions were eventually removed to this Court. Based on its initial conclusions that the royalty obligations at issue were immune from attachment and execution under the Foreign

172    **EXHIBIT A**    ss
                                                                                 AP

 

Sovereign Immunities Act ("FSIA"), the Court entered an order dissolving the writs of garnishment in the first of the garnishment actions ("the 100 case"). *Conn. Bank of Commerce v. Republic of Congo*, No. A-01-CV-100-SS, slip op. at 9 (W.D. Tex. Mar. 16, 2001).

The Fifth Circuit vacated the dismissal of the 100 case and remanded, holding this Court and the parties had not made the appropriate factual inquiry in applying the "commercial use" test under the FSIA. *Conn. Bank of Commerce v. Republic of Congo*, 309 F.3d 240, 260–61 (5th Cir. 2002). On remand, this Court reexamined the question of whether the royalty obligations at issue in this case met the "commercial use" test with the benefit of the Fifth Circuit's opinion and again concluded the obligations did not satisfy the test's requirements. Accordingly, this Court entered orders dismissing both this case—the judgment action—and all of the pending garnishment actions, including the 100 case. Af-Cap appealed the Court's judgments against it in the 100 case and in this case, but it did not appeal the Court's judgment in any of the other individual garnishment actions.

The Fifth Circuit again reversed, holding the royalty obligations met the requirements of the commercial use test under the FSIA, and hence were not entitled to immunity from execution. *Af-Cap, Inc. v. Republic of Congo*, 383 F.3d 361, 373 (5th Cir. 2004). On remand, Af-Cap moved the Court to reinstate the previously dissolved writs of garnishment. On November 5, 2004, this Court entered an order denying Af-Cap's request on the grounds the underlying debts had been paid. Order of Nov. 5, 2004 at 6–7. The Court did, however, authorize the issuance of new writs against the garnishees in the 100 case. *Id.* Af-Cap then filed a petition for writ of mandamus with the Fifth Circuit seeking to compel this Court to reinstate the previously dissolved writs of garnishment. The Fifth Circuit denied the petition. *In re Af-Cap, Inc.*, 04-51357, slip. op. at 2 (5th Cir. Dec. 20, 2004).



Then, on February 4, 2005, this Court entered a pair of identical orders in this case and the

100 case. The two significant aspects of those orders were that they: (1) dissolved the newly issued

writs of garnishment on the grounds that the royalty obligations, though subject to execution and

attachment under the FSIA, were not garnishable under Texas law; and (2) granted Af-Cap's motion

for a turnover order against the Congo. *Af-Cap, Inc. v. Republic of Congo*, No. A-01-CV-321-SS,

slip op. at 30–31 (W.D. Tex. Feb. 4, 2005). On the day that these orders were entered, the Court also

entered a final judgment against Af-Cap in the 100 case. Af-Cap subsequently filed a notice of

appeal of that judgment on March 7, 2005.

The Court has retained jurisdiction over this case, however, to enforce the turnover order

against the Congo. On February 22, 2005, pursuant to the Texas Turnover Statute, TEX. CIV. PRAC.

& REM. CODE § 31.002, and Rule 69 of the Federal Rules of Civil Procedure,[1] the Court entered an

order against the Congo requiring it to turn over the royalty payments owed to it by the garnishees

from the 100 case—namely, CMS Nomeco Congo, Inc., The Nuevo Congo Company, and Nuevo

Congo Ltd. (collectively, "the CMS Entities"). Order of Feb. 22, 2005 ¶ 3. To effectuate this order,

the Court directed the Congo to execute certain letters of instruction to the CMS Entities that would

direct each to begin paying its respective royalty obligations in cash into the registry of the Court.

*Id.*

To date, the Congo has not executed the letters of instruction. Accordingly, on April 6, 2005,

the Court entered an order pursuant to Rule 70 of the Federal Rules of Civil Procedure appointing

the Clerk of the Court to execute the letters. Order of Apr. 6, 2005 at 4; *see* FED. R. CIV. P. 70 ("If

---

[1] Rule 69 provides that "[t]he procedure on execution, in proceedings supplementary to and in aid of execution shall be in accordance with the practice and procedure of the state in which the district court is held . . . ." FED. R. CIV. P. 69(a).

 

a judgment directs a party to execute a conveyance of land or to deliver deeds or other documents or to perform any other specific act and the party fails to comply within the time specified, the court may direct the act to be done at the cost of the disobedient party by some other person appointed by the court and the act when so done has like effect as if done by the party."). On July 1, 2005, the Court imposed a set of additional sanctions against the Congo including a $10,000 per day fine against the Congo for its continuing contempt.

On July 21, 2005, Af-Cap sought the issuance of a show cause order against the CMS Entities on the theory that by failing to make the payments contemplated by the Clerk's letters of instruction, they were in contempt of court. Noting that the letters of instruction were not themselves court orders (and that accordingly, the failure to comply with the demands in those letters was not the equivalent of the failure to comply with a court order), the Court denied Af-Cap's motion.

Now, Af-Cap has filed another motion in this judgment action, this time seeking the issuance of new garnishment writs in the 100 case against the CMS Entities.

### Analysis

Since the Court has already made the determination in the February 4, 2005 order (which was entered in this case and the 100 case) that the royalty obligations at issue in this suit are not garnishable under Texas law, Af-Cap faces a significant hurdle in urging the re-issuance of garnishment writs. In an effort to get around the law-of-the-case difficulties it faces, Af-Cap attempts to argue that the defects identified in the February 4, 2005 order have been cured.

