**EXHIBIT C-2**

| Coordonnées Géographiques Ellipsoïde de Clarke 1880 | | Coordonnées U.T.M. (Clarke 1880) Fuseau 32-Mer: 9°E. | |
|---|---|---|---|
| Longitude EAST : Latitude SOUTH | | EAST | NORTH |

Point located at 38 km from the low-tide mark on the straight line
defined in paragraph 1.g. above.

| | Longitude EAST | Latitude SOUTH | EAST | NORTH |
|---|---|---|---|---|
| | 10°58'14"268 | 4°14'34"560 | 713.732 | 9.520.170 |
| 2 | 11°02'31''666 | 4°18'29''055 | 726.652 | 9.523.560 |
| 3 | 11°05'15''851 | 4°15'11''228 | 731.714 | 9.529.624 |
| 4 | 11°09'50''804 | 4°15'10''466 | 740.214 | 9.529.624 |
| 5 | 11°09'51''271 | 4°17'56''970 | 740.214 | 9.524.508,361 |
| 6 | 11°15'05''727 | 4°17'56''058 | 749.914 | 9.524.508,361 |
| 7 | 11°15'05''241 | 4°15'09''563 | 749.914 | 9.529.624 |
| 8 | 11°23'36''921 | 4°15'08''018 | 765.700 | 9.529.624 |
| 9 | 11°27'26''845 | 4°18'20''070 | 772.775 | 9.523.700 |
| 10 | 11°27'28''782 | 4°28'12''323 | 772.775 | 9.505.500 |
| 11 | 11°16'15''217 | 4°28'14''496 | 752.000 | 9.505.500 |
| 12 | 11°16'15''066 | 4°27'25''678 | 752.000 | 9.507.000 |
| 13 | 11°15'10''219 | 4°27'25''878 | 750.000 | 9.507.000 |
| 14 | 11°15'09''972 | 4°26'04''513 | 750.000 | 9.509.500 |
| 15 | 11°14'21''337 | 4°26'04''661 | 748.500 | 9.509.500 |
| 16 | 11°14'21''191 | 4°25'15''841 | 748.500 | 9.511.000 |
| 17 | 11°10'40''712 | 4°25'16''499 | 741.700 | 9.511.000 |
| 18 | 11°09'55''210 | 4°24'38''710 | 740.000 | 9.512.400 |
| 19 | 11°09'55''600 | 4°26'54''240 | 740.000 | 9.509.000 |
| 20 | 11°07'32''384 | 4°26'54''636 | 736.500 | 9.508.000 |
| 21 | 11°07'53''139 | 4°31'15''025 | 736.500 | 9.500.000 |
| 22 | 11°04'54''774 | 4°31'15''544 | 731.000 | 9.500.000 |
| 23 | 11°04'54''312 | 4°28'32''796 | 731.000 | 9.505.000 |
| 24 | 11°00'46''128 | 4°28'33''491 | 723.346,950 | 9.505.000 |

Intersection of Longitude East 11°00'46''944 meridian
and straight line J-K of the original "Pointe Noire
Grand Fonds" permit, as defined in Decree No. 68-270/
M CAEIM of October 17, 1968.

Point Located 65 km from the low-tide mark on the
straight line defined in paragraph 1.g. above.

GAR 00084

ARTICLE 2

The minimum work program to be performed on
the exploration permit described in Article 1 above is
defined in Exhibit 2 hereto.

ARTICLE 3

Hydro-Congo is hereby authorized to become a
party in association with the companies executing a
convention with the People's Republic of the Congo, for
the implementation of the exploration permit described
in Article 1 above as well as any exploitation and trans-
portation permits which may derive therefrom.

ARTICLE 4

The exploration permit described in Article 1
above may be renewed for a period of three (3) years in
accordance with the conditions set forth in the Mining
Code ("Code Minier").

