IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------------X
:
WALKER INTERNATIONAL HOLDINGS, LTD.,
:
        Plaintiff,         Civil Action No. 05-156 SLR
:
  - against -
:
THE REPUBLIC OF CONGO,
:
        Defendant,
:
CMS NOMECO CONGO INC.,
:
        Garnishee.
:
------------------------------------------------------------------X

**AFFIDAVIT OF JAMES W. PERKINS IN SUPPORT OF WALKER INTERNATIONAL HOLDINGS LIMITED'S EMERGENCY MOTION FOR AN ORDER TO SHOW CAUSE FOR A WRIT OF ATTACHMENT *FIERI FACIAS*, ORDER OF SEQUESTRATION AND PRELIMINARY INJUNCTION**

STATE OF NEW YORK   )
                             ) ss.:
COUNTY OF NEW YORK   )

       JAMES W. PERKINS, being duly sworn, deposes and says:

       1.    I am a shareholder of the law firm of Greenberg Traurig, LLP, counsel to Walker International Holdings Limited ("Walker") the plaintiff herein. I submit this affidavit pursuant to 28 U.S.C. § 1610(c), Federal Rule of Civil Procedure 69, as incorporating Delaware Superior Court Civil Rule 5(aa) and Delaware Chancery Court Rule 4(db)(1), and Federal Rule of Civil Procedure 70 in support of Walker's Emergency Omnibus Motion for an Order to Show Cause for a Writ of Attachment *Fieri Facias*, Order of Sequestration of defendant Republic of Congo's ("Congo") rights to royalty payments under an Oil Convention, dated May 25, 1979 (the "Convention"), with CMS Nomeco Congo, Inc. ("CMS") as its venture partner, and Preliminary

238253829v2

Injunction, enjoining CMS from making any further royalty payments to Congo or taking any further steps to remove its royalty obligations from this Court's jurisdiction. The factual statements made herein are based upon my personal knowledge obtained as counsel for the plaintiff in this action.

## Background

2. This is an action to enforce a $26,093,251.00, plus interest, money judgment (the "Judgment") that is registered in this District in favor of plaintiff and against Congo, as judgment debtor. (A true and correct copy of the Judgment, is attached hereto as Exhibit A.)

3. Upon information and belief, Congo is a foreign sovereign with over $5 billion in oil revenues per annum. Congo possesses great oil wealth and, upon information and belief, royalty payment obligations of CMS under the Convention alone are valued at an amount in the tens to hundreds of millions of dollars, well above amounts required to satisfy Congo's debt obligations to plaintiff as a result of the Judgment. The royalties paid to Congo annually under the Convention fluctuate with the price of oil, but conservatively exceed the value of the Judgment. (A true and correct copy of an Over/Under Chart prepared by SNPC, Congo's oil agency/instrumentality, showing the amount of oil lifted is attached hereto as Exhibit B.)

4. From the 1970's, until November 21, 2006, garnishee CMS was a Delaware corporation. CMS is an oil production company that is now wholly owned by the Perenco Group, a multibillion dollar conglomerate based in London, England. (A true and correct copy of the press release of Perenco concerning the acquisition of CMS, dated September 17, 2002, is attached hereto as Exhibit C.) Upon information and belief, CMS is now incorporated in the Bahamas.

5. Under the Convention, CMS is granted the right to extract oil from Congolese territory in exchange for CMS's obligation to make royalty and other payments to Congo. The

Convention also requires CMS to pay taxes and distributions to its venture partners (which include the Congo and SNPC). (*See* Convention at Section 7 *et seq.*, a true and correct copy of which is attached hereto as Exhibit D; *see also* Joint Operating Agreement at Art. 10 a true and correct copy of which is attached as Exhibit E.)

6. Walker is the successor in interest to the contractual rights to receive payments from Congo that it owes for the construction of electrical transmission lines in Congo. After Congo dishonored its written agreement to pay the debt, Walker commenced arbitration before the International Chamber of Commerce, International Court of Arbitration in Paris ("ICC"). Following a hearing in which Congo actively participated, the ICC found that Congo was liable to Walker for failing to pay under the loan agreements and on July 20, 2000 issued an arbitration award for $26,093,251.00, plus interest. (A true and correct copy of the ICC arbitration award is annexed hereto as Exhibit F.)

