14.

relatifs notamment aux conditions générales de travail, au régime des rémunérations, à la prévention et aux réparations des accidents du travail et des maladies professionnelles, ainsi qu'aux associations professionnelles et aux syndicats. De son côté, le CONGO n'édictera à l'égard de chaque SOCIETE ainsi que du personnel de celle-ci en matière de législation du travail et des lois sociales, aucune mesure qui puisse être considérée comme discriminatoire par rapport à celles qui seraient imposées aux autres entreprises exerçant leur activité au CONGO.

11.02   Chacune des SOCIETES s'engage à prendre en charge, conjointement avec les autres membres de l'ASSOCIATION et proportionnellement à son pourcentage de participation au sein de l'ASSOCIATION, la formation, tant sur le plan technique qu'administratif, des cadres, agents de maîtrise et employés congolais nécessaires aux activités d'exploitation, par l'organisation, dans des limites correspondant à l'importance des activités en question, de stages au CONGO ou à l'étranger, l'attribution de bourses d'études à l'étranger et la création de centres de formation professionnelle au CONGO.

11.02.1   Les programmes et les budgets de formation professionnelle devront être approuvés par le Comité de Direction prévu au CONTRAT D'ASSOCIATION après consultation avec l'Administration congolaise.

11.02.2   Chacune des SOCIETES, conjointement avec les autres membres de l'ASSOCIATION, emploiera en priorité, à qualification égale, dans ses établissements et installations, du personnel congolais. Elle s'engage à assurer la formation professionnelle et technique dudit personnel afin de faciliter à tous les niveaux son accession à des emplois en rapport avec ses capacités.

11.02.3   Sur les chantiers d'exploitation situés en dehors des agglomérations ou dans leur voisinage, les SOCIETES assureront conjointement le logement des travailleurs dans des conditions normales d'hygiène et de salubrité et créeront, si nécessaire, l'infrastructure médicale, scolaire, sportive et culturelle correspondant aux besoins normaux des travailleurs et de leurs familles.

11.02.4   Les moyens mis en oeuvre conjointement par les SOCIETES pour l'application des dispositions du présent article 11 ont pour objet de permettre le remplacement progressif du personnel étranger des SOCIETES affecté aux TRAVAUX PETROLIERS par un personnel congolais. A cet effet, les SOCIETES s'engagent à faire de leur mieux pour qu'à l'expiration de la dixième année après le début des TRAVAUX DE DEVELOPPEMENT ET D'EXPLOITATION, le personnel utilisé par l'OPERATEUR pour les TRAVAUX PETROLIERS au CONGO comprenne cent pour cent (100%) d'ouvriers et d'employés, quatre vingt pour cent (80%) d'agents de maîtrise et de techniciens, et cinquante pour cent (50%) de cadres, de nationalité congolaise.

**GAR 00017**

15.

11.02.5   Le personnel de nationalité congolaise utilisé par l'OPERATEUR pour les TRAVAUX PETROLIERS au CONGO sera recruté par l'OPERATEUR et engagé, à sa demande, par HYDRO-CONGO qui le détachera auprès de l'OPERATEUR pour être formé par celui-ci puis, à l'issue de la période de formation, pour être affecté aux TRAVAUX PETROLIERS.  A compter de la fin de ladite période de formation, les employés d'HYDRO-CONGO que l'OPERATEUR aura décidé de retenir pour les TRAVAUX PETROLIERS seront, pendant toute la durée de leur détachement auprès de l'OPERATEUR, les employés de ce dernier.

12.  Fournisseurs congolais

12.01   Les SOCIETES, ou l'OPERATEUR en leur nom, donneront la priorité pour la réalisation des TRAVAUX PETROLIERS aux fournitures et aux services fournis par des sociétés de droit congolais à égalité de qualité, de quantité, de conditions de vente, de délais de livraison et de services annexes, avec les fournitures et services disponibles à l'étranger.

12.02   Toutefois, les SOCIETES, ou l'OPERATEUR en leur nom, pourront choisir librement les armateurs et les pavillons des navires utilisés par elles à quelque titre que ce soit, sous réserve des restrictions d'application générale que le CONGO peut édicter.  Les SOCIETES utiliseront la flotte marchande congolaise qui pourrait être disponible pendant la durée de la CONVENTION, dans la mesure où les tarifs et les autres conditions offertes ne seront pas moins favorables que celles offertes sur le marché international.

