# EXHIBIT F



**International Chamber of Commerce**
*The world business organization*

International Court of Arbitration • Cour internationale d'arbitrage

> CERTIFIED A TRUE COPY
> ALLEN & OVERY
> DATED: 2 Oct 2000

# AWARD
# SENTENCE

Civil Action
No. 00-2987 (JR)

ICC International Court of Arbitration • Cour internationale d'arbitrage de la CCI

INTERNATIONAL COURT OF ARBITRATION

COUR INTERNATIONALE D'ARBITRAGE

FINAL AWARD

SENTENCE FINALE

CASE 10030/AC/DB

AFFAIRE 10030/AC/DB

WALKER INTERNATIONAL HOLDINGS LIMITED (British Virgin Islands)

vs/c

1. CAISSE CONGOLAISE D'AMORTISSEMENT (Republic of Congo)
2. REPUBLIQUE POPULAIRE DU CONGO (Republic of Congo)

This document is an original of the Final Award rendered in conformity with the Rules of the ICC International Court of Arbitration.

*****

Ce document est un original de la Sentence Finale rendue conformément au Règlement de la Cour Internationale d'Arbitrage de la CCI.

International Court of Arbitration

International Chamber of Commerce

AWARD

in the Arbitration Case

WALKER INTERNATIONAL HOLDINGS LIMITED

v/

1. CAISSE CONGOLAISE D'AMORTISSEMENT
2. REPUBLIQUE POPULAIRE DU CONGO

ICC Case 10030/AC/DB

# CONTENTS

|  |  |  | para. |
|---|---|---|---|
| Part I. | The Parties and the Dispute. | | |
| | A. | The Parties and the Arbitral Tribunal. | |
| | B. | The Convention de Rééchelonnement and the arbitral clause. | 1 – 3 |
| | C. | Introductory summary of facts, claims and defences of the Parties. | 4 – 12 |
| Part II. | The Arbitral Procedure. | | 13 – 19 |
| Part III. | The Decision of the Arbitral Tribunal. | | |
| | A. | The jurisdiction. | 20 – 24 |
| | B. | The applicable laws. | 25 – 33 |
| | C. | The purpose and content of the Convention de Rééchelonnement. | 34 – 44 |
| | D. | The purpose and content of the Assignment Agreement and its effects with respect to Respondents. | 45 – 53 |
| | E. | Conclusions. | 54 – 56 |
| Part IV. | The Award. | | 57 |

PART I.                The Parties and the Dispute.

A.    The Parties and the Arbitral Tribunal.

The Parties to the present Arbitration are:

- *Claimant*

WALKER INTERNATIONAL HOLDINGS LIMITED, a limited company incorporated in Tortola, British Virgin Islands
Craigmur Chambers, PO Box 71,
Road Town, Tortola, B. Virgin Islands

represented by:
John O'Conor and Kate Staples, Esq.
Allen & Overy
One New Change
London EC4M 9QQ, United Kingdom

and

- *Respondents*

1.    CAISSE CONGOLAISE D'AMORTISSEMENT,
      BP 2090,
      Brazzaville, Congo

2.    REPUBLIQUE POPULAIRE DU CONGO,
      BP 2090,
      Brazzaville, Congo

both represented by:
Jean-Pierre Vignaud, Jean-Yves Garaud and Thierry Leleu, Avocats à la Cour
Cleary, Gottlieb, Steen & Hamilton
41, avenue de Friedland
75008 Paris, France.

The Arbitral Tribunal consists of:

Prof. Avv. Andrea Giardina
Chiomenti Studio Legale,
Via Bertoloni 44/46, 00197 Rome, Italy

appointed as Sole Arbitrator by the International Court of Arbitration of the ICC at its session of 21st October 1998.

