(c) Banking expenses of FFr 2,510,711 in connection with the Convention de Rééchelonnement ("Banking Expenses").

36. The Promissory Notes were duly presented in Milan (being the place of presentation specified on the face of the Notes) and protested there on the dates set out in the Schedule to the Request, as evidenced by Notes of Protest. The principal Notes and related Protest Notes, the Interest Notes and related Protest Notes, and the Expenses Note and related Protest Note are appended to the Request for Arbitration. None of the instalments of the Principal Sum, Interest and Banking Expenses has been paid.

37. Apart from the disagreement of the Parties on the issue of prescription which will be examined later (*infra* para. 42-44), it remains uncontested by Respondents that the global sum due by them to Sadelmi at the time the last Promissory Notes were due for payment on 30th November 1995, amounted to FFr 155,678,470.08. This global sum is formed by the addition of three different amounts: FFr 100,428,443.00 constituting the net principal amount of the Debt; FFr 52,739,316.08 constituting the interest for the delayed payment of the principal amount, and calculated according to Article 4 of the Convention; FFr 2,510,711 constituting banking expenses.

38. Walker claims that after 30th November 1995 all three amounts (principal, interest and expenses) due by Respondents at that date continue to produce interest in compliance with the calculation methods agreed upon in the Convention under Article 4 which reads as follows: "Le taux d'intérêt annuel applicable au paiement de la créance pendant chaque période sera égal au taux du LIBOR à six mois majoré de 1 point plus 7/8 de point ...". The sums claimed following this method of calculation have been indicated in the schedule appended to Claimant's Submissions dated 19th April 1999. The global amount claimed at such date is FFr 280,728,849.58.

39. Respondents have globally rejected the requests of Claimant and raised the preliminary objection of the time bar for the claims based on the Promissory Notes. In this context the Tribunal considers that the Request for Arbitration Claimant at Sec. C, 9, requested to be awarded interest on the sums due at 30th November 1995 "pursuant to Article 4 of the Rescheduling Agreement (or alternatively, at such rate that the Tribunal may deem to be just) and costs". Moreover the Tribunal takes note of the conclusion proposed by Claimant, and not contested by Respondents, that the interest for the period subsequent to 30th November 1995 is due as the Respondents were duly requested to pay this interest through the protest of the Notes, in compliance with the applicable Swiss Law (Art. 102 (2) C.O.). The same applies to the measure of the interest, calculated by both Parties in conformity with the methods agreed upon in Article 4 of the Convention. The Tribunal is satisfied with this conclusion common to the Parties and will apply to the issue of interest the criteria and methods fixed in Article 4 of the Convention.

40. However the methods and calculations proposed by Claimant in the appended schedule to the Submissions of 19th April 1999 do not appear to the Tribunal in conformity with Article 4 of the Convention which they pretend to implement.

Claimant proposes to apply the agreed rate of interest (the LIBOR at 6 months increased by 1 and 7/8 of a point) to all three segments of the amount due by Respondents on 30th November 1995: the net principal amount; the interest for delayed payment; the bank expenses (cf. *supra* para. 38). The Tribunal is of the opinion that a correct implementation of the criteria fixed in Article 4 brings to the conclusion that only the segment relating to the principal amount and that relating to the bank expenses can generate interest after 30th November 1995. Actually Article 4 establishes a duty to pay interest in respect to the Debt. The Debt is defined in Article 2 of the Convention as the net principal amount due (FFr 100,428,443). Interest on interest is not foreseen in Article 4 and therefore will not be awarded by the Tribunal on the sum (FFr 52,739,316.08) which was also due on 30th November 1995, but represented the interest agreed for the delayed payment up to that date. After 30th November 1995, when the last Promissory Notes was to be paid, interest will continue to be applied on the principal amount due but not on the sum representing the interest relating to the period preceding that date.

41. The banking expenses for FFr 2,510,711 represented by a Promissory Note having a payment date of 30th June 1988 (Convention, Article 8), but not paid and duly protested, are submitted by the Tribunal to the same interest regulation established by Article 4 for the Debt. However, because interest on this amount is requested by Claimant only for the time subsequent to the end of the rescheduling period, the Tribunal awards this interest starting from that moment (1 December 1995), at the agreed rate and until actual payment.

42. The Arbitral Tribunal finds it appropriate to examine here the defence raised by Respondents that the claims based on the Promissory Notes would be time barred, with the exception of the last ones, because the three-years period of prescription had lapsed at the time the Request for Arbitration was introduced.

43. The Tribunal cannot recognise to this defence the effects Respondents pretend. Even accepting that the claims based on the Promissory Notes could be time barred by virtue of the three-years limitation period provided for in the applicable Uniform Law on Promissory Notes (the 1930 Geneva Convention, incorporated into the applicable Swiss law, as well as into English, Italian and Congolese laws), the Tribunal finds that the claims by Sadelmi based on the substantive rights evidenced by the Notes have continued to exist, by virtue of their being submitted to the general limitation period of ten years established for ordinary credits by the applicable Swiss law. This conclusion is also based on the express will of the Parties set out in Article 11 of the Convention, where under the heading "Absence de novation" it is stated "Il est précisé, pour autant que de besoin, que la souscription des billets à ordre par la CCA n'opère pas novation. SADELMI conservera donc en toutes circonstances à l'égard de la République, les recours découlant de la créance faisant l'objet de la présente Convention.".