In the February 4, 2005 order, the Court held that garnishment proceedings under Texas law may reach only two types of property—seizable effects and debts in money. *Af-Cap, Inc. v. Republic of Congo*, No. A-01-CV-321-SS, slip op. at 10 (W.D. Tex. Feb. 4, 2005). Since the Court concluded

-4-



that the in-kind royalty obligations owed by the CMS Entities to the Congo, which took the form of

obligations to deliver oil to the Congo, did not fit into either category, the Court granted the CMS

Entities' summary judgment motion and dissolved the writs of garnishment. *Id.* at 17–19. Af-Cap

contends that the Clerk's instruction letters to the CMS Entities have the effect of converting the

formerly in-kind royalty obligations into money debts owed by the CMS Entities to the Congo.

Accordingly, they argue the garnishment writs should reissue in the 100 case.

The most glaring problem with the Af-Cap's position is that the Court no longer has any

jurisdiction to do anything in the 100 case. A final judgment was entered months ago. Even if

Af-Cap could point to a correctable error in the judgment, its notice of appeal divested this Court of

jurisdiction. *See Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982) (per curiam)

("The filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction

on the court of appeals and divests the district court of its control over those aspects of the case

involved in the appeal").

Moreover, it is clear that the procedurally correct way to begin new garnishment proceedings

is the initiation of a new lawsuit naming the garnishees as party defendants. *See* Tex. R. Civ. P. 659

(directing the court or the clerk to separately "docket the case in the name of the plaintiff as plaintiff

and of the garnishee as defendant"). Although the failure to require the filing of a separate action

for new garnishment proceedings is not an error of jurisdictional significance, *see Cloughly v. NBC

Bank-Seguin, N.A.*, 773 S.W.2d 652, 658 (Tex. App.–San Antonio 1989, writ denied) (describing

such a failure as an "irregularity in procedure" that would not affect the validity of a judgment), it




is error, and the Court sees no basis on which to permit Af-Cap to serve new garnishment writs in either this action or the 100 action.[2]

In addition to the procedural hurdles facing Af-Cap's motion, the Court also notes that there are real questions about the ultimate legal effect of the Clerk's instruction letters vis-a-vis the CMS Entities. Af-Cap simply takes the position, almost as a matter of conclusion, that the in-kind royalty obligations were converted into money debts by the letters. However, a deeper inspection of the terms of the Convention, the letters themselves (which actually direct the cash payments to be made into the registry of the Court), and the relevant law would likely be required before the Court could find affirmatively the CMS Entities owed monetary debts to the Congo.

---

[2] Af-Cap contends this Court should issue new garnishment writs in the 100 case on the same rationale that was employed when new writs were issued on November 5, 2004. As the reasoning set out in the February 4, 2005 order makes clear, however, the situation presently before the Court is distinguishable from the one with which the Court was faced when it previously issued new writs in the 100 case:

> Garnishees further argue that allowing the filing of multiple garnishment writs under a single cause number would encourage gamesmanship since would-be garnishors could always avoid the problem of losing jurisdiction by simply filing new garnishment writs in old lawsuits. Any such concern is not warranted in this case, however. Af-Cap does not seek to reopen a closed garnishment action. Rather, it seeks the issuance of writs in a case on remand from the Fifth Circuit where the original writs were erroneously dissolved. The earlier writs cannot now be reinstated because the debts they had sought to capture have been fully paid. However, to require a renewed showing of the existence of personal jurisdiction would unnecessarily frustrate the Court's power to grant appropriate relief on remand.

Order of Feb. 4, 2005 at 6–7.

Unlike the prior situation, the Court is not now facing a situation in which it must craft an appropriate remedy to cure an error following a remand. In fact, the Court lacks jurisdiction to do anything in the 100 case at this point. Thus, there is no reason whatsoever to depart from the traditional rule that a separate action is required. *See Betzen v. Exxon Corp.*, 699 S.W.2d 352, 355 (Tex. App.–El Paso 1984, no writ) (holding that Rule 659 of the Texas Rules of Civil Procedure "requires a garnishment proceeding to be docketed separate from the main action [because] it is, in fact, an ancillary proceeding which involves a third party as garnishee.").

Af-Cap's motion makes clear that its real motivation for seeking the re-issuance of garnishment writs in the 100 case is the fact that unless the Court were able to rely on the CMS Entities' appearances in that case, it would probably not have personal jurisdiction over them. The Court is unwilling to adopt a rule, however, whereby personal jurisdiction obtained over a party in one suit, based on the facts existing at the outset of that suit, would forever subject that party to appear in all new proceedings which are in some way related to the original suit.

 

The Court is well aware that Af-Cap and its predecessors' efforts to collect on the judgment in this case has been plagued by a seemingly never-ending stream of obstacles. Although it is not unsympathetic to the difficulties they have faced, especially in light of the continuing intransigence of the Congo, the Court cannot grant more relief than the law will allow any more than it can make gold out of straw.

### Conclusion

In accordance with the foregoing:

IT IS ORDERED that Af-Cap's Emergency Motion for Order Authorizing Issuance of Garnishment Writs [#168] is DENIED.


SIGNED this the 17th day of August 2005.


_____
SAM SPARKS
UNITED STATES DISTRICT JUDGE