The minimum work program to be conducted within
the initial period and the renewal period as well as the
areas to be relinquished on the exploration permit
described in Article 1 above, are set forth in Exhibit
2 hereto.

ARTICLE 5

In the event a discovery of an exploitable
reservoir is made on the area of the exploration permit
described in Article 1 above, Hydro-Congo shall request
an exploitation permit for hydrocarbons, which shall be
granted as a matter of law.

GAR 00085

Each hydrocarbons exploitation permit is valid for thirty (30) years. The hydrocarbons exploitation permit may not be renewed.

All matters not defined by the present Decree regarding the hydrocarbons exploitation permit derived from the exploration permit described in Article 1 above are governed by the provision of the Mining Code relating to concessions.

## ARTICLE 6

The sub-contractors hired by Hydro-Congo or by any company associated with Hydro-Congo shall comply with the Mining Code.

## ARTICLE 7

The Minister of Mines and Energy is hereby entrusted with the implementation hereof which shall be registered, communicated wherever necessary and published in the Official Journal of the People's Republic of the Congo.

Done in Brazzaville on May 15, 1979.

President of the Central Wee of the Parti Congolais du Travail, President of the Republic, Head of State, President of the Council of Ministers

(s) Denis Sassou-Nguesso
Colonel signis of the Army

Prime Minister, of the Government

By the Minister of Mines

(s) Rodolphe Adada

GAR 00086

EXHIBIT 1

MAP OF THE "MARINE 1" PERMIT

GAR 00087

GAR 00088

ANNEXE 2

I - Minimum Work Program

A. Initial Period

The term of the first period shall be
five (5) years.

Phase I

The term of Phase I shall be three (3)
years and shall consist of the following:

(a) One thousand (1000) kilometers of
Marine seismic.

(b) Within six (6) months after receipt of
the processed data commit to drill a pre-salt test well
to be commenced within twenty-four (24) months from the
date of signing the Convention with the State, but not
later than thirty (30) months from such date, depending
upon availability of suitable equipment at competitive
rates, or relinquish the entire permit.

(c) The permit holder shall have the option
to relinquish the permit at the later of the following
two dates: (i) ninety (90) days after completion of the
exploration well, or (ii) ninety (90) days before the end
of Phase I, or proceed into Phase II.

GAR 00089

ANNEXE 2

I - Minimum Work Program

A. Initial Period

The term of the first period shall be
five (5) years.

Phase I

The term of Phase I shall be three (3)
years and shall consist of the following:

(a) One thousand (1000) kilometers of
Marine seismic.

(b) Within six (6) months after receipt of
the processed data commit to drill a pre-salt test well
to be commenced within twenty-four (24) months from the
date of signing the Convention with the State, but not
later than thirty (30) months from such date, depending
upon availability of suitable equipment at competitive
rates, or relinquish the entire permit.

(c) The permit holder shall have the option
to relinquish the permit at the later of the following
two dates: (i) ninety (90) days after completion of the
exploration well, or (ii) ninety (90) days before the end
of Phase I, or proceed into Phase II.



**GAR 00090**

11.

2.

### Phase II

The term of Phase II shall be two (2) years.

During the course of Phase II, the permit holder shall drill two (2) pre-salt exploration wells. The permit holder shall have the option to relinquish the permit upon completion of each well.

### B. Renewal period

The exploration permit shall be renewed upon request from the permit holder for a three (3) year renewal period, during the course of which at least three (3) wells will be drilled. However, the permit holder shall have the right to relinquish the permit upon completion of each well.

C. For purposes of paragraphs A and B above, the obligation to drill a well shall be deemed satisfied by the permit holder when the objective depth of formation is reached, or expenses actually incurred for such well shall have reached an amount equal to one hundred and fifty percent (150 %) of the estimated cost of such well, as budgeted by the Operating Committee of the Joint Venture to be formed by the permit holder of the Convention with the People's Republic of Congo described in Article 3 of the Decree.