7. Under the rules that govern ICC proceedings, Congo was obligated, and agreed, "to carry out any Award without delay" and to "waive[] their right to any form of recourse insofar as such waiver can validly be made." (*See* International Chamber of Commerce Arbitration Rules at Art. 28(6), true and correct copies of which are attached hereto as Exhibit G.)

8. On March 15, 2002, the United States District Court for the District of Columbia confirmed the ICC judgment and entered the Judgment in the District Court against Congo and in favor of Walker in the amount of $26,093,251.00.

9. On August 5, 2005, Walker registered its Judgment against Congo with this Court, and on August 9, 2005 the Court issued a Writ of Execution against Congo in aid of Walker's enforcement of its Judgment. On or about August 10, 2005, the clerk issued a Writ of

Execution, which Walker served on CMS's registered agent by hand by the U.S. Marshal's Service. (A true and correct copy of the U.S. Marshal's Service return of service of the Writ of Execution upon CMS is attached hereto as Exhibit H.)

10. On August 31, 2005, Walker also filed a motion for the issuance of a writ of attachment *fieri facias* against CMS, seeking to garnish the royalty obligation CMS has to Congo under the Convention. This writ application is still pending.

**The Texas Litigation**

11. Walker has also pursued collection efforts against the Congo in Texas. Through a separate proceeding pending in the United States District Court for the Western District of Texas (*Walker v. Republic of Congo,* Civil Action No. A-03-CA-117-SS), on April 7, 2005, Walker obtained an Order declaring that, as Congo's judgment creditor, it is entitled to execute upon Congo's royalty rights under the Convention.

12. At the same time, the Court entered a Turnover Order in favor of Walker against Congo requiring Congo to turn over to the Clerk of the Court the royalties it received from CMS under the Convention. Moreover, the Clerk of the Court signed on behalf of Congo, Letters of Instruction that direct CMS to pay the oil royalty that it owes Congo from time to time into the registry of the Court for Walker's benefit. Copies of the Walker Turnover Order and Letters of Instruction were served on CMS on or about April 10, 2005. (True and correct copies of the Turnover Order and the accompanying Letters of Instruction are respectively attached hereto as Exhibits I and J.)

13. Although a similar turnover order issued in a separate action in favor of another Congo judgment creditor, Af-Cap, Inc. ("Af-Cap"), was vacated by the Fifth Circuit Court of Appeals, Congo never appealed the Walker Turnover Order, and that the latter order is now final and no longer subject to appeal.

14. The Af-Cap case, however, has resulted in other rulings that are adverse to Congo and CMS and which clearly hold that the royalty obligation at issue in this proceeding is subject to execution. In particular, the Fifth Circuit held that the royalty obligation of the Congo was used for commercial activity in the United States and, thus, subject to attachment and execution under the Foreign Sovereign Immunities Act (the "FSIA"). *Id.* at 370-1 ("[W]e disagree with [the District Court's] legal conclusion that these tax and royalty obligations were not used for commercial purposes. Instead, we think that the facts relating to the past and present use of these obligations, examined broadly and in context, establish the opposite.... [W]e conclude that these tax and royalty obligations are used for commercial purposes of § 1610(a) of the FSIA."). The Circuit Court further held that irrespective of the efforts of the government of Congo or its courts to countermand efforts to enforce the United States judgments, CMS could not claim any defense under the theory of sovereign compulsion or the Act of State Doctrine. *Id.* at 372 n.14 ("Because this case does not involve such a public act, but rather a mere dispute over the payment of a debt the Congo does not dispute that it owes, the act of state doctrine does not apply.") (A true and correct copy of the Fifth Circuit's decision, dated September 17, 2004, is attached hereto as Exhibit K.)

15. The Fifth Circuit further ruled that the CMS royalty payment obligation under the Convention is not immune from execution by Congo's creditors and may be reached through proceedings occurring wherever CMS is located, including Delaware, as CMS's then state of incorporation. *Af-Cap, Inc. v. Republic of Congo*, 383 F.3d 361, 371 (5th Cir. 2004) *clarified on reh'g*, 389 F.3d 503 (5th Cir. 2004) *cert. denied*, 544 U.S. 962 (2005). As the Court held, the "situs of these royalty obligations is the United States--the situs of the Garnishees" and the "tax and royalty obligations therefore are not protected by sovereign immunity. It follows that the

district court erroneously dismissed Af-Cap's cause of action and dissolved the writs of garnishment obtained by Af-Cap against the Garnishees." *Id.*

16.  On remand, however, the Western District of Texas declared, and the Fifth Circuit later affirmed, that the non-monetary obligations owed by the CMS companies were not subject to garnishment in Texas under the Texas garnishment statue. Rather, on February 24, 2005, the Western District of Texas (to which the Congo had removed the action from state court) entered a Turnover Order against Congo, which required the Congo to pay the royalty payments into Court.