13.  Mise à disposition des informations

13.01   Les SOCIETES mettront à la disposition du CONGO tous les renseignements en leur possession qu'elles doivent communiquer aux termes du Code Minier.  De son côté, le CONGO pourra communiquer aux SOCIETES les informations, notamment de caractère technique, susceptibles d'être utilement employées dans la conduite des TRAVAUX PETROLIERS.  Les SOCIETES s'engagent à ne pas divulguer ces renseignements et documentations à des tiers, sauf dans la mesure requise par les TRAVAUX PETROLIERS et à condition, dans ce cas, qu'un engagement soit obtenu du récipiendaire de traiter ces renseignements et documentations comme confidentiels.

13.02   Outre les renseignements qu'elles doivent lui communiquer aux termes des dispositions du Code Minier, les SOCIETES devront mettre gratuitement à la disposition du CONGO toutes les informations géologiques qui seront susceptibles d'être utilisées pour la recherche et l'exploitation des substances minérales autres que les HYDROCARBURES sur le PERMIS. La SOCIETE qui agit en qualité d'OPERATEUR doit déclarer aux autorités congolaises compétentes toute découverte de substances minérales autres que des HYDROCARBURES réalisée sur le PERMIS; les SOCIETES se consulteront en vue d'apprécier l'opportunité, compte tenu des données techniques et économiques,

GAR 00018

16.

de s'associer pour l'exploitation desdites substances minérales. Les SOCIETES s'engagent à ne pas divulguer ces informations à des tiers. Le CONGO pourra librement utiliser toute information reçue au titre du présent paragraphe si les SOCIETES expriment leur absence d'intérêt ou ne parviennent pas, dans un délai de quatre (4) mois à compter de la réception de ces informations, à faire une proposition acceptable au CONGO pour un permis de recherches ou d'exploitation concernant la ou lesdites substances minérales.

13.03 A la demande du Ministre de tutelle, les SOCIETES examineront toutes les informations disponibles concernant les possibilités de recherche de substances minérales dans toute partie du territoire congolais qui leur sera indiquée par ladite autorité, et se consulteront entre elles en vue d'apprécier l'opportunité, compte tenu des données techniques et économiques, de s'associer pour la recherche desdites substances minérales.

14. <u>Transport et traitement des produits</u>

14.01 Le Ministre de tutelle pourra demander aux SOCIETES de s'associer avec d'autres exploitants au CONGO en vue de réaliser ou d'utiliser en commun des installations ou des canalisations pour évacuer tout ou partie de la production d'HYDROCARBURES, à condition, d'une part, que la réalisation desdites installations ou canalisations soit techniquement possible dans des conditions économiques normales, et, d'autre part, que leur utilisation ne porte pas atteinte directement ou indirectement au rendement économique des gisements découverts.

14.01.1 Les tarifs de transport à l'évacuation de la production seront établis par les sociétés exploitantes, après consultation de l'autorité congolaise compétente.

14.02 Dans le cas où la production le permettrait et où les produits finis seraient assurés d'un écoulement certain, le CONGO pourrait demander aux SOCIETES de se consulter en vue d'apprécier l'opportunité, compte tenu des conditions écono-miques et des prévisions de rentabilité, de la réalisation par les SOCIETES, en association avec le CONGO et/ou avec les partenaires agréés par le CONGO, d'une unité de traitement d'HYDROCARBURES au CONGO.

15. <u>Force majeure</u>

15.01 Si le CONGO ou l'une ou plusieurs des SOCIETES se trouve dans l'impossibilité, partielle ou totale, d'exécuter l'une ou plusieurs de ses obligations prévues à la CONVENTION ou en découlant par suite d'une force majeure, d'un cas fortuit ou d'un événement assimilé à la force majeure (ci-après col-lectivement désignés "FORCE MAJEURE"), la partie qui invoque la FORCE MAJEURE devra en informer les autres parties dans les plus brefs délais.

**GAR 00019**

17.

15.02  Ladite notification sera adressée par écrit soit par télex confirmé par lettre, soit par lettre recommandée avec demande d'avis de réception et devra faire état des éléments de nature à établir la FORCE MAJEURE.