B.  The Convention de Rééchelonnement, the Assignment Agreement and the Arbitral Clause.

1. On 20th April 1988 the République Populaire du Congo (hereinafter "the République" or "the Republic") and the Caisse Congolaise d'Amortissement (hereinafter "the CCA") entered into a Convention de Rééchelonnement (hereinafter "the Convention") with the Italian company SADELMI COGEPI Spa (hereinafter "Sadelmi"). The Convention expressed to refinance and redenominate an existing debt owed by the République to Sadelmi with reference to the performance by Sadelmi of certain construction contracts for the République.

2. On 3rd November 1997 Sadelmi entered into an "Assignment Agreement" (*infra* para. 6) with Walker International Holdings Limited (hereinafter "Walker") by means of which the latter purchased all rights, title and interest on the "Debt" (*infra* para. 4) owed to Sadelmi by the République under the Convention.

3. Article 14 of the Convention entered into by the République, the CCA and Sadelmi contained the following arbitration clause:

"Article 14 - Attribution de compétence.
En cas de différend, les parties conviennent de se concerter afin d'aboutir à un règlement à l'amiable. Si un accord n'est pas intervenu dans un délai de soixante (60) jours à compter de la saisie de la partie défenderesse, le différend sera définitivement résolu selon la procédure de conciliation et d'arbitrage de la Chambre de Commerce Internationale, siégeant à Paris, qui tranchera le litige en dernier ressort."

C.  Introductory summary of facts, claims and defences of the Parties.

4. Under the Convention de Rééchelonnement, dated 20th April 1988, the République and CCA agreed to provide payment of the Debt due to Sadelmi, amounting to FF 100,428,443, in 14 six-monthly instalments starting 30th May 1989 (Article 3 of the Convention). Interest on each instalment was to be paid in 14 instalments parallel to the principal and calculated on the basis of the 6-month LIBOR rate increased by 1 point and 7/8 of a point. The aggregate amount due at the end of the rescheduling period (30th November 1995) by the République and CCA, composed of the principal Debt, interest and banking expenses, was FF 155,678,470.08.

5. The repayment instalments for the sums indicated above were represented by Promissory Notes subscribed by the CCA in favour of Sadelmi and guaranteed by the République. On due terms the Promissory Notes were presented in Milan but none of them has been paid. The Promissory Notes were protested and in relation to

them Notes of protest were issued (copies of the Notes and of the Notes of protest are annexed to the Request for Arbitration as Doc. 2, 3 and 4).

6. On 3rd November 1997, Walker International Holdings Limited entered into an Assignment Agreement with Sadelmi (Request for Arbitration, Doc. 5) according to which Walker purchased all of Sadelmi's rights, title and interest to the Debt. The Assignment Agreement was notified to the CCA as obligor and to the République as guarantor by the Joint Notice of Assignment dated 3rd November 1997 (Request for Arbitration, Doc. 6).

7. The Request for Arbitration was introduced by Claimant on 25th June 1998. Claimant alleges that Respondents have failed to pay any of the sums due under the Convention as evidenced by the 14 Promissory Notes relating to the principal amount of the Debt, the 14 Promissory Notes concerning interest and the Promissory Note concerning banking expenses. Therefore Claimant claims payment of an aggregate sum of FF 155,678,470.08 increased of contractual interest to be calculated pursuant to Article 4 of the Convention and costs (Request for Arbitration p.3 and Claimant Reply No. 1, p. 3).

8. Claimant alleges that the effect of the Assignment Agreement entered into by Sadelmi and Walker was to "sell, assign and transfer to Purchaser ... all of the Seller's rights and claims in and to net principal amount of FF 100,428,442 evidenced by the 14 principal Promissory Notes". According to Claimant this means that not only the Notes, but the rights and claims of Sadelmi to the Debt itself were expressly transferred to Walker. According to Claimant the assignability to Walker of Sadelmi's rights and claims to the Debt and the effects of the assignment in respect to CCA and the République are to be determined under Swiss law, which governs the Convention (Claimant Reply No. 1, p. 3 and attached *Legal Opinion* by Mr A. Molino).