44. Accordingly, the proper construction of the Convention adopted by the Tribunal is that the existing substantive claims of Sadelmi against the République and CCA are incorporated, but not transformed into and substituted by the claims deriving from

the Promissory Notes. As stated in the Preamble of the Convention, at No. 6, "les parties ont convenu de regrouper la Dette sur Travaux et les sommes encore dues ..., en une seule et même dette". Similarly Article 2 of the Convention, under the heading "La créance" states: "SADELMI consent, et la République accepte à fusionner la Dette sur Travaux payable et les primes ... en une seule et même dette globale". The conclusion imposed by the above analysis and evaluation of the common will of the Parties to the Convention is that the existing substantive rights of Sadelmi are simply confirmed by the CCA as Obliger and by the République as Guarantor, and converted into French Francs at an agreed exchange rate. Accordingly, the Promissory Notes relating to the principal amount, interest and expenses simply represent the agreed amounts and schedule for the payment of the Debt. Therefore the possible prescription of the executive actions deriving from the Notes do not affect the substantive rights of Sadelmi in respect to the other two Parties to the Convention de Rééchelonnement, subsequently assigned to Walker.

D.   The purpose and content of the Assignment Agreement.

45. As stated in Section B. above, the purpose and content of the Assignment Agreement dated 3rd November 1997 through which Walker purchased all of Sadelmi's rights, title and interest to the Debt are to be determined in conformity with English law, applicable to the Agreement by virtue of the express choice of law made by the Parties in Article 11. However, the effects of the Assignment Agreement in respect to the Debt resulting from the Convention are to be determined according to Swiss law, applicable to the Convention by virtue of the express choice made by the Parties in its Article 15.

46. In view of the above distinction, the Tribunal will first proceed to determine the purpose and content of the Assignment Agreement and subsequently to establish the effects of the assignment of the Debt recognised and rescheduled in the Convention with respect to the Debtors.

47. With the Assignment Agreement "the Seller [Sadelmi] sells, assigns and transfers absolutely and unconditionally to Purchaser [Walker International Holdings] all of Seller's rights, title and interest in and to the Debt and the Related Documentation ....". In this regard the issue disputed between the Parties relates to the purpose and content of the Assignment Agreement. Claimant maintains that the Agreement simply provides assignment of the rights, title and interest of Sadelmi under the Convention; Respondents object that the Parties to the Agreement intended to assign the entire Convention, establishing a complex series of rights and obligations for all three contracting Parties, namely the République, the CCA and Sadelmi.

48. This issue is relevant in the present Arbitration because of the distinction between assignment of claims and assignment of obligations provided for in the Swiss Code

of Obligations which governs the Convention and, consequently, the effects of the assignment of the Debt rescheduled in the Convention in respect to the Debtors.

49. The Arbitral Tribunal is satisfied with the conclusion that the Assignment Agreement has transferred to Walker only "rights, title and interest" rescheduled for Sadelmi in the Convention. The Assignment Agreement does not pretend to transfer to Walker the entire Convention. As clarified during the Final Hearing, what has been formally transferred to Walker with the Agreement are the "rights to the Debt and the Related Documentation" (Article 1 (a)). Exhibit B appended to the Agreement contains at No. 1 a "Description of the Debt" and at No. 2 an indication of the "Related Documentation".

50. The "Debt" is defined as the aggregate principal amount of FFr 100,428,443 evidenced in 14 Notes, the related interest also evidenced in 14 Notes and the expenses as evidenced in a single additional Note. Subsequently, in No. 2 of the same Exhibit B the "Related Documentation" is defined as the originals of all the Notes evidencing the Debt, an original of the Convention, as well as other documents not relevant in the present context. The Arbitral Tribunal finds that the object of the assignment are the rights and claims to the Debt and not the Convention. The Tribunal rejects the argument raised by Respondents at the Final Hearing that the inclusion of an original of the Convention in the Related Documentation mentioned in Exhibit B referred to above implies that the intention of the Parties to the Agreement was the assignment also of the Convention in its entirety. The object of the assignment consists in simply the rights to the Debt and the transmission of the originals of the Notes and the Convention does not mean an additional transfer of other possible substantive rights and duties, but only the transfer of the documents evidencing the Debt for information purposes, thus permitting to the assignee to actually exercise its rights in respect to all other possible interested parties, especially the Debtor and the Guarantor. In view of the above, the Tribunal concludes that the transfer of the rights to the related documentation cannot be interpreted as a transfer of the entire Convention to the assignee.

51. This conclusion appears to the Tribunal as confirmed by the form of the "Joint Notice" of the Assignment appended to the Agreement as Exhibit D), where it is stated that Sadelmi has "assigned to Walker International Holdings Limited <u>all of its rights and claims to the Debt</u>" [emphasis added]. Nowhere in the notice it is stated that the Convention was assigned to Walker.