### II - Relinquishments

The permit holder shall relinquish the original area as follows:



GAR 00091

3.

(a) An area equal to twenty-five percent (25%) of the original contract area shall be relinquished at the end of Phase I of the initial period;

(b) Another area equal to twenty-five percent (25%) of the original contract area shall be relinquished at the end of Phase II of the initial period; and

(c) The remainder of the orginal contract area shall be entirely relinquished upon termination of the renewal period, except for the area or areas of the permit which are covered by one or several exploitation permits, if any;

(d) Areas of the permit that the Operating Committee of the Joint Venture described above has determined, before the effective date of the relinquishments or the expiration of the renewal period, to cover commercial reservoirs shall be excluded from areas relinquished by the permit holder upon termination of Phase I and Phase II of the first period and upon termination of the renewal period.

GAR 00092

## EXHIBIT II

The base of calculation of the royalty and corporate income tax shall be the market value of the LIQUID HYDROCARBONS sold.

For the purpose of the royalty, the market value of the LIQUID HYDROCARBONS shall be deemed equal to the FOB Congo reference market value based on Middle East sales calculated as described below.

For the purpose of the corporate income tax, the market value of the LIQUID HYDROCARBONS shall be the realized sales price, provided however that in the case of sales to affiliated purchasers, the sales price shall not be lower than the weighted average realized sales price of the selling COMPANY from third party purchasers for the same period of reasonable quantities of LIQUID HYDROCARBONS of similar quality and gravity, or in the absence of such sales of reasonable quantities to third parties, the sales price shall not be lower than a price equal to the competitive value for the same period of LIQUID HYDROCARBONS of similar quality and gravity.

### Calculation of the FOB

### Congo Reference Market Value

The FOB Congo reference market value shall be computed by reference to the government sales price for Arab Light crude oil for the applicable period adjusted for freight, gravity, sulfur and other quality differentials.

### Definitions

1. "Arab Light" means the crude oil produced in Saudi Arabia and sold at Ras Tanura, of API gravity 34 degrees.

2. "Berri" means the crude oil produced in Saudi Arabia and sold at Ras Tanura of API gravity 39 degrees.

3. "Government Sales Price" ("GSP") means the official state sales price of the Government of Saudi Arabia for the sale of Arab Light or Berri.

4. "AFRA VLCC" and "AFRA LR2" mean the freight costs as determined by the London Tanker Brokers Panel or by any

GAR 00093

## EXHIBIT II

The base of calculation of the royalty and corporate income tax shall be the market value of the LIQUID HYDROCARBONS sold.

For the purpose of the royalty, the market value of the LIQUID HYDROCARBONS shall be deemed equal to the FOB Congo reference market value based on Middle East sales calculated as described below.

For the purpose of the corporate income tax, the market value of the LIQUID HYDROCARBONS shall be the realized sales price, provided however that in the case of sales to affiliated purchasers, the sales price shall not be lower than the weighted average realized sales price of the selling COMPANY from third party purchasers for the same period of reasonable quantities of LIQUID HYDROCARBONS of similar quality and gravity, or in the absence of such sales of reasonable quantities to third parties, the sales price shall not be lower than a price equal to the competitive value for the same period of LIQUID HYDROCARBONS of similar quality and gravity.

### Calculation of the FOB

### Congo Reference Market Value

The FOB Congo reference market value shall be computed by reference to the government sales price for Arab Light crude oil for the applicable period adjusted for freight, gravity, sulfur and other quality differentials.

### Definitions

1.  "Arab Light" means the crude oil produced in Saudi Arabia and sold at Ras Tanura, of API gravity 34 degrees.

2.  "Berri" means the crude oil produced in Saudi Arabia and sold at Ras Tanura of API gravity 39 degrees.

3.  "Government Sales Price" ("GSP") means the official state sales price of the Government of Saudi Arabia for the sale of Arab Light or Berri.