17.  Furthermore, in *Walker Int'l Holdings, Ltd. v. Republic of Congo*, 395 F.3d 229 at 234 (5th Cir. 2004), the Fifth Circuit held that Congo explicitly waived its sovereign immunity to contest enforcement.

**CMS's Efforts To Thwart Enforcement Of The Walker Judgment**

18.  After plaintiff commenced its enforcement proceedings in Texas, CMS has, in response, vigorously defended those proceedings on behalf of itself and Congo, and taken a series of steps to attempt to remove itself beyond the reach of courts in the United States. In March 2005, CMS relocated its headquarters from Houston, Texas to London. (A true and correct copy of CMS's application for withdrawal as filed with the Texas Secretary of State, listing CMS's London office as the location for receipt of service of process, is attached hereto as Exhibit L.)

19.  In July 2005, after the filing of this action, in a document entitled "Notice of CMS Nomeco Congo Inc., the Nuevo Congo Company, Nuevo Congo Ltd. of Anticipated Sale and Transfer of Working Interests" (the "Transfer Notice"), filed by CMS in a parallel action before the District Court for the Southern District of Texas, CMS announced its intention:

> to convey [its] working interests [i.e., oil royalties]. The purchasers will be companies to be formed under Congolese law. <u>The consideration to be paid for the sales will be cash.</u> Upon closing of the conveyances, the working interests under the Convention will be owned by the Congolese purchasers of the working interests, and the rights and obligations under the Convention and Joint Operating Agreement previously held and owed by the Working Interest Owner Garnishees [,including CMS,] will be held and owed by the Congolese purchasers and not the Working Interest Owner Garnishees.

(A true and correct copy of the Transfer Notice, dated July 18, 2005 and filed in the matter of *FG Hemisphere Assocs., LLC v. Republique du Congo, et al.*, Civil Action No. H02-4261, is attached hereto as Exhibit M.)

20. On or about November 16, 2006, CMS advised Walker, through counsel, that it intended to "convert to a non-Delaware entity." Counsel further advised that, however, CMS "will not use that conversion as a basis for challenging the jurisdiction of the federal court in Delaware." (A true and correct copy of an email from Guy Lipe, counsel for CMS, to Kenneth Kaplan, counsel for Walker, dated November 16, 2006, is attached hereto as Exhibit N.)

21. On November 21, 2006, notwithstanding the entry and service of a writ of garnishment upon CMS in the Af-Cap case, and without notice to this Court, CMS purported to dissolve itself as a Delaware corporation. (A true and correct copy of the corporate records of the Delaware Secretary of State concerning CMS's dissolution are attached hereto as Exhibit O.)

22. According to CMS representative Roland Fox, after CMS's dissolution, CMS immediately reformed itself in the Bahamas. (*See* excerpts of the transcript of Mr. Fox's deposition held November 30, 2006, a true and correct copy of which is attached hereto as Exhibit P.) Mr. Fox further admitted that CMS left Delaware to avoid any further writs of garnishment being issued against its obligations to the Congo. (Fox Deposition at 249:25 - 250:5)

23. Moreover, Mr. Fox testified that, in April 2006, notwithstanding the Walker Turnover Order, and a writ of garnishment issued in the Af-Cap case now pending before this Court (CA No. 05-762 SLR), CMS made royalty payments to Congo in excess of $27 million. (*See e.g.* Fox Deposition at 161:25 - 162:25, 165:12 - 167:3 and 167:3 - 184:2-6.) Since the commencement of this action, CMS has paid to Congo or its alter ego, SNPC, between approximately $25.9 and $63.0 million dollars in oil under the Convention. (*See* Ex. B, SNPC Over/Under Chart.)