15.03  Seront considérés comme FORCE MAJEURE tous les événements indépendants de la volonté ou échappant à la maîtrise de l'une des parties et ayant pour conséquence d'empêcher totalement ou partiellement, ou de retarder notablement, l'exécution des obligations des parties sans qu'ils aient pu être raisonnablement maîtrisés ou évités.  Aux fins de la CONVENTION, seront notamment considérés comme FORCE MAJEURE: la guerre, les troubles civils graves, l'insurrection, les grèves nationales et toutes grèves d'ordre général, le tremblement de terre, l'incendie, l'explosion, les autres catastrophes et tous les empêchements qui résultent directe‑ment ou indirectement des commandements ou des prohibitions de la puissance publique.

15.04  La FORCE MAJEURE ne saurait toutefois être valablement invoquée si les cas, faits ou événements dont il s'agit étaient raisonnablement prévisibles ou s'il pouvait y être porté remède par l'exercice d'une diligence raisonnable. L'impossibilité de trouver le matériel nécessaire, si ce n'est à un prix prohibitif, constituera une FORCE MAJEURE.  Le manque de moyens financiers ne constituera pas une FORCE MAJEURE.

15.05  Les délais d'exécution des obligations de chaque SOCIETE affectées par une FORCE MAJEURE seront prorogés automatiquement d'une durée équivalente au retard entraîné par ladite FORCE MAJEURE, étant entendu que, d'une part, cette prorogation n'entraînera pas de pénalité à la charge de la partie à laquelle ces obligations incombent et que, d'autre part, les obligations autres que celles affectées par la FORCE MAJEURE devront continuer à être remplies conformément aux dispositions de la CONVENTION.

15.06  Dans tous les cas, la partie concernée devra prendre, en accord avec les autres parties, toutes dispositions utiles pour assurer la reprise normale de l'exécution des obligations affectées par la FORCE MAJEURE.  Si, par suite d'une FORCE MAJEURE, l'une des parties ne pouvait exécuter ses obligations telles que prévues à la CONVENTION pendant une période de trois (3) mois consécutifs à compter de la notification prévue ci-dessus, les parties se rencontreraient dans les plus brefs délais pour examiner les incidences des événements dont il s'agit, en particulier sur les délais d'exécution des obligations respectives de chacune des parties.  Si les parties ne peuvent se mettre d'accord sur les incidences dont il s'agit, elles soumettront leur différend à l'arbitrage conformément aux dispositions de l'article 17 ci-dessous.

16.  Déclaration et paiement d'impôts

Chaque SOCIETE sera seule responsable de ses déclarations aux autorités fiscales du CONGO, et du paiement de ses

GAR 00020

18.

impôts au titre de sa participation dans les activités de l'ASSOCIATION au CONGO, sur la base de son revenu imposable au titre de ses activités visées par la CONVENTION.

## 17. Arbitrage

17.01  Tous différends découlant de la CONVENTION, entre le CONGO d'une part et toute SOCIETE d'autre part, qui ne peuvent pas être résolus à l'amiable, seront tranchés définitivement par arbitrage conformément aux règles en vigueur du Centre International pour le Règlement des Différends relatifs aux Investissements (le "Centre") institué par la Convention pour le Règlement des différends relatifs aux investissements entre Etats et ressortissants d'autres Etats, à laquelle le CONGO est partie depuis le 14 octobre 1966.

17.02  Chaque partie à un différend sera autorisée à nommer un arbitre et les arbitres ainsi nommés se mettront d'accord sur un autre arbitre, si nécessaire, afin d'obtenir un nombre impair d'arbitres.  Au cas où un accord sur un autre arbitre ne pourrait être obtenu, cet arbitre sera nommé par le Président du Centre.

17.03  L'arbitrage aura lieu à Genève, Suisse.  La sentence qui sera rendue en anglais et en français, les deux textes ayant la même force, sera définitive et liera les parties à l'arbitrage.  Un jugement d'exequatur pourra être rendu par tout tribunal ou toute autorité compétente ou, selon le cas, une demande pourra être introduite devant ledit tribunal ou devant ladite autre autorité pour obtenir la confirmation judiciaire de la sentence et une décision exécutoire.

17.04  Les honoraires du Centre relatifs à l'arbitrage d'un différend seront supportés de manière égale par les parties audit arbitrage.

17.05  Tous différends pouvant survenir entre les SOCIETES seront tranchés conformément à la clause d'arbitrage du CONTRAT D'ASSOCIATION.

## 18. Droit applicable

La CONVENTION est régie par le droit congolais.

## 19. Avis

19.01  Tous avis seront valablement donnés par cable, télex ou courrier adressé à l'autre ou aux autres parties à l'adresse indiquée ci-dessous.