9. Claimant rejects Respondents' allegation that the Promissory Notes transferred to Walker under the Assignment Agreement together with all Sadelmi's rights, are time barred on the day the present Arbitration has been commenced. Claimant stresses that the Promissory Notes were presented for payment on the appropriate dates in Milan and that the expiry of limitation period concerning the legal actions based on the Notes "would not affect the existence of the underlying debt (Claimant Reply No. 1, p. 2 and 4).

10. With the Mémoire en Réponse dated 29th October 1999 Respondents reject the request of Claimant and allege that, according to their interpretation of the Assignment Agreement, Sadelmi transferred to Walker not only its rights to the Debt, evidenced by the Promissory Notes, but also the entire Convention which was included in the Related Documentation, referred to in Article 1 (a) of the Assignment Agreement. In particular, Respondents affirm that the assignment which constitutes the object of the present Arbitration might be qualified either as *i)* assignment of a contract or *ii)* assignment of a credit (Mémoire en Réponse No. 2, p. 5).

11. If the Agreement qualifies as assignment of a contract - which is what Respondents allege - Swiss law, which is applicable to the Agreement, would require the express consent of the assigned debtor. Therefore, in consideration of the lack of consent by the debtor, Respondents object that the assignment was not validly operated.
Respondent also alleges that if the Agreement qualifies as assignment of a credit the consent of the assigned debtor would not be required. Accordingly the assignment of the credit, represented by the Promissory Notes transferred by Sadelmi to Walker pursuant to the Agreement, would be considered as validly operated.

12. In case the latter alternative is accepted, Respondents maintain that the Geneva Convention of 7th June 1930 containing Uniform Law on Promissory Notes, incorporated in the Swiss law governing the Convention, is therefore applicable. Article 70, para. 1 of said Convention states that: "Toutes actions résultant de la lettre de change contre l'accepteur se prescrivent par trois ans à compter de la date de l'échéance".
Respondents conclude that i) the Convention had not been validly transferred to Walker; and ii) as far as the claims concerning the Promissory Notes are concerned they are time barred with the sole exception of the last ones, which were due on 30th November 1995, for which, at the time the present Arbitration was introduced, the three years limitation period had not yet lapsed.

Part II.    The Arbitral Procedure.

13. The Terms of Reference were signed on 17th February, 1999 in Paris by the Arbitrator and Claimant. In consideration of the absence of Respondents, the Arbitral Tribunal sent them an original of the Terms of Reference duly signed by Arbitrator and Claimant. The Terms of Reference were approved by the ICC International Court of Arbitration in its session of 3rd March, 1999 pursuant to Article 18 (3) of the Rules.

14. In the Terms of Reference the issues to be determined by the Arbitral Tribunal were specified as follows:

    (a) Is the Arbitral Tribunal competent, according to Article 6.2 of the ICC Rules of Arbitration, in consideration of the absence of an answer by Respondents?

    (b) Which is the language of Arbitration?

    (c) Are the People's Republic of Congo and the Caisse Congolaise d'Amortissement responsible for the payment of the global sum of FF 155,678,470.08 at the 30th November 1995?

(d) What is the aggregate sum of interest due up to the issuance of the final award in the present Arbitration?

(e) Which interest is to be applied after the issuance of the arbitral award and up to actual payment?

(f) Is Walker International Holdings Limited entitled as a consequence of the Assignment Agreement entered into by the Claimant and SADELMI on 3rd November 1997 to receive all the payments due by the People's Republic of Congo and Caisse Congolaise d'Amortissement to SADELMI?

(g) Which is the law governing the assignment to Walker International Holdings Limited of the contractual rights of SADELMI in respect of People's Republic of Congo and Caisse Congolaise d'Amortissement?