52. The Notice which was actually notified to the CCA and the République (Annex No. 6 to the Request for Arbitration) was formulated in terms identical to those foreseen and appended to the Agreement. As it was clarified at the Hearing, the reason for the Notice of the assignment to Debtor and Guarantor is not the sort of invitation to these two Parties to express their consent to the assignment, in view of permitting the transfer of the entire Convention. The Notice had the more limited function that can be inferred from Article 167 of the Swiss Code of Obligations which states that the obligor will be considered as validly discharged of its payment obligations if it

pays in good faith to the former obligee before having been notified of the assignment. The Notice had the only task of indicating to Debtor and Guarantor in the Convention that they had to address their future payments to Walker and not to Sadelmi and that the payment to Sadelmi after the Notice would not represent a valid discharge of the Debt. Actually, with the Notice, the Parties to the Assignment Agreement simply requested that the CCA, as Obligor, "acknowledge and register "Walker" as legal holder of all rights and the claims under [the] Debt.".

53. In this context it appears appropriate to the Arbitral Tribunal to stress an additional element which can be deducted from the clause on "Severability" contained in Article 9 of the Assignment Agreement. According to this clause any possible invalidity and/or unenforceability of a provision of the Agreement shall not affect the validity and/or enforceability of any other provision of the Agreement. With regard to the point at issue, this clause has the effect that in the case the scope of the assignment would not be limited to the rights and claims to the Debt, and extended to the entire Convention, then the invalidity and/or unenforceability of the transfer of the Convention (due to the absence of consent on the part of the debtor and guarantor required by Swiss law) would leave unaffected the validity and/or enforceability of the assignment of the rights and claims to the Debt (which under Swiss law, does not require any consent on the part of debtor and guarantor).

E.   Conclusions.

54. In consideration of the results reached in the Sections A, B, C and D above, the Tribunal finds that the Assignment Agreement executed between Sadelmi and Walker intended, and actually produced, the assignment of the rights and claims to the Debt of which Sadelmi was the legal owner according to the Convention. The assignment, valid and enforceable under English law, which is applicable to it, also complies with the requirements necessary according to Swiss law for a valid and enforceable transfer of rights and claims to the assignee (Walker).

55. Therefore, Walker is entitled to obtain from Respondents, the CCA as Obligor and the République du Congo as Guarantor, the payment of the principal amount of the Debt, the interest and expenses in an amount identical to the one that is determined by the Arbitral Tribunal in favour of Sadelmi according to the Convention (cf. *supra* para. 37). In addition, Walker is entitled to the payment of simple interest on the principal amount due by Respondents and on the banking expenses at the agreed rate, up to actual payment (cf. *supra* para. 40-41).

56. In the Request for Arbitration, at Section C, Claimant requests that the "costs" be charged to Respondents; this request is reiterated in the subsequent Submissions. Respondents request that all claims by Claimant be rejected (Mémoires of 29th October and 22nd November 1999). The Arbitral Tribunal, in compliance with Article

31 of the ICC Arbitration Rules, and in view of the decision adopted on the merits of the dispute and the attitude of the Parties in the course of the procedure, considers appropriate that the costs of the arbitration will be borne by Respondents and that each Party will bear the costs of its own legal defence.

Part IV.    The Award.

57. As a consequence of the foregoing, the Arbitral Tribunal declares and awards as follows:

(1) The Arbitral Tribunal has jurisdiction to decide the claim presented by Walker International Holdings against the Caisse Congolaise d'Amortissement and the République Populaire du Congo.

(2) The claim by Walker International Holdings is not time-barred.

(3) The Caisse Congolaise d'Amortissement (as Obligor) and the République (as Guarantor) are ordered to pay to Walker International Holdings the sum of FFr 155,678,470.08 as due at the end of the rescheduling period on 30th November 1995, and composed of: a) the net principal amount of the Debt for FFr 100,428,443; b) the interest on that amount at the agreed rate, for FFr 52,739,316.08; c) the banking expenses for FFr 2,510,711.

(4) In addition, the CCA (as Obligor) and the République (as Guarantor) are to pay simple interest to Walker International Holdings relating to the principal amount of the Debt (FFr 100,428,443) for the period starting 1st December 1995 until actual payment at the agreed rate of Libor at six months for the FFr, increased by 1 and 7/8 of a point (Convention de Rééchelonnement, Art. 4).
The CCA (as Obligor) and the République (as Guarantor) are to pay simple interest to Walker International Holdings also in relation to the banking expenses (FFr. 2,510,711) at the same agreed rate, starting on 1st December 1995, until actual payment.

(5) The costs of the present Arbitration, fixed by the ICC International Court of Arbitration at USD 150.000, are to be borne by the CCA (as Obligor) and the République (as Guarantor). As Walker International Holdings has paid such costs in advance, the CCA (as Obligor) and the République (as Guarantor) are ordered to reimburse them to Walker International Holdings;

(6) Each Party shall bear the expenses of its own legal defence in the procedure.

Done in Paris on 20th July, 2000

The Sole Arbitrator

(Andrea Giardina)