4.  "AFRA VLCC" and "AFRA LR2" mean the freight costs as determined by the London Tanker Brokers Panel or by any

GAR 00094

2.

other organization substituted therefor, for shipment in very large crude carriers and large range two tankers, respectively.

5. "SPOT VLCC" and "SPOT LR2" mean the freight costs calculated from the Average Worldscale Rates for Single Voyage Dirty Fixture published monthly by H.P. Drewry Ltd., London, in their Shipping Statistics and Economics - SSE Publication and would be a weighted average of Fixtures in the 70,000 - 174,999 Cargo Size DWCT for "SPOT LR2" and 175,000 - 300,000 for "SPOT VLCC", respectively. For the purpose of 2. and 3. hereof, the respective "SPOT VLCC" and "SPOT LR2" freights costs shall be based on the rates published for the month in which LIQUID HYDROCARBONS are lifted.

The FOB Congo reference market value shall be determined as follows:

1. Take the GSP of one barrel of Arab Light crude oil of 34.00 -34.09 degrees gravity.

2. Determine the freight per barrel of transporting Arab Light from Ras Tanura to Rotterdam via The Cape and returning from Rotterdam to Ras Tanura via The Cape by dividing the average of the published "AFRA VLCC" and "SPOT VLCC" freight per ton by the number of barrels of such crude oil per ton.

3. Determine the freight per barrel of transporting LIQUID HYDROCARBONS from Pointe Noire, Congo, to Rotterdam by dividing the average of the published "AFRA LR2" and "SPOT LR2" freight per ton by the number of barrels of such crude oil per ton. Subtract the resulting freight cost from the freight cost determined under 2 above and add the result to the GSP under 1 above.

The amount determined in accordance with the above procedure shall be adjusted upward or downward pursuant to the following quality factors which shall be computed as follows:

1. Gravity factor:

The differential for gravity will be determined as follows:

(a) Use 34 degrees API gravity for Arab Light.

(b) Deduct said gravity from the stated gravity of the LIQUID HYDROCARBONS. Any positive result will be added to the FOB Congo reference market value; any negative result will be subtracted from the FOB Congo reference market value.

GAR 00095

3.

(c)  Multiply said (b) remainder by ten and obtain a
     product.

(d)  Multiply the product (c) by the Arab Light quoted
     value for gravity differential per 0.1 (one tenth)
     API; the result will be the gravity adjustment.

2.  Sulfur factor:

  (a)  Arab Light and Berri

      (i)   Determine the difference in GSP between Arab
            Light and Berri.

      (ii)  Determine the amount of (i) difference
            attributable to gravity by subtracting from such
            difference the product of the number of 1/10
            degrees gravity between the two grades times the
            gravity differential value per 0.1 (one-tenth)
            degree API for the two grades.

      (iii) Deduct the product (ii) from the difference per
            (i).

      (iv)  Divide the remainder per (iii) by the
            differential number of 0.1 (one-tenth) weight
            percent sulfur (SWT%) between the two grades.
            Use 1.8 SWT% for Arab Light and 1.1 SWT% for
            Berri until revised by mutual agreement.

  (b)  Obtain the Congo sulfur adjustment by multiplying the
       difference in number of 0.1 SWT% between the LIQUID
       HYDROCARBONS sulfur content and the average of the
       Arab Light and Berri sulfur content by U.S. cents per
       0.1 SWT% determined as set forth in sub-paragraph (a)
       (iv) above.

Such adjustment will increase the FOB Congo reference market
value if Congo sulfur is less than said average, and reduce the
FOB Congo reference market value if Congo sulfur exceeds said
average.