24. On July 11, 2005, Walker and Af-Cap initiated a separate action in the Delaware Court of Chancery, seeking relief under Delaware's Fraudulent Transfer Act and the common law arising from CMS's efforts to hinder and delay creditors, including attempting to move the royalty payment obligation beyond the reach of CMS's creditors. That action (CA No. 1488-N) is pending before Vice Chancellor Strine.

**CMS Should Be Preliminary Enjoined From Making Further**
**Royalty Payments Or Otherwise Attempting To Remove The Royalty Obligations**

25. To date, Congo has refused to comply with any part of the Judgment, and the Judgment remains unsatisfied. For its part, CMS has acted to protect Congo and taken steps to move the royalty right beyond the reach of Congo's creditors. As Walker satisfies the standard for entry of a preliminary injunction, CMS should be enjoined from taking further steps to impair Walker's rights.

26. First, Walker has a reasonable likelihood of success on the merits of this enforcement proceeding. Congo is indisputably a judgment creditor of Walker. CMS admits to holding property -- payment of a royalty right -- that belongs to Walker's judgment debtor. (*See* CMS Answer to Af-Cap Writ of Garnishment at 19, 20 ¶ 4.) In addition, under the Fifth Circuit's decision in *Af-Cap v. Republic of Congo*, 383 F.3d at 371 (and CMS is estopped from

arguing otherwise) the royalty obligation is subject to execution wherever CMS is located. *See id.* at 371. Furthermore, the Fifth Circuit's *Walker* decision establishes that the asset at issue is not immune from garnishment. Finally, as explained in the accompanying brief, Delaware law permits sequestration/attachment of, and execution upon, intangible contingent debt obligations such as royalty payments. Thus, this Court has the power to order attachment/sequestration and, thereafter, satisfaction of the Judgment from CMS's royalty obligations to Congo.

27. Second, Walker will be irreparably harmed if CMS is successful in moving the asset outside of the United States. In that circumstance, Walker's recovery in the United States (as well as that of other judgment creditors) would be foreclosed since the payment obligation would be beyond the reach of United States courts. Thus, unless CMS is enjoined, Walker will likely have no remedy of execution in the United States.

28. Third, the balancing of the harms favors Walker. Preserving the *status quo* pending disposition of this case would do nothing more than leave CMS in the position it has been in for decades. CMS, and its predecessors, have been incorporated in Delaware since the 1970's and have held the Convention rights since 1979. CMS did not purport to remove the Convention rights outside of the United States until after Walker obtained its Turnover Order and Af-Cap had obtained and served on CMS a writ of garnishment from the Delaware Superior Court. And, CMS has no legitimate interest in taking any further steps to block plaintiff's debt recovery efforts, which have the effect of hindering and delaying Congo's creditors.

29. Fourth, the public interest weighs in favor of granting the injunction. As stated above, CMS's efforts to remove itself and its assets from Delaware are designed solely to

frustrate Congo's creditors. CMS's withdrawal is precisely the type of conduct that an injunction is intended to protect against because it would otherwise result in compromising the Court's ability to render a full, complete and final adjudication of the pending issues. CMS should not be rewarded for its evasive conduct.

30. Recently, on January 8, 2007, counsel for CMS advised that CMS intends to make a lifting of royalty oil to Congo sometime between February 10 and 15. Thus, this application has urgency in order to prevent Congo's royalties from being paid to Congo. (A true and correct copy of the email message from Guy Lipe, counsel for CMS, to Kenneth Kaplan, counsel for Walker, is attached hereto as Exhibit Q.)

31. Wherefore, on behalf of plaintiff Walker, I respectfully request that the Court grant Walker's Motion, and: (a) issue a writ of attachment *fieri facias* (garnishment) against garnishee CMS, thereby instructing the U.S. Marshal to levy such writ on CMS in aid of Walker's execution of the Judgment against Congo; (b) enter an order of sequestration of the royalty payment obligation pending satisfaction of the Judgment; and (c) enter an order of preliminary injunction, enjoining CMS from making further royalty payments to Congo or otherwise attempting to remove the royalty obligation beyond this Court's jurisdiction.

_____
JAMES W. PERKINS

Sworn to before me this
9th day of January, 2007

_____
Notary Public

CHRISTY SCHAEFFER
Notary Public, State of New York
No. 31-4769958
Qualified in New York County
Commission Expires August 31, 2010

238253829v2                                            10