(a)  pour le CONGO:

Monsieur le Ministre des Mines et de l'Energie
Ministère des Mines et de l'Energie
Brazzaville
République Populaire du Congo

GAR 00021

19.

à l'attention de:  Monsieur le Ministre

(b)  pour SUPERIOR:

Congolese Superior Oil Company
P.O. Box 1521
Houston, Texas 77001
Etats-Unis d'Amérique

Télex:  0775369

à l'attention de:  <u>Vice-President Exploration</u>

(c)  pour CITIES SERVICES:

Cities Services Congo Petroleum Corporation
P.O. Box 642
Houston, Texas 77001
Etats-Unis d'Amérique

Télex:  762056

à l'attention de:  <u>Vice-President Operations</u>

(d)  pour CANADIAN:

Canadian Superior Oil Ltd.
Three Calgary Place
355 4th Avenue S.W.
Calgary, Alberta T2P 0J3
Canada

Telex:  03826640

à l'attention de:  <u>Vice-President Exploration</u>

(e)  pour HYDRO-CONGO:

Société Nationale de Recherches
  et d'Exploitation Pétrolières --
  Hydro-Congo
B.P. 2008
Brazzaville
République Populaire du Congo

Télex:  5220

à l'attention de Monsieur le Directeur Général

**GAR 00022**

20.

Tous avis formels seront donnés par lettre recommandée avec demande d'avis de réception ou, si ils sont donnés par cable ou télex, confirmés par lettre recommandée avec demande d'avis de réception.

19.02  Chacune des parties pourra modifier l'adresse ci-dessus en avisant les autres par écrit conformément aux dispositions du présent article 19.

19.03  Au stade de la recherche, chacune des SOCIETES désignera un représentant au CONGO auprès duquel tous avis formels seront faits valablement. En cas de découverte commercialement exploitable, la SOCIETE établira au CONGO une succursale régulièrement immatriculée au Registre du Commerce. Par dérogation à l'article 20 de la loi n° 29-62 du 16 juin 1962, tel que modifié, les SOCIETES ne seront pas requises de constituer une société filiale de droit congolais.

20.  Avenants

Il pourra être procédé par avenant, à la demande de l'une des parties, à la révision d'une ou plusieurs clauses de la CONVENTION, une telle révision ne pouvant intervenir que d'un commun accord.

21.  Garantie par société mère

Les obligations des SOCIETES au titre de la CONVENTION sont garanties par les sociétés mères de leurs groupes respectifs, le cas échéant, conformément à des lettres de garantie dont un modèle est joint en annexe V à la CONVENTION.

Fait à Brazzaville, le 25 mai 1979

Pour la République Populaire
du Congo

Rodolphe Adada,
Ministre des Mines et de l'Energie

Pour Congolese Superior
Oil Company

Diego O. Giordano-Echegoyen
Vice-President

Pour Cities Service Congo
Petroleum Corporation

Antoine Saadi

Pour Société Nationale de
Recherches et d'Exploitation
Pétrolières "HYDRO-CONGO"

Alphonse M'Boudo-Nssa,
Directeur Général

Pour Canadian Superior
Oil Ltd.

Robert G. Schneider

GAR 00023

ANNEXE I

COPIE DU DECRET ACCORDANT LE PERMIS

GAR 00024

<u>ANNEXE I</u>

<u>COPIE DU DECRET ACCORDANT LE PERMIS</u>

GAR 00025

PRESIDENCE DE LA REPUBLIQUE                  REPUBLIQUE POPULAIRE DU CONGO
PRESIDENCE DU CONSEIL DES                       Travail + Démocratie + Paix
        MINISTRES                            -=-=-=-=-=-=-=-=-=-=-=-=-

                    DECRET N° 253  /  du 16 MAI 1979.