15. According to Procedural Order No. 1, contained in the letter dated 14th May, 1999, the Arbitral Tribunal decided that the Arbitration would be conducted and the Award would be rendered in English, although the Parties were given the possibility to submit documents and memoranda and conduct oral hearings in French. Respondents had to submit their answer to Claimant's First Memorandum not later than 5th June, 1999. Claimant's Reply Memorandum was due before 20th July, 1999 and Respondents' rebuttal Memoranda before 5th September 1999. According to this schedule Claimant submitted to the Tribunal its First Memorandum, but there was no answer by Respondents. By letters dated 7th and 13th September 1999 the Tribunal convened a conclusive hearing on 5th October 1999.

16. By a letter of 29th September 1999 the Law Firm Cleary, Gottlieb, Steen & Hamilton informed the Tribunal that the République and the CCA had asked them to represent Respondents in the arbitral procedure. The representatives of Respondents requested that the oral hearing scheduled for 5th October 1999 be postponed.

17. In consideration of the above, with Procedural Order No. 2, dated 1st October 1999, the Tribunal decided, with the consent of the Parties, to postpone the conclusive hearing to a date to be determined. Furthermore a new timetable was provided for the submissions of the Parties. Respondents were allowed to submit a Memorandum on or before 1st November 1999 and the Reply of Claimant was due before 15th November 1999. The answer to such a Reply by Respondents had to be submitted seven days after this last submission. The linguistic regime of the Arbitration, fixed in Order No. 1, was maintained.

18. In compliance with the schedule described above, on 29th October 1999 Respondents submitted to the Tribunal their first Mémoire en Réponse. The Reply of Claimant was submitted on 15th November 1999 and the second Mémoire en Réponse by Respondents was addressed to the Tribunal on 22nd November 1999.

19. With the agreement of the Parties the Arbitral Tribunal fixed a Final Hearing on 4th February, 2000 at the ICC Headquarters in Paris. The Hearing was attended for

Claimant by Mr. John O'Conor, Ms. Kate Staples, Mr. Christopher Szostak, Mr. Andrea Molino and Ms. Karin Valenzano; for Respondents by Mr. Jean-Yves Garaud, Mr. Sacha Benichou, Ms. Delphine Michot, Mr. Olivier Bounkoulou and Ms. Armelle Obami-Itou.

On the basis of a common request of the Parties, in view of the negotiation of a settlement, the procedure was suspended for the period from 7th March to 31st May 2000.

Part III.    The Decision of the Arbitral Tribunal.

A.    The jurisdiction.

20. As reminded above (para. 13), Respondents did not take part in the initial phase of the procedure. After the Request for Arbitration and before the appointment of the Sole Arbitrator by the ICC Court and the transmission of the file to the Tribunal, Respondents had confined themselves to express preference for an arbitral tribunal composed of three members and for the use of French as the language of the procedure. The jurisdiction of the Tribunal to be constituted, however, had not then been contested.

21. When Respondents decided to take part in the procedure (Letter by Cleary, Gottlieb, Steen & Hamilton dated 29th September 1999) no mention was made of the procedural and substantive issues that they intended to raise before the Arbitral Tribunal. Subsequently, in the two submissions (Mémoire en Réponse dated 29th October 1999 and Mémoire en Réponse No. 2, dated 22nd November 1999) and in the related correspondence no challenge of the jurisdiction of the Arbitral Tribunal was made. This attitude was expressly confirmed by Respondents' representatives at the Final Hearing which took place on 4th February, 2000 in Paris.

22. The agreement of the Parties as to the competence of the Arbitral Tribunal is based on arguments which were briefly examined at the Final Hearing. It was considered that there are two possible interpretations of the assignment by Sadelmi to Walker, that of the assignment of the Convention in its entirety, and that of the assignment of the rights and claims to the Debt only. In case of transfer to Walker of the entire Convention, the compromissory clause contained in Article 14 is to be considered transferred to Walker with the Convention and this also in case of invalidity of the Agreement. This conclusion is based on the principle of the autonomous nature of the compromissory clause, admitted both in Swiss and English law, which renders the clause unaffected on grounds of invalidity and/or enforceability possibly referred to the transfer of the contractual relation in its entirety.