3.  Other quality factors:

  (a)  Should the heavy gas oil distilled from LIQUID
       HYDROCARBONS (meaning that product distilled between
       the range of the 600 to 960 degrees Fahrenheit cut
       pursuant to the American Society for Testing Metals --
       or any organization substituted therefor --
       distillation procedure) exceed 0.5 Neutralization
       number (Neutralization number means the number of

GAR 00096

4.

milligrams of potassium hydroxide required to
neutralize the acid contained in one (1) gram of the
heavy gas oil), or

(b)    Should the heavy gas oil extracted from LIQUID
HYDROCARBONS as defined in (a) above, contain over
0.24 parts per million of nickel and copper, or nickel
equivalent (calculated by addition of the parts per
million of vanadium divided by 4.3, plus parts per
million of nickel and copper), or

(c)    Should any currently unknown quality factors of the
LIQUID HYDROCARBONS appear,

the Parties hereto shall meet to agree on an equitable
adjustment of the FOB Congo reference market value determined,
pursuant to the foregoing, to the extent those characteristics
are of significance.

GAR 00097

2.

Office or other furniture                                10.0%
Telephone                                                15.0%

LOADING AND STORAGE INSTALLATIONS

Annex III (Exhibit III)


Depreciation rates applicable to the COMPANIES

| Type of investments to be amortized | annual rate |
|---|---|
| subsurface and drilling works | |
| non-producing wells | 50 % |
| producing wells: in function with the | |
| estimated duration of production.  If no estimate | 12.5% |
| | |
| Transportation Equipment | |
| interior pipelines | 10 % |
| exterior pipelines | 7.5% |
| | |
| Drilling Equipment (in general) | 10 % |
| drilling pipe | 20 % |
| drilling tools | 20 % |
| diesel engines | 20 % |
| derrick and drive machinery | 20 % |
| | |
| Intangible Costs | |
| G + G | 20 % |
| | |
| Constructions | |
| permanent buildings, offices, labs, garages, | |
| housing, etc | 3½% |
| metallic-sided buildings | 3½% |
| semi-portable construcitons without foundation | 10 % |
| portable cabins or other assembled field buildings | 10 % |
| interior workshop facilities | 10 % |

GAR 00098

2.

Office or other furniture                                           10.0%
Telephone                                                           15.0%

LOADING AND STORAGE INSTALLATIONS

Storage installations                                               10.0%
  Except pipe and tube yards                                        20.0%
Loading pier                                                        3.1/3%
Loading installations                                               10.0%
Floating pipelines                                                  20.0%

VEHICLES AND ACCESS ROADS

Civil engineering machines                                          30.0%
Automotive vehicles and their trailers                              33.0%
  Except fire trucks, workshop trucks,
  cementing trucks                                                  20.0%

RIVER TRANSPORTS

Pinnaces (lighters)                                                 15.0%
Tugboats, pusher-type tugs, tank-barges, barges                    10.0%
Access roads to geophysical works and
  improductive wells                                                50.0%
Access roads to productive wells                                    20.0%

OTHER FIXED ASSETS

Water system                                                        10.0%
Compressed air system                                               10.0%
Electricity system                                                  10.0%

POWER LINES

Pylons                                                              3.1/3%
Other elements                                                      5.0%

TRANSFORMERS

Buildings and fixed plant                                           5.0%
Portable plant                                                      10.0%

FIXED MACHINES

Compressors                                                         10.0%
Compressors at sea                                                  20.0%
Miscellaneous motors and pumps on land                             10.0%
Miscellaneous motors and pumps at sea                              20.0%
Machine tools on land                                               10.0%
Machine tools at sea                                                20.0%
Small tools                                                         15.0%
Fixed laboratory equipment                                         10.0%

GAR 00099

3.