                    Attribuant à la Société HYDRO-CONGO un Permis de
                    recherche de type "A" pour hydrocarbures (dit
                    "Permis MARINE I").-

            LE PRESIDENT DU COMITE CENTRAL DU PARTI CONGOLAIS DU TRAVAIL
            PRESIDENT DE LA REPUBLIQUE, CHEF DE L'ETAT,
            PRESIDENT DU CONSEIL DES MINISTRES

        - Vu l'Acte n° 038/PCT/CC du 30 Mars 1979 portant fondement, organisa-
          tion et fonctionnement des Pouvoirs Publics ;
        - Vu le Décret n° 79/154 du 4 Avril 1979 portant nomination du Premier
          Ministre ;
        - Vu le Décret n° 79/155 du 4 Avril 1979 portant nomination des Membres
          du Conseil des Ministres ;
        - Vu la Loi n° 29/62 du 16 Juin 1962 portant Code Minier ;
        - Vu la Loi n° 31/62 du 16 Juin 1962 fixant les taux et règles de
          perception des droits sur les titres miniers ;
        - Vu la Loi n° 35/65 du 12 Août 1965 complétant les dispositions du
          Code Minier ;
        - Vu le Décret n° 62/247 du 17 Août 1962 déterminant certaines condi-
          tions d'application de la loi n° 29/62 susvisée ;
        - Vu l'Ordonnance n° 14/73 du 4 Juin 1973 portant création de la So-
          ciété Nationale Hydro-Congo ;
        - Vu le Décret n° 79/111 du 10 Mars 1979 accordant l'Autorisation
          Personnelle Minière à la Société Hydro-Congo ;
        - Vu la demande présentée par Hydro-Congo en date du 13 Janvier 1979
          sous le n° DRP/HC/538/252/ILJR/MM ;

            Le Conseil des Ministres entendu :

                        D E C R E T E :

Article 1er : Il est octroyé à la Société Hydro-Congo dans les conditions
prévues par le présent Décret un Permis de recherche de type "A" dit per-
mis "MARINE I" valable pour les hydrocarbures liquides et gazeux, sous le
n° RC 1-15 dont la surface, réputée égale à 1432 (mille quatre cent trente
deux) kilomètres carrés et représentée sur la carte jointe en annexe 1 au
présent Décret, est comprise à l'intérieur du périmètre défini par :

    1.a. Les droites joignant les points 1 et 2, 2 et 3, 3 et 4, 4 et 5,
5 et 6, 6 et 7, 7 et 8, 8 et 9, 9 et 10; ces droites étant réputées coïn-
cider avec la limite séparant le permis "MADINGO MARITIME (A)" renouvelé
et le permis "MARINE I".

                                                        .../...

                        GAR 00026

- 2 -

b. La droite joignant les points 10 et 11, cette droite étant réputée
   coincider en partie avec la limite séparant le permis "MADINGO MARITIME
   (A)" renouvelé et le permis "MARINE I", et en partie avec la limite
   séparant la concession "LOANGO EST" et le permis "MARINE I ".

c. Les droites joignant les points 11 et 12, 12 et 13, 13 et 14, 14 et 15,
   15 et 16, 16 et 17, ces droites étant réputées coincider avec la limite
   séparant la concession "LOANGO EST" et le permis "MARINE I".

d. Les droites joignant les points 17 et 18, 18 et 19, ces droites étant
   réputées coincider avec la limite séparant la concession "LOANGO OUEST"
   et le permis "MARINE I".

e. Les droites joignant les points 19 et 20, 20 et 21, 21 et 22, 22 et 23,
   23 et 24, 24 et 25, ces droites étant réputées coincider avec la limite
   séparant le permis " POINTE-NOIRE GRANDS FONDS (A)" renouvelé et le permis
   " MARINE I".

f. La droite joignant les points 25 et 26, cette droite étant réputée
   coincider avec la limite séparant le permis "MER PROFONDE" et le permis
   " MARINE I".

g. La droite joignant les points 26 et 1, c'est-à-dire une partie de la
   droite passant à l'intersection de la laisse de basse-mer avec la limite
   des territoires du Congo et du Gabon dans un   azimut  géographique de
   212 degrés, cette droite étant réputée coincider avec la limite des eaux
   respectivement sous juridiction du Congo et du Gabon.

2. Les points 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17,
   18, 19, 20, 21, 22, 23, 24, 25, et 26 qui sont définis comme suit :

   .... / ....