23. If the assignment given by Sadelmi to Walker is considered limited to the claims (rights, title and interest, as stated in the Assignment Agreement at Article 1 (a)) deriving for Sadelmi from the Convention, the arbitral clause is to be construed as one of the "privileges and ancillary rights [which] pass together with the claim" according to Article 170 of the Swiss Code of Obligations, applicable to the issue of transmission as is amply discussed below (cf. Mr. A. MOLINO's *First Legal Opinion* submitted by Claimant, on p. 4, and quoting the judgement of the Swiss Federal Tribunal dated 25th January, 1997 and Swiss literature such as M. GULDENER, *Schweizerisches Zivilprozessrecht*, 3rd ed. p. 264 and A. VON TUHR and A. ESCHER, *Allgemeiner Teil des Schweizerischen Obligationsrecht*, 3rd ed., p. 329 et seq).

24. Having evaluated the two possible constructions for founding its competence, and considering the agreement of the Parties in this respect, the Arbitral Tribunal affirms its competence and proceeds to examine the merits of the dispute.

B.   The applicable laws.

25. In order to decide the different substantive claims and answers of the Parties in respect of the assignment by Sadelmi to Walker and its consequences for the CCA and the République, the Arbitral Tribunal has to determine the applicable law to the different relationships which have to be considered to solve the dispute.

26. It is uncontested that the two contracts, the legal effects of which have to be determined, contain valid clauses on the choice of the applicable law. The Convention contains Article 15 *Droit Applicable* which is so drafted: "La présente Convention sera régie et interprétée conformément au droit suisse". There may have been various reason for such choice by an Italian party and two Congolese parties (choice of a law third in respect to the parties, a law having a given content and interpreted according to a well-established body of doctrine and judicial decisions). In any case the Arbitral Tribunal, in compliance with Article 17 of the ICC Rules of Arbitration presently in force (Terms of Reference, Article 10), considers to be bound to this express choice made by the Parties.

27. The Assignment Agreement executed by Sadelmi and Walker also contains under Article 11 (a) a choice of law clause which states: "This Agreement shall be governed and construed in accordance with English law". Therefore, also with regard to the Assignment Agreement, the Arbitral Tribunal considers to be bound, in compliance with Article 17 of the ICC Rules, by the selection expressly made by the Parties. The consequence of the two different express choices of law contained in the Convention and in the Assignment Agreement is that the two contracts are governed by different laws: the first by Swiss law, and the second by English law.

28. These clear and simple conclusions, imposed by the express will of the contracting Parties, are confirmed by the conflict rules of the two legal systems referred to by the

Parties. As to Swiss conflict of laws, the specific rule contained in Article 145 of LDIP (Private International Law Statute) states that "La cession contractuelle de créance est régie par le droit choisi par les parties ou à défaut de choix, par le droit applicable à la créance cédée; le choix fait par le cédant et le cessionnaire n'est pas opposable au débiteur sans son approbation" According to Mr. GUNTER's *Legal Opinion* on Swiss law submitted by Respondents, this means that, in the present case, given the absence of consent by the Obligors (CCA and the République) to the assignment, the relations between Assignor and Assignee are governed by English law, but the relations between the Obligors and the Obligee (Sadelmi) remain governed by Swiss law. According to this Legal Opinion, also the consent of the Obligors to the assignment falls within the scope of application of the law governing the assigned claim, i.e. Swiss law.

29. The same conclusion would be reached on the basis of the English conflict system. This system now incorporates the Rome 1980 Convention on the law applicable to contractual obligations. Article 12 of the Rome 1980 Convention contains a general rule according to which the mutual obligations of assignor and assignee of a right against another person ("the debtor") are governed by the law governing the assignment contract. Then Article 12 continues "the law governing the right to which the assignment relates determines the assignability, the relationship between the assignee and the debtor, the conditions under which the assignment can be invoked against the debtor and any question whether the debtor's obligations have been discharged". Cf. on this rule and its interpretation in English law: DICEY & MORRIS, *Conflict of Laws*, 13th ed. (L. Collins Gen. Ed.), London, 2000, p. 977 *et seq*.