Mobile laboratory equipment                                    20.0%
Topography equipment                                           10.0%
Sea camp equipment                                             50.0%
Land camp equipment                                            20.0%

SPECIFIC OFFSHORE EQUIPMENT

Drilling barges                                                20.0%
Drilling and production platforms                              15.0%
Offshore well equipment                                        20.0%
Underwater energy transport cables                             20.0%
Mooring buoys                                                  25.0%
On-platform equipment                                          20.0%
Underwater wellheads and wellhead supports                     20.0%
Gathering lines between wells and storage
  stations                                                    .20.0%
Main lines                                                     10.0%
Underwater loading lines                                       20.0%

Costs and expenses accumulated by the COMPANIES in
connection with EXPLORATION WORKS will be treated in the
following fashion: those of such costs and expenses which
relate to the creation of capitalized assets shall be
amortized, beginning in the first fiscal year showing a taxable
income, in accordance with the depreciation rates set forth
above. The other costs and expenses shall constitute "frais de
premier établissement" (costs of initial installation), which
may as such be amortized, at each COMPANY's option, without
time limit.



GAR 00100

## EXHIBIT IV

### I - PAYMENT OF ROYALTY

When the mining royalty is paid in cash, each COMPANY shall, at the latest on the 20th of each month, file a monthly declaration of HYDROCARBONS lifted by it during the preceding calendar month.

Eighty-five percent (85%) of the royalty due for such preceding month of each quarter shall be paid at the time the corresponding monthly declaration is filed. The balance of the royalty due for each quarter shall be calculated and paid at the same time as the monthly declaration made during the second month following the end of the said quarter.

### II- PAYMENT OF CORPORATE TAX

Each COMPANY will make prepayment of corporate taxes as follows:

(a) During the course of the first quarter, each COMPANY will estimate the tax it will owe for the current year.

(b) An amount equal to 8/120th of such estimate will be paid on or before the 20th of each of the months of April, May, June, July, August and September.

(c) During the course of the third quarter, each COMPANY will review, on the basis of the actual results of the first semester, the estimate made by it of the annual tax.

(d) An amount corresponding to 8/120th of the new estimate shall be paid at the latest on or before the 20th of each of the months of October, November, December, as well as January, February and March of the following year, the payment for the month of October being however adjusted in such a way that the total amount of the provisional payments paid on October 20, correspond to 56/120th of the new estimate.

(e) The balance of the corporate tax shall be paid at the time of filing of the annual declaration, and taxes paid in excess, if any, shall be treated in accordance with Article 126 of the Code Général des Impôts du Congo.

GAR 00101

EXHIBIT V

MODEL OF LETTER OF GUARANTEE

GUARANTEE

WHEREAS the People's Republic of the Congo (hereinafter referred to as the "CONGO"), Congolese Superior Oil Company, Cities Service Congo Petroleum Corporation, Canadian Superior Oil Ltd., and Société Nationale de Recherches et d'Exploitation Pétrolières -- "HYDRO-CONGO" entered into a Convention dated the 25th day of May 1979, for the exploration and exploitation of liquid and gaseous hydrocarbon resources offshore the CONGO (hereinafter referred to as the "CONVENTION"),

and

WHEREAS /Name of the parent company_/ (hereinafter referred to as the "PARENT COMPANY") as owner, directly or indirectly, of all of the shares representing the capital stock of /name of the affiliated company_/ (hereinafter referred to as the "AFFILIATED COMPANY") desires to assure the CONGO of the performance of the obligations of the AFFILIATED COMPANY under the CONVENTION.

ACCORDINGLY,

The PARENT COMPANY hereby agrees and undertakes to provide or cause to be provided to its AFFILIATED COMPANY the funds necessary for it to comply with its obligations under the CONVENTION.

Executed at _____, on_____ 1979

(Name of PARENT COMPANY)

By: _____
       (Title)

GAR 00102

EXHIBIT V

MODEL OF LETTER OF GUARANTEE

GUARANTEE

WHEREAS the People's Republic of the Congo (hereinafter referred to as the "CONGO"), Congolese Superior Oil Company, Cities Service Congo Petroleum Corporation, Canadian Superior Oil Ltd., and Société Nationale de Recherches et d'Exploitation Pétrolières -- "HYDRO-CONGO" entered into a Convention dated the 25th day of May 1979, for the exploration and exploitation of liquid and gaseous hydrocarbon resources offshore the CONGO (hereinafter referred to as the "CONVENTION"),

and

WHEREAS /Name of the parent company_/ (hereinafter referred to as the "PARENT COMPANY") as owner, directly or indirectly, of all of the shares representing the capital stock of. /name of the affiliated company_/ (hereinafter referred to as the "AFFILIATED COMPANY") desires to assure the CONGO of the performance of the obligations of the AFFILIATED COMPANY under the CONVENTION.