GAR 00027

| Points | Coordonnées Géographiques Ellipsoïde de Clarke 1880 | | Coordonnées U.T.M. (Clarke 1880) Fuseau 32-Ne : 9°E. | |
|---|---|---|---|---|
| | Longitude Est | Latitude Sud | Est | Nord |
| 1 | Point situé à 38 kms de la laisse de basse-mer sur la droite précédemment définie au paragraphe 1.g. ci-dessus. | | | |
| | 10°58'14"260 | 4°14'54"560 | 718.730 | 9.530.170 |
| 2 | 11°02'31"668 | 4°18'29"055 | 726.652 | 9.523.560 |
| 3 | 11°05'15"851 | 4°15'11"228 | 731.714 | 9.529.624 |
| 4 | 11°09'50"804 | 4°15'10"446 | 740.214 | 9.529.624 |
| 5 | 11°09'51"271 | 4°17'56"090 | 740.214 | 9.524.308,361 |
| 6 | 11°15'05"727 | 4°17'56"056 | 749.914 | 9.524.308,361 |
| 7 | 11°15'05"241 | 4°15'09"563 | 749.914 | 9.529.624 |
| 8 | 11°23'36"921 | 4°15'08"045 | 765.700 | 9.529.614 |
| 9 | 11°27'26"845 | 4°18'20"020 | 772.775 | 9.523.700 |
| 10 | 11°27'28"782 | 4°28'12"323 | 772.775 | 9.505.500 |
| 11 | 11°16'15"217 | 4°28'14"496 | 752.000 | 9.505.500 |
| 12 | 11°16'15"066 | 4°27'25"672 | 752.000 | 9.507.000 |
| 13 | 11°15'10"219 | 4°27'23"878 | 750.000 | 9.507.000 |
| 14 | 11°15'09"972 | 4°26'04"513 | 750.000 | 9.509.550 |
| 15 | 11°14'21"337 | 4°26'04"661 | 748.520 | 9.509.500 |
| 16 | 11°14'21"191 | 4°25'15"846 | 748.500 | 9.511.000 |
| 17 | 11°10'40"712 | 4°25'16"499 | 741.700 | 9.511.000 |
| 18 | 11°09'55"210 | 4°24'38"710 | 740.000 | 9.512.400 |
| 19 | 11°09'55"600 | 4°26'54"240 | 740.000 | 9.508.000 |
| 20 | 11°07'32"384 | 4°26'54"634 | 736.500 | 9.508.000 |
| 21 | 11°07'53"139 | 4°31'15"025 | 736.500 | 9.500.500 |
| 22 | 11°04'54"774 | 4°31'15"544 | 731.000 | 9.500.000 |
| 23 | 11°04'54"312 | 4°28'32"795 | 731.000 | 9.505.000 |
| 24 | 11°00'46"128 | 4°28'33"491 | 723.346.900 | 9.505.000 |
| 25 | Intersection du méridien de Longitude Est 11°00'46"944 et de la droite JK du Permis d'origine "POINTE NOIRE GRANDS FONDS" déterminée dans le Décret n° 68-270 M/CAETH du 17 Octobre 1968. | | | |
| 26 | Point situé à 65 kms de la laisse de basse-mer sur la droite précédemment définie au paragraphe 1:G. | | | |

.../...

Article 2 :

Le programme minimum de travaux à exécuter sur le permis de recherches visé à l'article 1 ci-dessus est défini en Annexe 2 au présent Décret.

Article 3 :

Hydro-Congo est autorisé à s'associer avec des sociétés signataires d'une Convention avec la République Populaire du Congo pour la mise en valeur du Permis de recherches visé à l'article 1 ci-dessus ainsi que des permis d'exploitation et de transport qui en découleront éventuellement.

Article 4 :

Le permis de recherches visé à l'article 1 ci-dessus pourra faire l'objet d'un renouvellement pour une durée de 5 ans dans les conditions prévues au Code Minier. Le programme minimum de travaux à exécuter au cours de la période initiale et de la période de renouvellement, ainsi que les réductions de la superficie du permis de recherches visé à l'article 1 ci-dessus, sont précisées dans l'Annexe 2 jointe au présent Décret.

Article 5 :

En cas de découverte d'un gisement exploitable sur la superficie du permis de recherches visé à l'article 1 ci-dessus, Hydro-Congo demandera un permis d'exploitation d'hydrocarbures, dont l'attribution est en ce cas de droit.

Chaque permis d'exploitation d'hydrocarbures est valable trente (30) ans. Le permis d'exploitation d'hydrocarbures ne fait pas l'objet de renouvellement.

Sur tous les points qui ne sont pas définis par le présent Décret, le ou les permis d'exploitation découlant du permis de recherches visé à l'article 1 sont régis par les dispositions du Code Minier relatives aux concessions.

Article 6 :

Les sous-traitants engagés par Hydro-Congo ou l'une des Sociétés auxquelles elle se sera associé devront se conformer aux dispositions applicables du Code Minier.

.../...