30. The conclusion referred above is therefore common to Swiss and English conflict of laws and to the national conflict systems of all the European countries parties to the Rome Convention. According to this conclusion, the assignability of the claim and/or rights, the relationships between the assignee and the debtor, the conditions under which the assignment can be invoked against the debtor and the discharge by the obligor of its obligations remain submitted to the law governing the assigned claim. The Arbitral Tribunal shares this conclusion and in the case in question will submit all the above mentioned issues to Swiss law, which is the law governing the assigned claims and remains such owing to the lack of consent to the assignment by the obligors.

31. In view of the above results and bearing in mind the express choice of law made by the contracting Parties in the two contracts, the Arbitral Tribunal cannot share the construction suggested by Respondents with their Mémoire No. 2 of 22nd November 1999. According to this construction, because the Assignment Agreement is governed by English law, English law should also govern the preliminary question as to whether the Convention constitutes and represents a relationship between CCA and République on the one side and Sadelmi on the other side attributing mutual rights and duties to the Parties, or simply the acknowledgement and the rescheduling of the rights-claims pertaining to Sadelmi. In view of this approach Respondents

have submitted the *Legal Opinion* by R. Salter Q.C. on the construction of the Convention according to English law.

32. According to this Legal Opinion, the Convention would be considered a synallagmatic contract in case English law governs. The Tribunal does not deem it necessary to discuss the proposed construction and the objections raised by Claimant at the Final Hearing on the interpretation under English law that the Convention would impose synallagmatic duties on Sadelmi. The construction proposed by Respondents which consists in applying to a preliminary question the same substantive law governing the principal question, does not appear convincing to the Tribunal, in consideration of the conclusion generally accepted in this regard that the applicable law to a preliminary question is not to be determined simply on the basis of the substantive law governing the main question, but on the basis of the conflict rules of the *forum*, or on the basis of the conflict rules pertaining to the law applicable to the main question (*lex causae*). This alternative approach is, in particular, followed both in English law (cf. DICEY & MORRIS, *On the Conflict of Laws*, cit., at 45 *et seq.*) and in Swiss law (cf. BUCHER, *Droit international privé suisse*, t. I/2, Bâle, 1995, p. 252 *et seq.*).

33. In view of all above arguments and developments, the Arbitral Tribunal continues to consider itself bound to abide by the express choice of law contained in the Convention and will apply Swiss law to all the issues of interpretation and construction of the Convention, particularly to the issues of the assignability of the claim and the effects of the assignment in respect of the debtor. Consequently English law will be applied only to the issues of interpretation and application of the Assignment Agreement.

C. The purpose and content of the Convention de Rééchelonnement.

34. The Convention was entered into by the République represented by the Ministry of Planning and Finance, the CCA and Sadelmi on 20th April 1988. The purpose of the Convention was to refinance and redetermine an existing debt which the République owed to Sadelmi in respect of Sadelmi's performance of certain construction contracts for the République. It was agreed that payments would be made in a number of instalments of principal and interest as well as of banking expenses. The repayment instalments for the principal sum, interest and banking expenses were evidenced by Promissory Notes.

35. The Convention provided for the payment of instalments in the following manner:
    (a) Net principal amount of FFr 100,428,443 (the "Principal Sum") to be paid to Sadelmi in 14 six-monthly instalments.
    (b) Interest on each instalment of principal to be calculated on the basis of the 6 month LIBOR rate increased by 1 point and 7/8 of a point and to be paid in 14 parallel instalments of principal. The aggregate sum of such interest at 30th November 1995 was FFr 52,739,316.08 (the "Interest").