ACCORDINGLY,

The PARENT COMPANY hereby agrees and undertakes to provide or cause to be provided to its AFFILIATED COMPANY the funds necessary for it to comply with its obligations under the CONVENTION.

Executed at _____, on_____ 1979

(Name of PARENT COMPANY)

By: _____
        (Title)

GAR 00103

A P P E N D I X

GAR 00104

CONFIDENTIAL

(Letterhead of Congolese Superior Oil Company)

Minister of Finances                     Houston, May 17, 1979
...stry of Finances
...aville

.. Minister:

Our company, together with Cities Service Congo Petroleum
...ration and Canadian Superior Oil Ltd. are signing on May 25,
... with the People's Republic of the Congo, represented by its
...ister of Mining and Energy, a Convention relating to hydrocarbon
...ration and exploitation on the permit known as "Marine 1".
...is regard, we would like to request clarification with respect to
following questions:

1. The works relating to the working of this permit will
...t necessary for us, as Operator for the Joint Venture, a ...
...gs to a lesser extent for the other non-Congolese members of the
... Venture, to send to the Congo specialized personnel for periods
... will be limited, but may extend over several years.

(a) The expatriate personnel may bring with them household
...ture, private cars and household furnishings for their personal
...bring their stay in the Congo. Can such goods be imported,
...exported at the end of their stay, free of customs duties
...ties?

(b) The transfer to the Congo may entail for such personnel
...ional costs which are a direct consequence of such transfer:
...nance of two residences, special education expenses for their
...n, and, in the absence of a tax treaty between the People's
... of the Congo and the United States of America, double taxation
...r income. It will probably be necessary for us to pay such per-
...an indemnity intended to cover these additional costs. Will
... indemnity be subject to Congolese personal income tax, in
...h to the tax payable on their salary after deduction of the
...d BCN deduction for professional expenses?

2. Should the Joint Venture, for reasons of Force Majeure,
... discontinue the exploitation for an appreciable length of time,
...ss income tax payments, if any, be reimbursable?

3. With respect to the costs and expenses accumulated
...he exploration phase, we understand that the Congolese tax
...tus will result in treating such costs and expenses in the follow...
...on: those of such costs and expenses which relate to the

GAR 00105

The Minister of Finances            -2-            May 17, 1979

creation of capitalized assets shall be amortized, beginning in the
first fiscal year showing a taxable income, in accordance with the
depreciation rates attached as an exhibit to the aforementioned
Convention. The other costs and expenses shall constitute "frais de
premier établissement" (costs of initial installation), which may
as such be amortized, at the taxpayer's option, without time limit.
We would be grateful if you could confirm that this would be the case.

Very truly yours,

(s) Diego C. Giordano
Diego O. Giordano
Vice-President

GAR 00106

(Letterhead of the Ministry of Finance)

Brazzaville, May 25, 1979

.gleno Superior Oil Company
.h Floor
.st City National Bank Building
.ston, Texas

. Sirs:

In reply to your letter of May 17, 1979, we are pleased
. let you know the following:

1.(a)  Household furniture, furnishings and materials
. be imported and re-exported free of customs duties and taxes,
.atever the length of the stay, so long as their use is limited to
.rmal use by the expatriate personnel. Private cars can be
.ported free of duties and taxes only for a period of six months.

1.(b)  Since the indemnities described in your letter
.. a reimbursement of exceptional costs naturally incurred, different
. nature from the professional expenses that the standard deduction is
.nded to cover, they shall not be included in the taxable income
. the employees in question, subject of course to the furnishing of
.oper justification.

2.  The discontinuation of exploitation in the circumstances
.scribed in your letter can be interpreted as a discontinuation of
.tivities, with corresponding application of the provisions of Article
.. bis (4) of the General Tax Code.

3.  We confirm to you that your description of the amor-
.ation of costs and expenses accumulated during the exploration phase
. accurate. This matter is indeed covered in identical terms by
.. last sub-paragraph of Exhibit III to the Convention that your
.pany and Cities Service Congo Petroleum Company and Canadian
.perior Oil Ltd. are signing today with the People's Republic of
.. Congo and Hydro-Congo.

Very truly yours,

Minister of Finance

GAR 00107

REPUBLIQUE POPULAIRE DU C   GO
Travail * Démocratie * P   x

— — — — — —

/ OI N°  60/83  / DU  II/8/I90

Complétant la loi n°17/83 du
27/01/83 portant approbation des
Accords particuliers signés 1
11 Décembre 1981 pour le Perm s
"MARINE 1" respectivement ave
BRASPETRO et I.E.D.C. (Congo)
Ltd.--

— — — — — —

L'ASSENBLEE NATIONALE POPULAIRE A DELIBERE ET AD PTE ;

LE PRESIDENT DU COMITE CENTRAL DU PARTI CONGOLAI : DU
TRAVAIL, PRESIDENT DE LA REPUBLIQUE, CHEF DE L'E AT,
PRESIDENT DU CONSEIL DES MINISTRES, PROMULGUE LA LOI
DONT LA TENEUR SUIT :

ARTICLE 1ER.- L'article 1er de la loi n°17/83 du 27/ 1/83
portant approbation des accords particuliers signés   e
11 Décembre 1981 pour l'exploitation du Permis Marin  1
est complété comme suit :

    après : sont approuvés les accords ci-après sig és le
11 Décembre 1981 pour l'exploitation du Permis Marin   1 :

    ajouter : Avenant n°1 A LA CONVENTION DU 25 MAI 1979

    Le reste sans changement.

ARTICLE 2.- La présente loi sera publiée au Journal  fficiel de la République Populaire du Congo et exécutée comme
loi de l'Etat./-

                    Fait à Brazzaville, le   II AOUT 19 3

                                    GAR 00108

            COLONEL Denis SASSOU - NGUESSO.--

(Free) <u>Translation</u>

PEOPLE'S REPUBLIC OF THE CONGO

Work – Democracy – Peace

- - - - - - - - -
- - - - - - - - -

Law No. 60/83 of August 11, 1983
completing Law No. 17/83 of
January 27, 1983 approving
the Accords particuliers signed
December 11, 1981 re
"the Marine I Permit" with
BRASPETRO & I.E.D.C. (Congo)
Ltd.

- - - - - - - - -
- - - - - - - - -

The People's National Assembly has deliberated and adopted;

The President of the Central Committee and
The Congolese Worker's Party, President of
the Republic, Chief of State, President of
the Council of Ministres, promulgates the
Law the text of which follows:

Article 1    Article 1 of Law No. 17/83 of January 27, 1983 approving the
Accords particuliers signed December 11, 1981 for the exploitation of the
Marine I Permit is completed as follows:

After "have approved the accords below signed December 11, 1981
for the exploitation of the Marine I Permit"

Add: "Amendment No. 1 to the Convention of May 25, 1979."

The remainder is unchanged.

Article 2    This Law will be published in the Official Journal of the
People's Republic and executed as a law of the State.

Made in Brazzaville, August 11, 1983

COLONEL Denis SASSOU - NGUESSO

GAR 00109

ENGLISH TRANSLATION

• • • •

AMENDMENT N° 1
TO THE MAY 25, 1979
"MAPINE 1" CONVENTION

December 11, 1981

GAR 00110